IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

|  |  |
|---|---|
| JACK J. GRYNBERG, GRYNBERG PRODUCTION CORPORATION (TX), GRYNBERG PRODUCTION CORPORATION (CO) and PRICASPIAN DEVELOPMENT CORPORATION (TX), | ) ) ) ) ) |
| Serve: Prentice Point, Suite 500, 5299 DTC Blvd., Greenwood Village, CO 80111 | ) ) |
|  | ) |
| Plaintiffs, | ) ) |
|  | ) |
| v. | ) ) |
|  | ) |
| BP P.L.C., a United Kingdom corporation d/b/a BP CORP NORTH AMERICA INC., an Indiana corporation, | ) ) |
| Serve: The Prentice Hall Corp. Systems, Inc. 251 East Ohio Street, Suite 500, Indianapolis, IN 46204 | ) ) |
|  | ) |
| STATOILHYDRO ASA, a Norwegian corporation, | ) |
| Serve at: Forusbeen 50, N-4035 Stavanger, Norway; Corporation Service Company, 50 Weston St., Hartford, Connecticut 06120 | ) ) ) |
|  | ) |
| BG GROUP P.L.C., a United Kingdom corporation | ) |
| Serve at: 100 Thames Valley Park Drive, Reading Berkshire, England | ) ) |
|  | ) |
| d/b/a BG NORTH AMERICA, LLC, a Texas corporation, | ) |
| Serve at: CT Corporation Systems, 350 N. St. Paul Street, Dallas, TX 75201 USA | ) ) |
|  | ) |
| JOHN BROWNE, | ) |
| Serve at : Lansdowne House, 57 Berkley Square, London, W1J6ER, United Kingdom | ) ) |
|  | ) |
| ANTHONY HAYWARD, | ) |
| Serve at:  1 St. James Place, London, SW1Y4PD, United Kingdom, | ) ) |
|  | ) |
| PETER SUTHERLAND, | ) |
| Serve at:  1 St. James Place, London, SW1Y4PD, United Kingdom | ) ) |
|  | ) |

|  |  |  |
|---|---|---|
| HELGE LUND, | ) | |
|   Serve at : N-4035 Stavanger, Norway | ) | |
| | ) | |
| EIVIND REITEN, | ) | |
|   Serve at :  3783 Kragerø skjærgårdsrute, Norway, | ) | |
| Drammensveien 264 0283 Oslo, Norway | ) | |
| | ) | |
| ROBERT WILSON, | ) | |
|   Serve at :  100 Thames Valley Park Drive, Reading | ) | |
| Berkshire, RG6.1PT, England | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FRANK CHAPMAN, | ) | NO. |
|   Serve at : 100 Thames Valley Park Drive, Reading | ) | |
| Berkshire, RG6.1PT, England | | |

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

## VERIFIED COMPLAINT AND JURY DEMAND

COME NOW the Plaintiffs, Jack J. Grynberg ("Grynberg"), Grynberg Production Corporation, a Texas corporation ("GPC Texas"), Grynberg Production Corporation, a Colorado corporation ("GPC Colorado") and Pricaspian Development Corporation, a Texas corporation ("PDC"), collectively, the "Grynberg Plaintiffs," through their undersigned counsel and for their Complaint against Defendants B.P. P.L.C. ("BP"), BP Corp North America Inc., StatoilHydro ASA ("StatoilHydro"), John Browne ("Browne"), Anthony Hayward ("Hayward"), Peter Sutherland ("Sutherland"), Helge Lund ("Lund"), British Gas ("BG") and Eivind Reiten ("Reiten"), respectfully allege as follows:

## INTRODUCTION

Plaintiffs in this action seek to recover from Defendants Plaintiffs' proportionate share of bribes charged unwillingly and unknowingly to Plaintiffs and paid to foreign nationals to secure various oil rights from joint ventures in which Plaintiffs have an interest. Plaintiffs also seek

multiple damages based on the RICO act and other collateral damages.

## I.     THE PARTIES AND JURISDICTION

1.     Grynberg is a 76-year old individual who is a resident of Arapahoe County, State of Colorado. At all times material to this Complaint, Grynberg has been a registered professional engineer licensed in the States of Colorado, Texas, Oklahoma and South Dakota. At all times material to this Complaint, Grynberg also has been the President of GPC Texas, GPC Colorado and PDC, and has acted for each of these three corporations within the scope of his executive authority.

2.     In the last 34 years, Grynberg has participated in the drilling of 552 new wells in the United States, of which 335, or 60%, have been determined to be commercially productive oil and/or natural gas wells. During the same time period Grynberg has participated in the drilling of 425 wells internationally of which 96.05% have been determined to be commercially productive oil and/or natural gas wells. Currently, Grynberg operates approximately 27 oil and natural gas producing properties in Colorado, Louisiana, New Mexico, Oklahoma, and Wyoming. In addition to the Grynberg-operated properties, Grynberg owns interests in over 100 producing properties comprising more than 800 oil and natural gas wells throughout the USA and overseas.

3.     GPC Texas is a Texas corporation that maintains its principal place of business in Arapahoe County, State of Colorado.

4.     GPC Colorado is a Colorado corporation that maintains its principal place of business in Arapahoe County, State of Colorado.

5.     PDC is a Texas corporation that maintains its principal place of business in Arapahoe County, State of Colorado.

6.     BP does business in the United States as BP Corp North America Inc., (formerly

BP Amoco Corp.), an Indiana corporation, and is incorporated under the laws of England and Wales and maintains its North American headquarters in Chicago, Illinois. BP is the holding company of the world's second largest petroleum and petrochemicals groups. BP's main activities are, exploration, development and production of crude oil and natural gas; refining, marketing, supply, transportation, distribution, and manufacturing and marketing of petrochemicals. BP has operations in Europe, North and South America, Australia, Africa, Asia and the former Soviet Union.

7.    StatoilHydro, formerly Statoil ASA (Statoil), does business in the United States, is incorporated under the laws of Norway and maintains its North American headquarters in Connecticut. StatoilHydro's main activities are, exploration, development and production of crude oil and natural gas; refining, marketing, supply, transportation, distribution, and manufacturing and marketing of petrochemicals. StatoilHydro has operations in Europe, North and South America, Australia, Africa, Asia and the former Soviet Union.

8.    BG does business in the United States by selling shares on the New York Stock Exchange. BG conducts operations in the United States through its wholly-owned subsidiary, BG North America, LLC, in Houston, Texas and elsewhere. BG is a United Kingdom corporation located in Reading, England. BG has operations in Europe, North and South America, Australia, Africa, Asia and the former Soviet Union.

9.    At all times material to this Complaint, and beginning in 1997, Sutherland was the Chairman of BP and of BP Exploration (Caspian Sea) Ltd. and BP Exploration Operating Company Ltd. Sutherland is a former Attorney General of the Irish Republic and is also the current Chairman of Goldman Sachs International in London and New York. On information and belief Sutherland is a resident of London, England.

10.    At all times material to this Complaint, until May of 2007, Browne was CEO of

BP (formerly British Petroleum) and of BP Exploration (Caspian Sea) Ltd., and BP Exploration

Operating Company Ltd. ("BPX"), and resident of London, England.

11.     Beginning May 1, 2007, Hayward became CEO of BP, BP Exploration and BPX,

with offices in London, England.

12.     Lund is current President and CEO of StatoilHydro, and, on information and

belief, is a resident of Stavanger, Norway.

13.     Reiten is a previous President and CEO of StatoilHydro, and, on information and

belief, is a resident of Stavanger, Norway.

14.     At all times material to this Complaint, Wilson was and is the Chairman of BG.

Wilson is a resident of United Kingdom.

15.     At all times material to this Complaint, Chapman was and is the CEO of BG.

Chapman is a resident of United Kingdom.

16.     Sullivan & Cromwell, LLP ("S&C"), a New York limited liability partnership,

and Emmitt Marvin and Martin, LLP ("EM&M"), a New York limited liability partnership, are

attorneys and agents who are not named as Defendants herein.

17.     James H. Giffen is a co-conspirator who is not named as a Defendant herein.

Giffen has been charged with, inter alia, conspiracy to commit wire fraud and mail fraud, and to

violate the Foreign Corrupt Practices Act and United States income tax evasion.  Giffen is at the

center of the wide-ranging conspiracy to bribe top officials from the Government of Kazakhstan

and to cover up those bribes and is currently free under a $10,000,000.00 bond while awaiting

trial in New York.  The Defendants named herein have played a substantial role in covering up

and/ or participating in this conspiracy.

18.     This Court has appropriate jurisdiction over this action pursuant to 28 U.S.C. §

1332, as the amount in controversy exceeds $75,000.00 and the action is brought by citizens of

this country against the Defendants listed, both jointly and severally.  The Court also has federal question jurisdiction as to the RICO claims, with ancillary jurisdiction over the state claims.

19.    Venue is appropriate pursuant to 28 U.S.C. § 1391(d).

20.    At all times material hereto, actions taking place outside the United States were directed at residents and citizens of the United States, causing a "direct effect" in the United States, as explained more fully below.

## II.    GENERAL ALLEGATIONS

### Introduction

21.    Plaintiff Jack J. Grynberg ("Grynberg") at present lives and works in the State of Colorado, County of Arapahoe, and is president and chief operating officer of Grynberg Petroleum Company and Pricaspian Development Corporation. Mr. Grynberg graduated from the Colorado School of Mines in 1952 with his first engineering degree. Since 1953, Grynberg has worked as a petroleum, geophysical and petrophysical engineer in the exploration, development, production and delivery to the market of oil and natural gas both in the United States and overseas. Grynberg's resume is attached as Exhibit 1.

22.    This is a case about Statoil's, BP's and BG's role -- and the role of its executive leadership – in a massive scheme involving illegal bribes paid to various top officials of the Government of Kazakhstan by several oil companies, and the scheme to cover up those bribes from public disclosure through a series of misrepresentations.  There have been many victims of these bribes and their cover up – beginning with the People of Kazakhstan who have been denied their right to the benefits of the resources extracted from their land and the right to the honest services of their governmental officials of the bribes and the cover-up.  The Grynberg Plaintiffs are another group of victims.

23.    The Grynberg Plaintiffs comprise a small petroleum exploration, development

and production consortium, who have engaged in honest and fully transparent business dealings in Kazakhstan and elsewhere since the late 1980's.  Plaintiffs contracted with larger oil companies to help them explore and develop Kazakhstan's vast oil and natural gas potential. But some of the larger oil companies cut their own deal with the Kazakhstan Government to squeeze the Grynberg Plaintiffs out of Kazakhstan, using the Grynberg Plaintiffs' confidential, proprietary, and extremely valuable, geological and geophysical information.  Settlement agreements were ultimately reached between Plaintiffs and the larger companies, whereby the larger companies bore express duties to account for net profits in the Pricaspian Sedimentary Basin of offshore and onshore northwestern Kazakhstan, also known as the Area of Mutual Interest ("AMI"), and pay Plaintiffs a portion of those net profits, and implied duties to engage honest business practices including transparent accounting and refraining from foreign corrupt practices.

24.    This lawsuit arises from the Grynberg Plaintiffs' discovery that Defendants have engaged in criminal bribery schemes, and in attempting to cover up those bribes, have lied to the Plaintiffs, withheld evidence, with trickery have attempted to force Plaintiffs, without their knowledge, consent or approval, to pay a portion of those illegal bribes out of the profits that the corporate Plaintiffs should have shared in, thereby harming Plaintiffs' hard-earned and well-justified reputation as a crusader against bribery and other corruption within the petroleum industry.

25.    Grynberg has a long history of resisting and exposing the corruption in the petroleum industry. In April of 1995, Grynberg filed a series of False Claims Act *qui tam* lawsuits in his capacity as a Realtor for the United States and Native Americans, including Civ. No. 95-725 (TFH), District Court, District of Columbia, U.S. *ex rel*. Jack J. Grynberg v. Alaska Pipeline Co. *et al*., and Case No. 1999MDL1293, U.S. District Court, Casper, Wyoming, Natural

Gas Royalties *Qui Tam* Litigation. Both were filed in accordance with the False Claims Act, 18 U.S.C. § 3729 *et seq*. In all, Grynberg has expended in excess of twenty million dollars ($20,000,000.00) on attorney's fees, court costs and expenses.

26.    The above mentioned *qui tam* lawsuits, against 66 and subsequently enlarged to 305 corporate Defendants in the natural gas industry, challenged the mismeasurement of the volume and wrongful analysis of the heating content of natural gas causing substantial underpayments of royalties to the United States and Native Americans. Grynberg's lawsuits allege that those Defendants are responsible for under-measuring the volume and wrongly analyzing the heating content of natural gas produced from mineral property interests owned by the United States and Native Americans, and artificially inflating net-back charges using improper valuation and transactions with non-arm's length affiliates, to reduce royalties owed to the United States and to Native Americans.

27.    The consolidated *qui tam* actions are currently before the U.S. Tenth Circuit Court of Appeals. Several "copy-cat" *qui tam* actions against the oil and natural gas industry have been filed by other whistleblowers and are progressing through the courts as well.

28.    The Congress is scheduled to debate a measure to adopt the approach urged by Grynberg in these actions in H.R. 435 which would write into law the analysis ensuring fair and accurate measurement of the volume of condensate and heating content of natural gas argued for in Grynberg's *qui tam* litigation. H.R. 435 is currently before the Subcommittee on Energy and Mineral Resources and is scheduled to be debated in the Subcommittee in March, 2008.

29.    Mr. Grynberg speaks, reads and writes fluent Russian, and was a scientific analyst in the United States Army Research and Development Command working on Soviet radioactive warfare in 1956-57.

### Discovery of the Vast Caspian Potential

30.    Plaintiffs hereby incorporate by reference the Affidavit of Jack J. Grynberg, filed under seal along with this Complaint.

31.    Plaintiffs Grynberg, GPC Texas, GPC Colorado, and more recently, PDC, have engaged in the international petroleum exploration, development and production for over forty (40) years.

32.    In the late-1980's Grynberg, using his knowledge of Russian, personally began establishing relationships with key individuals and decision makers in the oil, natural gas and mineral exploration and production industries in the former Soviet Union, including the satellite states of Eastern Europe, and the future Caspian Sea republics, including and especially Kazakhstan.

33.    Beginning late 1989 and early 1990, as the Soviet Union began showing signs of possible collapse or decentralization, Plaintiffs funneled substantial time, money and effort into gathering and developing geophysical, geological and economic data concerning Kazakhstan's petroleum fields, its prospects and potential areas for oil and natural gas exploration, development, production, and exploitation, both onshore and offshore in the adjacent Caspian Sea, referred to as the AMI.

34.    In November of 1990, in a meeting in Almaty, the capital of Kazakhstan, at a private dinner in the dacha [country home] of now President Nursultan Abishevich Nazarbayev, who at the time was still the First Secretary of the Communist Party of Kazakhstan, Secretary Nazarbayev showed Mr. Grynberg a file of statistical information presented to him by one James Giffen, who flew in from Moscow a few days before and informed Secretary Nazarbayev that he, Giffen, can get much more money for him than anybody else in the world, provided that he is given authority by Secretary Nazarbayev to negotiate with international oil companies to get that

money in exchange for Kazakhstan offshore and onshore oil and natural gas concessions. Secretary Nazarbayev told Grynberg that same evening that Giffen's representation to him consisted of money to be obtained from BP, BG, Total, Shell, ENI, and others, and the representation that he, Giffen, is the man who can do it because of his experience in representing various American companies in the Soviet Union for the past several years.

35.    Grynberg recognized that to fully exploit his data-gathering, contact-building and economic and geological analyses competitively, he would need access to massive financial backing, to build upon the unique, proprietary and highly valuable, confidential information concerning the largely up-to-now, untapped greater Caspian Sea potential, also known as the Greater Pricaspian Sedimentary Basin.

36.    The Grynberg Plaintiffs therefore moved quickly to find potential partners with significant capital, complementary technology and appropriate markets, to aid the Grynberg Plaintiffs in exploiting this unique, proprietary and highly valuable, confidential information. Two companies which expressed the earliest interest in joining the Grynberg Plaintiffs were BP Exploration Operating Company Ltd. ("BPX") and the British Gas Group ("BG"). The Grynberg Plaintiffs, BG and BPX quickly formed ventures as fully described in the accompanying Affidavit of Jack J. Grynberg (submitted under seal) that is incorporated herewith. Suffice it to say that the Grynberg Plaintiffs were entitled under these co-venturing agreements to a substantial share of any proceeds.

37.    In June of 1993, BPX joined the Kazakhstancaspiishelf ("KCS") consortium, a partnership with the Kazakhstan Government. KCS would be redesignated, in 1997, as the Offshore Kazakhstan International Operating Company ("OKIOC") by which it is currently known.

38.    At this time, 1993, BPX's interest in GKOF was also being split into a sub-joint

venture with Statoil (2/3 BPX and 1/3 Statoil).

39.    In 1999 the BPX/Statoil joint venture dissolved, and BPX assigned to Statoil one-third (⅓) of its interest in the GKOF oil and natural gas reserves.

40.    In or about June of 2001, BPX and Statoil entered an agreement to sell their entitlement to the recoverable oil and natural gas reserves in GKOF to all the other members of OKIOC. That sale closed in May of 2002 (the "2002 Sale"). The 2002 Sale conveying BPX's and Statoil's respective share of petroleum reserves in GKOF triggered an obligation for BPX and Statoil to make additional payments to the Grynberg Plaintiffs.

41.    BPX has been mentioned in connection with violations of the Foreign Corrupt Practices Act in Azerbaijan, another country bordering the Caspian Sea. After being terminated abruptly as CEO of BP in May, 2007 Defendant Browne was implicated by a high-level BP employee in a multi-million dollar criminal bribery scheme to unlawfully influence Azerbaijani government officials in a pattern similar to the unlawful activities uncovered by the United States Department of Justice ("DOJ") in Kazakhstan. Les Abrahams, who led BP's successful bid for the Azerbaijan Concession, recently stated publicly that line item expenditures on BP's books were not always what they seemed. For example, an £8 million payment to SOCAR, Azerbaijan's state-owned oil company, for the right to use a construction yard on the Caspian Sea was a cover for bribes to top Azerbaijani Government officials. Furthermore, the £45 million for first year costs in Baku (capital of Azerbaijan), covered up £5 million in direct bribes to "key local figures in Baku." *Quoted from* Our Man In Baku; Les Abrahams with Nicholas Monson; *as reported by* Glen Owen, Hookers, Spies, Cases Full Of Dollars…How BP Spent £45m To Win 'Wild East' Oil Rights; UK Daily Mail; May 13, 2007. See Exhibit 2.

42.    On a somewhat related front, Statoil, on October 11, 2006, entered into a Deferred Prosecution Agreement with the United State Department of Justice ("DOJ"), paying a

penalty of $10.5 million for violations of the Foreign Corrupt Practices Prevention Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3, 78ff, as to Iranian government petroleum officials. Moreover, following the recent merger of Statoil ASA with Norsk Hydro ASA, and fearing violation of the October, 2006 Deferred Prosecution Agreement, the President and CEO of StatoilHydro, Eivind Reiten, resigned on October 5, 2007 after admitting the concealment of illegal payments to Libyan Government petroleum officials, between 1999 and 2001 (when he was President and CEO of NorskHydro), from the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime. StatoilHydro recently hired the U.S. law firm of S&C to manage its internal investigation, simultaneously with its defense of BP.  Moreover, in May of 2007, the DOJ cooperating with Swiss authorities confiscated some $84 million previously held in Swiss bank accounts owned by several top Kazakhstan government officials connected with GKOF licensing and operations, which the DOJ had previously frozen with assistance of the Swiss criminal authorities. These monies were earmarked by the DOJ as having been paid on behalf of Western oil and gas companies in securing the very contracts at issue in the Arbitration. Given the BPX/Statoil 1/7th interest, BPX bore its proportionate share of $8 million and Statoil $4 million of those illegal "expenses", which were deducted illegally and must therefore be restored *pro rata* to the Plaintiffs.

43.     Defendant Browne, in addition, was found guilty of perjury by a High Court in the United Kingdom and declared a felon in or about the spring of 2007 in an unrelated matter. Simultaneously, he has been implicated for his direct role in many unreported, illegal and almost certain to eventually be found criminal payments to overseas government officials as described above.

44.     Defendant Browne is commonly referred to as a "murderer" in Texas City, Texas

for unilaterally revoking 25% of the maintenance costs of the local BP Texas City Refinery which was yielding $1.6 billion yearly profits to BP. This cancellation of maintenance resulted in an explosion that killed 17 workers and injured 170 more as a result of an explosion at the refinery on March 23, 2005. See Exhibit 3.

45.     James H. Giffen ("Giffen") was the principal and CEO of Mercator Corporation ("Mercator"), a New York corporation owned by Mr. Giffen, who had been advising the Republic of Kazakhstan throughout the 1990's and early 2000's in connection with various transactions related to the sale by Kazakhstan of portions of its oil and natural gas wealth.

46.     On March 30, 2003, Giffen was arrested at Newark Airport attempting to flee the United States, served with a criminal grand jury indictment, and is now awaiting trial after posting $10,000,000.00 bail, in U.S. v. Giffen, 03-MJ-663, S.D.N.Y. (March 2003). See Exhibit 4. Giffen was notorious for his part of a scheme to pay off high Kazakh government officials to smooth the way for the original KCS Concession Agreement and subsequent Kazakh Government approval for the BPX/Statoil assignment of its interests to other OKIOC Concessionaires. No payment to Giffen, by any person engaged in GKOF activities, could have been for other than criminally-tainted purposes.

47.     The Defendants BP/Statoil and BG paid their share, amounting to at least 1/7th of $84 million or $12 million of the illicit bribes attributed to Giffen's activities with respect to GKOF.

48.     One prominent American oil company, Chevron, which did not participate in OKIOC consortium appears to be the exception that proves the rule. Chevron did not pay the $40 million "entrance fee," as it has been confided by a confidential source to Plaintiff Grynberg, precisely because it was seen as an illegal bribery. Plaintiff Grynberg has signed a verification of this Complaint to confirm this information.

49.     The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3, 78ff, the

Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952, and Engaging in Monetary

Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957, not only bar this

type of conduct directly but at the same time compel both the corporate Plaintiffs and Jack J.

Grynberg to take independent action to disassociate themselves, in their contractual capacity,

from these illegal acts by the BPX/Statoil, BG, and the individual defendants.  As a forced and

innocent victim in the payment of approximately $40,500,000.00 of illegal payments to foreign

government officials (a percentage of which was charged to Plaintiffs), failure to take the

necessary steps to seek immediate return of these funds and disavowal in such practices might

potentially expose Plaintiffs to risk and costs associated with the ongoing DOJ criminal

investigations against each of the oil and gas company Defendants.

50.     Following Giffen's criminal indictment, Grynberg sought to obtain information

concerning the details of Giffen's arrangements with various oil companies within Kazakhstan,

including BP, Statoil, BG, ENI and Chevron, both informally and in the context of settlement

negotiations.  Defendants have asserted attorney-client privileged information, trade

secrets, contractual obligations or proprietary information for BP/Statoil and BG. or

other consortium members and ultimately demanding the return of documents,

which, more likely than not, establish unlawful, potentially criminal conduct.

Defendants will also seek to use the confidentiality agreement from the Arbitration

to shield information and documents relating to their activity.  Plaintiffs have

nevertheless uncovered documentary evidence that at least $500,000 has been paid by BP to

Giffen for so-called "expenses" believed to constitute illegal bribe payments.  Defendants

BP/Statoil, moreover, have classified approximately $40 million in unspecified

expenses as "production sharing fees," while BG has denied Plaintiffs access to

audit its books where similar hidden, so-called "production sharing fees" are to be found. Standard international production sharing contracts pay production sharing fees only from actual petroleum production and not before any oil and natural gas production begins. The so-called "production sharing fees" of approximately $40 million are, more likely than not, illegal bribe payments. Given Defendants' intransigence and misuse of confidentiality provisions, the corporate Plaintiffs and Jack J. Grynberg are compelled to take independent action, through this Complaint and to the extent confidential as detailed in the Affidavit of Jack J. Grynberg (filed under seal).

## BG's Role in the Scheme

51.    Much like BP, in the early 1990's BG expressed a strong interest in working with Mr. Grynberg in the exploration, development and production of the potentially vast petroleum resources of the Pricaspian Basin both onshore and offshore northwest in Kazakhstan. Grynberg proved to BG the existence of specific and concrete, yet either undiscovered and/or undeveloped, petroleum deposits within Kazakhstan, including what Mr. Grynberg called Tashigali Offshore, now known as the Offshore Greater Kashagan Fields, and the Onshore Karachaganak Field. The Karachaganak deposit was contaminated by an unsuccessful underground nuclear explosion to create a massive underground cavern to store molten sulfur byproduct. Before further oil and natural gas development Karachaganak had to be decontaminated. This information was a great Soviet state secret which Grynberg uncovered and conveyed to BG in May, 1990 during a joint visit to Disneyland, California with top Kazakhstan Government officials. Subsequently, Grynberg entered into a letter agreement with BG, on or about

August 14, 1990 which was similar in form to the June 7, 1990 BP agreement. The Grynberg/BG agreement, *inter alia,* created a joint venture by and between BG and Grynberg with respect to the exploration, development and production of the onshore and offshore Pricaspian Basin, specifically the geographic area defined by the agreement as the AMI; provided Grynberg with a carried twenty percent (20%) net profits interest in any successful oil and natural gas venture within the AMI in which BG participated; provided for the confidential supply and exchange of very valuable technical and proprietary, geologic and geophysical information; and obligated BG to negotiate a consortium agreement with other western oil and natural gas companies that entered into similar agreements with Grynberg.

51.    Much like BP, BG ultimately did business in Kazakhstan in violation of its agreement with the Grynberg Plaintiffs, and settled litigation with Grynberg that required BG to provide a percentage of its net profits in the AMI, and to fully account for the same.

52.    In or about November of 1997, BG, entered into a Production Sharing Agreement ("PSA") with Kazakhstan in connection with the giant Karachaganak oil and natural gas field.  As part of the transaction, the oil companies agreed to pay (along with its 50% partner) $17 million into a Swiss escrow account, purportedly for the purpose of paying the fees of certain, so-called "advisors" for Kazakhstan in connection with the transaction. This payment is highly questionable and has been hidden by BG. It is probably a violation of both the Travel Act and Foreign Corrupt Practices Act, and their British equivalents.

53.    In September 2006, in Washington, D.C. after a festive dinner

in honor of President of Kazakhstan, his Excellency Nursultan Abishuly Nazarbayev, to which Mr. Grynberg was invited, Mr. Grynberg had a long chat with a top executive of ENI, a 50/50 partner of BG in the giant Karachaganak Field. Mr. Grynberg was instrumental in finalizing the existence of the Karachaganak Field and brought BG into the Karachaganak Field venture. BG subsequently brought in ENI as a 50% partner. This ENI senior executive informed Mr. Grynberg with a wink in his eye that BG and ENI made a so-called $100,000,000.00 "loan" in 1993 to Kazakh officials to affirm the award of the Karachaganak Field. Thus, here is another $50,000,000.00 bribe by BG that was hidden, in violation of the Travel Act and Foreign Corrupt Practices Act, and their British equivalents.

54.    The Grynberg Plaintiffs have been in arbitration in Calgary, Canada with BG relating to the proper allocation of profits on the Karachaganak and Kashagan Fields. The issue of illegal payments raised in this complaint are not subject to, and fall outside that arbitration.

55.    In summary, Defendant BG has included Grynberg in at least 15% of the following bribes:

| | | | |
|---|---|---|---|
| $50,000,000 .............. | "Karachaganak Loan" | @ 15% = | **$ 7,500,000** |
| 40,000,000 ................ | "Production Sharing Agreement fees" @ 15% = | | **6,000,000** |
| 17,000,000 ........... | "Swiss Escrow Account" | 15% of 50% = | **1,185,000** |
| | | | **$ 14,685,000.** |

### Predicate Acts

56.    Predicate acts of the conspiracy include those listed at Paragraphs 65, 66, 69, 71, 75, 77 and 81 of the attached Indictment, which is expressly incorporated herein.    These

predicate acts sound in bribery, money laundering, Travel Act violations, mail fraud, and wire fraud. Specifically, the predicate acts include without limitation.

- On or about May 4, 1998, Defendants and other co-conspirators including Giffen caused $5 million to be transferred to an account controlled personally by a Senior Kazakh official. Giffen Indictment ¶ 65(DD);

-  On or about May 4, 1998, Defendants and other co-conspirators including Giffen caused $2.5 million to be transferred to an account controlled personally by a Senior Kazakh official, who's identity is not presently known, but who is a different official than the official referred to in the preceding bullet point. Giffen Indictment ¶ 65(EE);

- On or about June 29, 1998, Defendants and other co-conspirators including Giffen caused approximately $350,000 to be transferred to Giffen and an account controlled personally by a Senior Kazakh official. Giffen Indictment ¶65(FF);

- On or about  July 9, 1998, Defendants and other co-conspirators including Giffen caused approximately $150,000 to be transferred to Giffen and an account controlled personally by a Senior Kazakh official;  Giffen Indictment ¶ 65 (ff).

 Each of these acts constitute illegal wire fraud. See 18 U.S.C. Sections 1343 and 1346. Moreover, on information and belief, additional predicate acts arose in the subsequent cover up, and sound in tax fraud (for reporting the bribes as legitimate expenses and therefore paying less in income taxes), and mail/wire fraud (for deliberately misrepresenting the nature of the bribery payments to Plaintiffs). Details concerning subsequent suspected predicate acts are confidential and are included in the accompanying Affidavit of Jack J. Grynberg (filed under seal).

### III.    CLAIMS FOR RELIEF

### COUNT 1 – VIOLATION OF RICO § 1962(a)

57.    Plaintiffs incorporate paragraphs 1-56, including the attached indictment and

Affidavit of Jack J. Grynberg (filed under seal), as if fully set forth herein.

58.     The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1962(c), states,

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1961(1), states,

> "racketeering activity" means[…] (B) any act which is indictable under any of the following provisions of title 18, United States Code: (…)section 1952 (relating to racketeering) (…)section 1957 (relating engaging in monetary transactions in property derived from specified unlawful activity)[.]

59.     The section commonly known as the "Travel Act," 18 U.S.C. § 1952(a), states:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to[…] (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[…] (A) shall be fined under this title, imprisoned not more than 5 years, or both[….] (b) as used in this section (i) "unlawful activity" means (3) any act which is indictable[…] under section 1956 or 1957 of this title[.]

60.     That portion of the "Money Laundering Control Act of 1986" found in 18 U.S.C.

§ 1957(a), states:

> Whoever[…] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity, shall be punished as provided in subsection (b).

18 U.S.C. § 1957(f) states:

> (1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title, but such

term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution;

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the term "specified unlawful activity" has the meaning given that term in section 1956 of this title.

61.    That portion of the "Money Laundering Control Act of 1986" found in 18 U.S.C.

§ 1956(c), states:

As used in this section--

(1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

(2) the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

(3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

(4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

(5) the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities

or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

(6) the term "financial institution" includes--

(A) any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated there under; and

(B) any foreign bank, as defined in section 1 of the International Banking Act of 1978 (12 U.S.C. 3101);

(7) the term "specified unlawful activity" means--

(A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

(B) with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--

(iii) fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)); [FN2]

(iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official[.]

62.    "'Pattern of racketeering activity' means engaging in "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]" 18 U.S.C. § 1961(5). "'Enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). "Person" means any individual or entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3).

63.    As set forth in the indictment, Giffen, his unnamed co-conspirator who assisted

with the banking and money laundering portions of the scheme, and Mercator, constituted a continuing RICO enterprise since approximately 1993.

64.    Giffen and Mercator are "persons" as defined under section 1961(3). Section 1962(a) states:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

65.    Defendants diverted income from Plaintiffs through a pattern of racketeering activity through the aforementioned predicate acts resulting in substantial losses to Plaintiffs, and accrual to Defendants BP/Statoil, of at least $6,075,000.00 and BG Defendants of at least $14,685,000.00, totaling $20,760,000.00. See Paras. 21-23 and 28-30 of the Affidavit of Jack J. Grynberg (filed under seal). Defendants have, in turn, used this racketeering income in furtherance of improper efforts to cover up their scheme so that Plaintiffs, taxing authorities and criminal justice authorities cannot uncover it and to pay their law firms to conceal these facts with frivolous claims of confidentiality .

66.    As a direct and proximate result of Defendants' diversion and investment of racketeering income, Plaintiffs have suffered damages in the amount in excess of $6,075,000.00. The total amounts legitimately owed by BPX/Statoil and BG to the corporate Plaintiffs evade precise calculation because of Defendants' continuing lack of cooperation and wrongful withholding and hiding of pertinent information. This amount should be trebled after trial.

## COUNT II – VIOLATION OF RICO CONSPIRACY § 1962(d)

67.    Plaintiffs incorporate each of the allegations contained in Paragraphs 1-66 of this Complaint, including the attached indictment and Affidavit of Jack J. Grynberg (filed under seal), as if set forth in full here.

68.    Pursuant to the illegal scheme, Defendants conspired amongst themselves and with others to violate section 1962(a).

69.    Defendants knowingly agreed among themselves to commit or participate in at least two Predicate Acts in furtherance of their conspiracy.

70.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have suffered damages in the amount in excess of $6,075,000.00.  The total amounts legitimately owed by BPX/Statoil and BG to the corporate Plaintiffs evade precise calculation because of Defendants' continuing lack of cooperation and wrongful withholding and hiding of pertinent information, This amount should be trebled after trial.

## COUNT III – COMMON LAW FRAUD

71.    Plaintiffs incorporate each of the allegations contained in Paragraphs 1-70 of this Complaint, including the attached Affidavit of Jack J. Grynberg (filed under seal), as if set forth in full here.

72.    No privilege or confidentiality applies to information relating to illegal acts, including bribery and diversion of funds. Active hiding of a felony is not privileged.

73.    Defendants' knowing false representations and material omissions were made and/or concealed by Defendants for the purpose of misleading Plaintiffs and others.

74.    As a direct and proximate consequence and result of Defendants' misconduct, misleading conduct and misdeeds, Defendants have perpetrated substantial fraud and deceit upon Plaintiffs, as well as upon the United States Government and its laws.

## COUNT IV – THEFT/CONVERSION

75.     Plaintiffs incorporate each of the allegations contained in Paragraphs 1-62 of this Complaint, including the Affidavit of Jack J. Grynberg (filed under seal), as if set forth in full here.

76.     The Plaintiffs allege they are entitled to full recovery under Colorado's Rights in Stolen Property statute. C.R.S. § 18-43-405.

77.     Section 18-43-405, C.R.S., provides all property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property. The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property.  In any such action, the owner may recover two hundred dollars or three times the amount of actual damages sustained by him, whichever is greater, and he may also recover costs of the action and reasonable attorney fees.

78.     Here, the totality of the facts and circumstances support Plaintiffs' contention that by their actions these Defendants have unlawfully converted and stolen Plaintiffs' share of consortium proceeds in an amount to be determined at trial.

## COUNT V – FALSE LIGHT

79.     Plaintiffs incorporate each of the allegations contained in Paragraphs 1-78 of this Complaint, including the Affidavit of Jack J. Grynberg (filed under seal), as if set forth in full here.

80.     The fabricated "administrative costs" were in reality bribe payments.

81.     The United States Government is actively investigating the circumstances of Mr. Giffen's bribery scheme and payments made between Giffen and others.  On information and belief, the Government is investigating the possible participation of American petroleum companies, and of foreign petroleum companies doing business in the U.S., in making bribe

payments to individual senior officials of the Republic of Kazakhstan.

82. Defendants' payment of the bribes was published to all consortium members among others, some of whom are *qui tam* defendants in the action described in Paras. 22 et seq. above. And the United States Government is reasonably likely to uncover this payment as well and that discovery will lead to public association of the Plaintiffs with the bribery scheme. Following the money, the aforementioned entities either have uncovered or are likely to uncover that Plaintiffs have been associated with paying out some of the bribe money.

83. While special damages need not be alleged, Plaintiffs' role as a *qui tam* Realtor and their laborious efforts for more transparency, better governance, and a stronger FCPA are extremely well-documented, and his reputation is damaged by the false portrayal in an amount to be determined at trial but believed to be at least $10 million.

## COUNT VI – CONSTRUCTIVE TRUST

84. Plaintiffs incorporate each of the allegations contained in Paragraphs 1-83 of this Complaint, including the Affidavit of Jack J. Grynberg (filed under seal), as if set forth in full here.

85. By virtue of settlement agreements that relied on Defendants' good faith accounting of profits, Defendants were placed in a position of trust and fiduciary duty vis-à-vis the Plaintiff. But Defendants have refused to accurately report their income by providing misleading information as to the illegal payments, and have not provided Plaintiffs the opportunity to do a full audit as to such payments.

86. As a result, Defendants have an equitable duty to fully account for its profits, expenses and any illegal payments. The Court should place a constructive trust over profits wrongfully diverted and illegal payments made by Defendants.

## IV.  <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

## V.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants, jointly and severally, for compensatory, special, consequential and incidental monetary damages sufficient to fully compensate Plaintiffs for their damages, losses and injuries.  Plaintiffs further respectfully pray that they be awarded appropriate treble damages on the RICO claims, and punitive damages for common law fraud and false light. Finally, Plaintiffs respectfully pray that they be awarded pre-judgment interest, moratory interest, post-judgment interest, costs, reasonable attorneys' fees and such other and further relief as may be equitable and just under the circumstances.

Dated: February ___, 2008.

Respectfully submitted,

_____

DC LAW FIRM

Daniel L. Abrams
2 Penn Plaza, Suite 1910
New York, New York 10121
Telephone: (212) 292-5663
Facsimile: (646) 536-8905

Samuel Z. Yahn
5399 DTC Boulevard, Suite 500
Greenwood Village, Colorado 80111
Telephone: (303) 850-7490
Facsimile: (303) 850-7498

STATE OF COLORADO          )
                           ) ss.
COUNTY OF ARAPAHOE   )


I, JACK J. GRYNBERG, being first duly sworn, state under oath that I have read the foregoing VERIFIED COMPLAINT AND JURY DEMAND, and that the statements contained therein are true and correct.



_____


        Subscribed and sworn to before me this _____ day of _____ 2008 by Jack J. Grynberg.


_____
Notary Public


My commission expires:

# **Exhibit 1**

**RESUME OF JACK J. GRYNBERG**

**(June, 2007)**

## EDUCATION

Colorado School of Mines
Professional Degrees:

1/1950-5/1952  Master of Engineering* (Petroleum Refining
(Chemical) Engineer)

8/1952-5/1953  Completed Graduate Studies for a Doctor of
Science in Geophysical Engineering except thesis

1/1959-5/1959  Master of Engineering* (Professional Degree
as Petroleum (Production) Engineer)

5/1976  Honorary Degree and Distinguished Achievement
Medal in the Field of Mineral Engineering

3/1976-3/1981  Member Board of Trustees, Colorado School of
Mines, Golden, Colorado

*Formerly Professional Engineer's Degree

## REGISTERED PROFESSIONAL ENGINEER

Active and in Good Standing
Colorado          - Registration No. 29586
Oklahoma          - Registration No.  3663
South Dakota      - Registration No.  5581
Texas             - Registration No. 14578

## PROFESSIONAL EXPERIENCE

2006-Present    Chairman of Superior Energy Company

2005-Present    President /CEO of GADECO, LLC

1996 (Jan) -    Chairman, President & CEO
   Present      RSM Production Corporation

1990-Present    Founder and Partner in a number of oil &
                gas and gold ventures in the former
                Soviet Union

1988-Present    Active in international oil and natural gas and gold
                exploration and development in the former
                Soviet Union, Middle East, Africa, Far East
                and Latin America.

| 1985-Present | President/CEO, Grynberg Production Corporation |
|---|---|
| 1980-Present | Chairman/CEO, Transworld Resources Corporation |
| 1962-Present | Independent Oil, Gas, and Mineral Operator, U.S.A. Domestic operations within the continental United States with oil and gas production and exploration in California, Colorado, Louisiana, Michigan, Mississippi, South Dakota, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah and Wyoming. |
| 1954-Present | President/CEO, Grynberg Petroleum Company and its predecessor, Jack Grynberg and Associates |
| 1976-1982 | President/CEO, Olympic Uranium Company. Uranium exploration and development, U.S.A. |
| 1974-1981 | Founder, Chairman, and CEO, Universal Drilling Company and Universal Drilling Services, Inc., a six-rig drilling contractor with 10,000 to 22,000-foot rigs. Companies sold in 1981. |
| 1974-1981 | President/CEO, Universal Drilling S.A., Panama |
| 1973-1974 | President of Hess Exploration Company (affiliate of Amerada Hess) and beneficiary of 20% credited interest |
| 1969-1976 | Founder and Principal Stockholder (76%), Chairman, President and Chief Executive Officer of Oceanic Exploration Company, a public company whose stock is traded over-the-counter. The company is engaged in off-shore and onshore oil, gas and mineral exploration and production in the following areas outside the continental United States: British North Sea, Dutch North Sea, Cameroon, Greece, Madagascar, Malaysia, Nicaragua, Peru, Timor and Taiwan. Company sold in 1981. |
| 1954-1962 | Partner (60%-owner) in Pirson-Grynberg Associates. Through this partnership with Dr. Sylvain J. Pirson, jointly conducted two-week intensive well log interpretation and four-week advanced reservoir engineering courses in the U.S.A. (Austin, Texas and Denver, Colorado), Canada, Venezuela, England, France, Italy and the Middle East. |
| 1954-1962 | Owner, Jack Grynberg and Associates, consulting petroleum, petrophysical, geological and geophysical engineers. |

| 1953-1954 | Research Engineer, Research and Development Department, Continental Oil Company, Ponca City, Oklahoma. |

## PROFESSIONAL ATTAINMENTS, APPOINTMENTS & MEMBERSHIPS

Patent Holder:
United States Patent #4,492,862 - January 8, 1985
"Method and Apparatus for Analyzing Components of Hydrocarbon Gases Recovered from Oil, Natural Gas and Coal Drilling Operations"
Invented by: Jack J. Grynberg, Leonard Y. Nelson and Stephen E. Moody

Appointments:
Appointed by Colorado Governor Richard Lamm to the Board of Trustees, Colorado School of Mines, March 1975 to March 1981
Appointed to the International Board of Advisors, Gubkin State Oil and Gas University, Moscow, Russia-1992
Appointed to the Presidential Council, Colorado School of Mines, 1989-Present
Committee on Nuclear and Alternative Energy Systems of the National Academy of Sciences and National Academy of Engineering -- Presidential Appointments by President Gerald Ford (1974-1976) and President Jimmy Carter (1976-1980)
Appointed by President Bill Clinton to panel consisting of chief executives of American oil and gas companies to represent the American oil and gas industry in the Russian Republic in order to enhance American-Russian oil and gas joint ventures - 1994

Speaking Invitations:
Speaker at the 6th African United Nations Oil & Gas, Trade & Finance Conference in Douala, Cameroon in October of 2002.
Represented the U.S. Department of Energy and U.S. Department of Commerce at the 7th African United Nations Oil & Gas, Trade & Finance Conference in Luanda, Angola and made a presentation on behalf of the U.S. Government in May of 2003.
Speaker at the African Petroleum Forum in March of 2004 in London, England.
Speaker at 8th African United Nations Oil & Gas, Trade & Finance Conference in Marrakech, Morocco in April of 2004.
Speaker at the 10th Annual Latin Oil & Gas 2004 Conference in June of 2004 in Rio de Janeiro, Brazil.
Speaker at the African Petroleum Forum April 14 and April 15, 2005 in Houston, Texas.
Speaker at the African Energy Forum 2005, June 22 – June 24 in Barcelona, Spain.
Speaker at the Upstream Oil & Gas Summit at Amelia, Island, Florida, February 5 – 7, 2006. Topic "Effective Strategies to Deal with the top Challenges of Remote Supply Markets."
Speaker & Chairman of a Gas21 Session at the Africa Energy Forum 2006, Lille, France 28-30 June, 2006. Topic "The Gas Potential of Africa".
Speaker at Tribal (American Indian) Energy in the Southwest Conference 11-12, December, 2006.

|  | Speaker & Chairman of a Gas21 Session at the Africa Energy Forum 2007, Hamburg, Germany 27-29 June, 2007. |
| Memberships: | National Society of Professional Engineers |
|  | Society of Exploration Geophysicists (SEG) |
|  | American Association of Petroleum Geologists (AAPG) |
|  | American Institute of Mining and Engineers (AIME) |
|  | Society of Petroleum Engineers (SPE) |
|  | Association of International Petroleum Negotiators |
|  | European Society of Exploration Geophysicists (ESEG)* |
|  | Rocky Mountain Association of Geologists (RMAG) |
|  | American Petroleum Institute (API)* |
|  | Member Board of Trustees, Colorado Energy Research Institute, March 1975 to March 1981 |
|  | Honorary Consul, Republic of Panama, 1974-1986 |
|  | Member, Uranium Subpanel of Supply and Delivery Panel, |

**\*Member Emeritus**

## PUBLICATIONS

"Induction Log Departure Curves for No Invasion" (Oil Base Mud or  Air)
      By:  Jack J. Grynberg - 1953

"The Microlog - Its Application and Interpretation"
      By:  Jack J. Grynberg and Leendert de Witte - 1954

"Quantitative Electric Log Interpretation of "D" and "J" Sands–Denver Basin"
      By:  Jack J. Grynberg - 1956

"The Continuous Dipmeter"
      Articles in April 1 and 22, 1957, The Oil and Gas Journal
      By:  Jack J. Grynberg and Morris I. Ettinger

"Log Interpretation Charts"
      By:  Sylvain J. Pirson and Jack J. Grynberg - 1958

"Selected Well Logging Problems for Geologists and Petroleum Engineers"
      By:  Sylvain J. Pirson and Jack J. Grynberg - 1958

"DST - Success or Failure?"
      Article in June 22, 1959, The Oil and Gas Journal
      By:  Jack J. Grynberg

"Log Interpretation Manual Number 2"
 Supplement-A-Ri-Rt Conversion Charts
      Based on Lectures by Jack J. Grynberg and Sylvain J. Pirson - 1960
"Handbook of Well Log Analysis"
      McGraw-Hill - 1964
      Based on Lectures by Sylvain J. Pirson and Jack J. Grynberg

"Application of Water Resistivity Data"

By: Jack J. Grynberg and B.L. Carlberg - 1974

Study of Nuclear and Alternative Energy Systems
Supporting Paper 1 - 1978
"Problems of U.S. Uranium Resources and Supply to the Year 2010"
     By: The National Research Council, The National Academy of  Science
     By: Leon T. Silver, Jack J. Grynberg, David S. Robertson, Joseph B. Rosenbaum
        and Arnold J. Silverman

Study of Nuclear and Alternative Energy Systems
"U.S. Energy Supply Prospects to 2010" - 1979
     By: The National Research Council, National Academy of Science
     By: Jack J. Grynberg and others.

## LANGUAGES

English, French, German, Polish, Russian, Hebrew

## MILITARY SERVICE

U.S. Army Corps of Engineers; U.S. Army Research and
Development Command, Soviet Radioactive Warfare Section, and
Worked as a scientific spy 1956-1957
Honorable discharge

## PERSONAL

U.S. Citizen, born January 21, 1932, Brest, Poland
Married June, 1959, to Celeste C. Bachove; three
adult children and 3 grandchildren

# Exhibit 2

**GrynPetro**

**From:**     Rachel Grynberg [rgrynberg@mac.com]
**Sent:**     Monday, June 04, 2007 12:08 AM
**To:**        Gene Webb; Wendy Stryker; Ronald Minkoff; j.grynberg@grynberg.com; r.jatko@grynberg.com
**Subject:** this is very interesting

## BP executives working for Lord Browne spent millions of pounds on champagne-fuelled sex parties to help secure lucrative international oil contracts.

## The company also worked with MI6 to help bring about changes in foreign governments, according to an astonishing account of life inside the oil giant.

Les Abrahams, who led BP's successful bid for a multi-million-pound deal with one of the former Soviet republics, today claims that Browne - who was forced to resign as chief executive last month after the collapse of legal proceedings against The Mail on Sunday - presided over an "anything goes" regime of sexual licence, spying and financial sweeteners.

High life: Mr Abrahams, left, and another BP executive not linked to any impropriety with local girls in Azerbaijan

He also claims that Home Secretary John Reid was arrested at gunpoint on a BP-funded foreign trip for being out on the streets after a military curfew had been imposed.

Mr Abrahams tells how he spent £45 million in expenses over just four months of negotiations with Azerbaijan's state oil company.

Armed with a no-limit company credit card, he ordered supplies of champagne and caviar to be flown on company jets into the boomtown capital, Baku, to be consumed at the "sex parties".

Ex-BP boss Lord Browne
The hospitality continued in London, where prostitutes were hired on the BP credit card to entertain visiting Azerbaijanis.

Mr Abrahams, an engineer by training, joined BP in 1991, just as the disintegration of the Soviet Union had triggered a "new gold rush" by oil multi-nationals seeking a share of the 200 billion barrels of oil reserves beneath the Caspian Sea.

While employed by BP, Mr Abrahams says he was persuaded to work for MI6 by John Scarlett, now head of the service but then its head of station in Moscow.

He says he was passing information to Scarlett in faxes and at one-to-one meetings in the Russian capital.

He also claims that BP was working closely with MI6 at the highest levels to help it to win business in the region and influence the political complexion of governments.

Mr Abrahams worked for BP's XFI unit - Exploring Frontiers International - which specialises in opening new markets in often unstable parts of the world.

He said Lord Browne, then BP's head of exploration, allocated a budget of £45 million to cover the first year's costs of the Baku operation.

5/2007

"The order came from Browne's aides to 'get them anything they want'.

"By 'them', they meant local officials in Azerbaijan," Mr Abrahams said.

"There were 20 or 30 people working on it at BP head office, and we soon had a steady stream of executives coming over as negotiators. We got through the money in just four months - after which it was simply increased without question."

He described a Wild West world in which oil executives with briefcases full of dollars rubbed shoulders with mafia members, prostitutes and fixers and cut their deals in smoke-filled back rooms.

"The BP officials would come out to Baku in groups of five or six, every week," he said.

"Sometimes I would charter an entire Boeing 757 to carry as few as seven staff. Their main base was the hard currency bar of the old Intourist hotel - so named because it accepted only dollars and was only open to foreigners.

"It was full of prostitutes and many of us, including me, used them on a regular basis, although we quickly established they all worked for the KGB.

"If we went back to the rooms, not only were they bugged, but the girls would quiz us closely about what we were doing and where we were going, and reported straight back to their handlers.

"Everywhere was bugged, and all the phones were tapped. One of our executives was recorded saying unflattering things about the president, and his comments were played back to us in a meeting with local state oil company officials.

"We were then told clearly that he was no longer welcome in the country."

Mr Abrahams helped to forge links with the local officials by throwing lavish parties. He said the Azerbaijani girls who worked in the BP office, which occupied a floor of the Sovietskaya hotel, would attend the parties and routinely provide "sexual favours".

They were also presumed to work for the local intelligence services.

"There was one girl, called Natasha, assigned to teach us Russian, but it usually ended up as more that that. She would use the intimate opportunity to ask us questions about what we were up to.

"Caviar and champagne were consumed at the parties, which would start in the bars but inevitably end with the girls in the rooms.

"We had a company American Express card with no name on it which we could use to draw out £10,000 a time to pay for entertaining without ever having to account for it.

"Our local fixer was called 'Zulfie', who would help find girls, drink and occasionally hashish. We always suspected he worked for the KGB, because he was so well connected.

"A lot of the BP men's marriages went wrong. Either they ended up with the local girls, or the wives would find out - often because the girls would ring their home numbers "by accident".

"I don't believe that Browne didn't know everything that was going on. He came out to Baku on five or six occasions."

Mr Abrahams, who left BP in 1994, said his first marriage buckled because of his work in Baku. He has since remarried and lives in West London with his new wife Lana and six-year-old daughter Anastasia. He now works as an adviser to the EU.

He said BP applied the same laissez-faire attitude to hospitality when Azerbaijani officials came to the UK during the negotiations.

"I was given a hotline number which connected to a desk in the Foreign Office. It meant visas could be granted instantly for the Azerbaijanis and collected on arrival at the airport, rather than taking the usual several weeks.

"We had bundles of cash to spend on them when they got here, and could again use the corporate card without restraint.

"We would typically have a dinner at which Lord Browne would be present, then he would go home and we would head off to somewhere like the Gaslight Club in Piccadilly - where girls would dance topless and you would get charged £250 for your drink.

"Our guests would usually want girls to go back with afterwards. Sometimes we could persuade the girls in the clubs, but more often we would just phone up an escort agency.

"We could charge them straight to the BP Amex card. But it sometimes became problematic. One group of Khazak Oil officials stripped their hotel rooms in Aberdeen bare, including the sheets and pillowcases, and they would usually clear out the minibars wherever they were staying."

All the entertaining paid off in September 1992 when BP signed a £300 million deal to exploit the Shah Deniz oilfields.

Mr Abrahams says that a key factor in securing the deal was an £8 million payment BP made that year to SOCAR, the state-owned oil company in Azerbaijan, for the right to use a construction yard on the edge of the Caspian Sea.

"It was effectively a sweetener to help to secure the deal - and it worked," he said.

Among the guests at a dinner and ceremony at Baku's Gulistan Palace to celebrate the Shah Deniz deal were Lord Browne and Baroness Thatcher.

Mr Abrahams says he was told to ensure that everything ran smoothly for the event, including meeting Browne's fastidious requirements.

"I had his favourite brand of water, Hildon, and his preferred foods flown out in advance, and I made sure money was paid for police escorts and to circumvent immigration procedures at the airport for Browne and his entourage.

"That evening, he personally handed me a briefcase containing a cheque for $30 million (£15million), to close the deal.

"He was so keen to wear a particular shirt, which he had left at the airport, that I persuaded the

chief of police to close off the roads so his cavalcade could go via the airport to collect it."

In 1993, Mr Abrahams played host to a group of MPs who visited Baku as guests of BP, including Harold Elletson - then a Tory MP but now an adviser to the Liberal Democrats - and Home Secretary John Reid, a Shadow Defence Minister at the time.

"John flew out in the BP Gulfstream jet," he recalls.

"After dinner, we went drinking in the hard currency bar. He was drinking a lot - this was a year before he gave up for good - and I grew worried as it got closer to the time of the curfew imposed because of the tense political situation at the time.

"I said, 'Come on John, we have to get back to the hotel.' But as we left, he was swaying around and being very noisy.

"I urged him not to draw attention to us because we weren't meant to be still on the streets. But then a van load of police armed with Kalashnikovs pulled up and asked us what we were doing.

'He said, 'I am a British politician...' I urged him to be quiet, but then he said to one of the policemen, 'If you don't take that f***ing Kalashnikov out of my face I'm going to stick it up your f***ing a***.'

'With that, we were arrested and shoved at gunpoint into the back of the van.

'It was only after I persuaded the driver to go to the hotel to speak to the intelligence officer there that they released us. John had only about two hours' sleep, then was up at 5.30am to fly to the nearby war zone of Nagorno Karabakh. He was completely hung over."

Some of Mr Abrahams' most intriguing claims surround the alleged co-operation between BP and the British intelligence services to secure a more pro-Western, pro-business regime in the country.

He says the operation, masterminded by Scarlett in Moscow, contributed to the coup in May 1992 which saw President Ayaz Mutalibov toppled by Abulfaz Elchibey, and then to a second change a year later which saw Haydar Aliyev take power.

Just months after Aliyev was installed, BP signed the so-called 'contract of the century', a £5 billion deal which placed BP at the head of an oil exporting consortium.

John Scarlett, says Mr Abrahams, "approached me very subtly and asked me to help to gather information for him.

Because my daily route to the construction yard passed the supply routes for Nagorno Karabakh, he asked me to report on troop and weapons movements. And BP's deputy representative in Russia seemed very close to the embassy, too.

BP supported both coups, both through discreet moves and open political support. Our progress on the oil contracts improved considerably after the coups."

Subsequently released Turkish secret service documents claimed BP had discussed an 'arms for oil' deal with the assistance of MI6, under which the company would use intermediaries to supply weapons to Aliyev's supporters in return for the contract.

5/2007

When the documents emerged in 2000, BP denied supplying arms - although sources admitted its representatives had "discussed the possibility".

A BP spokesman said last night of Mr Abrahams' claims: "There are some facts in his account that are accurate, but we don't recognise most of it. We regard it as fantasy."

A spokeswoman for John Reid said she had no comment and the Foreign Office said of Mr Abrahams' claims: "We neither confirm nor deny anyone's allegations in relation to intelligence matters."

## GrynPetro

**From:** Rachel Grynberg [rgrynberg@mac.com]

**Sent:** Monday, June 04, 2007 12:27 AM

**To:** Gene Webb; Wendy Stryker; Ronald Minkoff; j.grynberg@grynberg.com

**Subject:** Same story with some additions

**Hookers, spies, cases full of dollars...how BP spent £45m to win 'Wild East' oil rights**By GLEN OWEN - More by this author »

Last updated at 11:16am on 20th May 2007

Comments (1)

When Lord Browne resigned as BP chief executive earlier this month after lying to the courts during a failed attempt to gag The Mail on Sunday, his supporters paid tribute to the buccaneering way he built the company into a global oil giant.

But now a former BP employee has come forward to give the first insider's account of what the deal-making often entailed - sex, spying and briefcases full of hard currency...

A former BP worker has told how he threw champagne-fuelled sex parties to help secure lucrative international oil contracts.

The company also worked with MI6 agents to help bring about changes in foreign governments, according to an astonishing account of life inside the oil giant.

Les Abrahams, who was involved with BP's successful bid for a multi-million-pound deal with one of the former Soviet republics, today claims that he witnessed an "anything goes" drive for business which sometimes degenerated into sexual licence, spying and financial sweeteners.

He also claims that Home Secretary John Reid was arrested at gunpoint on a BP-funded foreign trip for being out on the streets after a military curfew had been imposed.

Mr Abrahams said he helped to spend £45million of the company's money over the course of just four months of negotiations with Azerbaijan's state oil company.

Most of the money was spent on new offices, hiring staff in London and the Azerbaijan capital Baku - including paying generous start-up bonuses - public-relations work and the chartering of corporate jets.

But he claims that more than £5million was set aside for cultivating key local figures in Baku, with huge sums spent on lavish entertainment.

Mr Abrahams says he was armed with a no-limit company credit card, allowing him to arrange for supplies of champagne and caviar to be flown on company jets to Baku, and then consumed at the "sex parties".

Former BP chief executive Lord Browne
The hospitality continued in London, where he hired prostitutes to entertain visiting Azerbaijanis. According to the former oil worker, he would fly dignitaries from Baku to London, put them up at The Savoy, and take them shopping for anything they desired.

Mr Abrahams, an engineer by training, joined BP in 1991, just as the disintegration of the Soviet Union had triggered a "new gold rush" by the oil giants to target the 200billion barrels of oil reserves beneath the Caspian Sea.

At the same time as he was assisting the company's drive for the business, he says he was persuaded to work for MI6

5/2007

by John Scarlett - now head of the intelligence service but then MI6's Head of Station in Moscow.

He passed information to Scarlett in faxes and at one-to-one meetings in the Russian capital.

He further claims that BP was working closely with MI6 at the highest levels to help it to win business in the region and influence governments.

Mr Abrahams worked for BP's XFI unit - Exploring Frontiers International - which specialises in opening up new markets in often unstable parts of the world.

He said Lord Browne, then BP's head of exploration, allocated a budget of £45 million to cover the first year's costs of the Baku operation.

He also claims that Home Secretary John Reid was arrested at gunpoint on a BP-funded foreign trip for being out on the streets after a military curfew had been imposed.

Mr Abrahams said he helped to spend £45million of the company's money over the course of just four months of negotiations with Azerbaijan's state oil company.

Most of the money was spent on new offices, hiring staff in London and the Azerbaijan capital Baku - including paying generous start-up bonuses - public-relations work and the chartering of corporate jets.

But he claims that more than £5million was set aside for cultivating key local figures in Baku, with huge sums spent on lavish entertainment.

Mr Abrahams says he was armed with a no-limit company credit card, allowing him to arrange for supplies of champagne and caviar to be flown on company jets to Baku, and then consumed at the "sex parties".

Former BP chief executive Lord Browne
The hospitality continued in London, where he hired prostitutes to entertain visiting Azerbaijanis. According to the former oil worker, he would fly dignitaries from Baku to London, put them up at The Savoy, and take them shopping or anything they desired.

Mr Abrahams, an engineer by training, joined BP in 1991, just as the disintegration of the Soviet Union had triggered a "new gold rush" by the oil giants to target the 200billion barrels of oil reserves beneath the Caspian Sea.

At the same time as he was assisting the company's drive for the business, he says he was persuaded to work for MI6 by John Scarlett - now head of the intelligence service but then MI6's Head of Station in Moscow.

He passed information to Scarlett in faxes and at one-to-one meetings in the Russian capital.

He further claims that BP was working closely with MI6 at the highest levels to help it to win business in the region and influence governments.

Mr Abrahams worked for BP's XFI unit - Exploring Frontiers International - which specialises in opening up new markets in often unstable parts of the world.

He said Lord Browne, then BP's head of exploration, allocated a budget of £45 million to cover the first year's costs of the Baku operation.

The order came from Browne's aides to 'Get them anything they want'. By 'them', they meant local officials in Azerbaijan," he said.

There were 20 or 30 people working on it at BP head office, and we soon had a steady stream of executives coming over as negotiators.

We got through the money in just four months, after which it was simply increased without question."

He describes a Wild West world in which oil executives with briefcases full of dollars rubbed shoulders with mafia

members, prostitutes and fixers and cut their deals in smoke-filled back rooms.

"The BP officials would come out to Baku in groups of five or six, every week. Sometimes I would charter an entire Boeing 757 to carry as few as seven or eight staff.

"Their main base was the "hard- currency bar" of the old Intourist hotel - so named because it only accepted dollars and it was only open to foreigners.

"It was full of girls, and many of us, including me, used them on a regular basis, although we quickly established they all worked for the KGB.

"If we went back to the rooms, not only were they bugged but the girls would quiz us closely about what we were doing, where we were going, and so on, and report straight back to their handlers.

"Everywhere was bugged and all the phones were tapped.

"One of our executives was recorded saying unflattering things about the president, and his comments were played back to us in a meeting with local state oil company officials.

"We were then told clearly that he was no longer welcome in the country."

Mr Abrahams helped to forge links with the local officials constructing the deals by throwing lavish parties.

He said the local girls who worked in the BP office, which occupied a floor of the Sovietskya hotel, would attend the parties and routinely provide "sexual favours".

They were also presumed to work for the local intelligence services.

There was one girl called Natasha assigned to teach us Russian, but it usually ended up as more that that. She would use the intimate opportunity to ask us questions about what we were up to.

Caviar was consumed with shipped- out champagne at the parties, which would start in the bars but inevitably end with the girls in the rooms.

We had a company American Express card with no name on it which we could use to draw out $10,000 at a time to pay for the entertaining without ever having to account for it.

Our local fixer, Zulfie, would help to find girls, drink and occasionally hashish.

We always suspected he worked for the KGB, because he was so well-connected: his sister-in-law was director of the Sovietskya.

A lot of the BP men's marriages went wrong. Either they ended up with the local girls, or the wives would find out, often because the girls would ring their home numbers "by accident".

Lord Browne came out to Baku on five or six occasions."

Last night, speaking in Baku, Zulfie accepted that girls were often on the scene but denied acting as a 'pimp' for the BP executives or arranging hashish supplies for them.

Zulfie, who did not want his surname printed, said he helped to sort out visa and Customs problems at the airport, and drove the executives to parties with employees of Azerbaijani oil companies in bars and restaurants.

But he claimed that financial sweeteners appeared to be commonplace. "I didn't see any money actually passing from hand to hand, but it has been spoken about a lot,' he said.

I saw the briefcases with cash that the Brits had with them.

So sometimes I was called up in the middle of the night to drive someone to SOCAR (the state-owned oil company) immediately because they had an "urgent meeting".

"And in a very short period - like a year - the wealth of some key people at SOCAR increased astronomically. Everybody here knows that."

One former colleague of Mr Abrahams, who worked closely with him during his Baku posting, said: "The Brits came here and did what they wanted, spending company money on moving from bar to bar and picking up girls.

"They would come away from their families and spend time with their lovers here. The girls were very generously rewarded."

The Mail on Sunday also spoke to an executive of SOCAR, who was seconded to BP in Baku in the Nineties. He said:

"The Brits behaved like kings here, they spent company money loafing from bar to bar, as well as buying expensive carpets, diamonds and antiques.

"The Azerbaijanis were so poor, they were ready to sell anything just to get a few dollars. I was responsible for the company car pool and I know how many vans officials ordered for their luggage when they flew back to Britain."

Mr Abrahams left BP in 1994 and now works as an adviser to the EU on anti-trust legislation.

He said BP applied the same laissez-faire attitude to hospitality when officials from Azerbaijan and other former Soviet states were flown over to the UK.

"I was given a direct hotline number which connected to a desk in the Foreign Office which helped us to facilitate the process - it meant visas could be granted instantly for the Azerbaijanis and collected on arrival at the airport, rather than taking the usual several weeks.

"We had bundles of cash to spend on them when they got here, and could again use the corporate card without restraint.

"We would typically have a dinner for them, at which Lord Browne would be present, then he would go home and we would head off to a gentleman's club where girls would come and dance topless for you, and you would get charged £250 for your drink.

"Our guests would usually want girls to go back with afterwards. Sometimes we could persuade the girls in the clubs, but more often we would just phone up an escort agency and arrange for the girls to go to the hotels. We could charge them straight to the BP Amex card.

"But it sometimes became problematic. One group of Khazak Oil officials stripped their hotel rooms in Aberdeen completely bare, including the sheets and pillowcases, and they would usually clear out the minibars wherever they were staying."

All the entertaining paid off in September 1992 when BP signed a £300 million deal to exploit the Shah Deniz oil fields.

Mr Abrahams says that a key factor in securing the deal was an £8million payment BP made that year to SOCAR, in Azerbaijan, for the right to use a construction yard on the edge of the Caspian Sea called the Shelf Project.

"It was effectively a sweetener payment to help to secure the deal - and it worked," he said.

Lord Browne and Baroness Thatcher were among the guests who flew out to Baku for a dinner and signing ceremony at the Gulistan Palace to celebrate the Shah Deniz deal.

In the weeks running up to the dinner, Mr Abrahams says he was detailed to ensure that everything ran smoothly for the event, including making sure Browne's fastidious requirements were met.

"He had his favourite brand of water, Hildon, and his preferred foods flown out in advance, and I made sure the money was paid to arrange police escorts and to circumvent immigration procedures at the airport for Browne and his entourage.

"That evening, he personally handed me a briefcase with a cheque for $30million, to close the deal, which I kept safe until the ceremony.

5/2007

"He was so keen to wear a particular shirt, which he had left at the airport, that I persuaded the chief of police to close off the roads so his cavalcade could go via the airport to collect it."

In 1993, Mr Abrahams hosted a group of MPs who visited Baku as guests of BP, including Harold Elletson - then a Tory MP, but now an adviser to the Liberal Democrats foreign affairs team - and Home Secretary John Reid.

Elletson was later accused by renegade MI6 officer Richard Tomlinson of being an MI6 agent. Friends of Mr Elletson did not deny those claims last night.

But it was the visit of Reid, then a Shadow Defence Minister, that proved most memorable - for all the wrong reasons. "John flew out in the BP Gulfstream jet," recalls Mr Abrahams. "After dinner, I went drinking with him in the hard currency bar.

"This was during the period when he was drinking a lot - a year before he gave up for good - and I grew more and more worried as it got closer to the time of the curfew which had been imposed because of the tense political situation at the time.

"I said, "Come on, John, we have to get back to the hotel." As we left, he was swaying around and being very noisy.

"I urged him not to draw attention to us, because we weren't meant to be still on the streets. But then a van load of police armed with Kalashnikovs pulled up and asked us what we were doing.

"He said, "I am a British politician..." I urged him to be quiet, but then he said to one of the policemen, "If you don't take that f***ing Kalashnikov out of my face I'm going to stick it up your f***ing arse." With that, we were arrested and shoved at gunpoint into the back of the van.

"It was only after Zulfie "had words" with the police that Reid was released. John only had about two hours sleep, then was up at 5.30am to fly to the battle lines in the nearby warzone of Nagorno Karabach. He was completely hungover."

Zulfie confirmed that he arranged the release of a British politician, but can't remember his identity.

Some of Mr Abrahams' most intriguing claims surround the alleged co-operation between BP and the British intelligence services to boost the company's fortunes by securing a more pro-Western, pro-business regime in the country.

He says the operation, masterminded by Scarlett in Moscow, contributed to the coup in May 1992 that saw President Mutillibov toppled by Abulfaz Elcibay, and then to a second change a year later which saw Haydar Aliyev take power - a move welcomed by the UK and US governments.

Just months after Aliyev was installed, BP signed the so-called 'contract of the century', a £5billion deal that placed the firm at the head of an oil exporting consortium.

Mr Abrahams added: "John Scarlett, the MI6 Head of Station in Moscow, approached me very subtly and asked me to help to gather information for him.

"Because the daily route taken to reach the oil construction yard passed the supply routes to the Nagorno Karabach warzone, he asked me to report on troop and weapons movements to him.

"There was also BP's deputy representative in Russia, who seemed very close to the embassy. She always came down to Baku with UK Government officials. During this time, all communications to and from the UK Government would come through the BP office.

"BP supported both coups, both through discreet moves and open political support,' said Mr Abrahams. "Our progress on the oil contracts improved considerably after the coups."

Subsequently released documents from the Turkish secret service claimed that BP had discussed an "arms for oil" deal, with the assistance of MI6, under which the company would use intermediaries to secure weapons to pass to Aliyev's supporters in return for the subsequent contract.

When the documents emerged in 2000, BP denied supplying arms - although sources admitted that its representatives had "discussed the possibility".

5/2007

When the allegations were put to MI6, a Foreign Office spokesman on security matters said: "We have no comment to make on intelligence matters." A BP spokesman said of Mr Abrahams' claims:

"There are some facts in his account that are accurate, but we don't recognise most of it. We regard it as fantasy."

Another BP source said Mr Abrahams was effectively an office manager for BP's exploration arm, and had exaggerated his seniority at the firm.

He had played "absolutely no part" in negotiations for contracts, which, the source insisted, were secured entirely legitimately.

The source insisted that Mr Abrahams' account was "utter rubbish", but declined to specify which of his claims were inaccurate.

A spokeswoman for John Reid said she had no comment to make.

Les Abrahams is writing Our Man In Baku, a memoir of his experiences in Azerbaijan, with Nicholas Monson.

# Exhibit 3



platts

2008-01-28

### Pending BP Texas City settlement draws new ire over Jan 14 death

Houston (Platts)--28Jan2008

The latest fatality at BP's Texas City, Texas, refinery shows the company has failed to ensure the facility is safer since the deadly March 2005 accident, Anthony Buzbee, an attorney for the family of an employee who died on January 14, said Monday.

The family of the late William Gracia, a longtime BP employee and shift foreman at the Texas City refinery, plans to voice opposition to a pending $50 million settlement agreement BP had secured with the US Department of Justice in relation to the agency's criminal investigation of the March 23, 2005, accident that killed 15 and injured many others.

The Gracias family will state their opposition to the settlement at a February 4 hearing in US District Court for the Southern District of Texas in Houston, according to Buzbee.

"This man for 32 years worked at that company and he was very loyal to that company. The family is very angry," Buzbee said.

When a group of victims from the 2005 incident argued in federal court that the fine agreed to under the federal Clean Air Act was far too small in relation to the scope of the disaster, BP responded that it "has been punished enough," Buzbee said, by spending $1 billion on an ongoing recommissioning, settling with victims and saying "that they've cleaned up their act." But, "Any company that kills one person a year, there's major problems with it,"

Buzbee said.

    "Obviously, the multiple lawsuits and
settlements and a $50 million fine
is not enough," the attorney added.

    Buzbee filed suit January 15 against BP
on behalf of the Gracias family,
and BP has 20 days from being served to
respond.

    Buzbee has represented many plaintiffs
who sued in relation to the March
2005 accident.

    The lawsuit contends that BP as well as
AltairStrickland, which was
involved in the turnaround of the unit in
which the January 14 incident
occurred, were negligent and failed to
properly maintain the equipment, among
other things. Gracias was walking by a water
pump in the ultracracker unit,
according to Buzbee, when a lid weighing
between 300 and 500 pounds was "blown
eight to 12 feet" and "struck him in the
head." Gracias also suffered burns
that Buzbee said he believed were from a
chemical release.

            --Katharine Fraser,
katharine_fraser@platts.com

    This is an excerpt. For more news,
request a free trial to
Platts Oilgram News at
http://www.platts.com/Request%20More%
20Information/index.xml?src=story
or subscribe now at
http://www.platts.com/infostore/product_info.p
hp?cPath=1_29&products_id=29


Post this story to: del.icio.us | Digg | Newsvine |
NowPublic | Reddit


    Top Headlines            Oil?src=energybulletin
                    Headlines

                    *Email*

**GrynPetro**

**From:**    Platts Energy Bulletin [webeditor@platts.com]
**Sent:**    Tuesday, January 29, 2008 5:45 AM
**To:**      alanwernz@grynberg.com
**Subject:** Platts Energy Bulletin



### January 29, 2008

*Top Headlines*



Try our
new search        **:fast**

**Search made easier**
Visit platts.com to try
our new search engine.    **GO**
Advanced/Saved Search
Search Tips

*Allegro*

**The following news items are a selection of the top, most recent headlines posted on Platts.com. Visit platts.com for the most current headlines. Platts.com is updated throughout the day. EMAIL A FRIEND PLATTS ENERGY BULLETIN.**

**OIL** 〉〉〉

**EUROPE, MIDDLE EAST & AFRICA**

**Iraq suspends oil supplies to SK Energy over Kurdistan deal**
**Seoul (Oilgram News)**
Iraq has halted crude exports to South Korea's top oil refiner SK Energy in protest at its involvement in an "illegal" exploration deal in northern Iraq, a South Korean energy ministry official said Tuesday. *Go to story...*

**Crude futures above $91/b on expectations of US interest rate cut**
**London (Forward Curve Oil)**

**ASIA-PACIFIC**

**Bunker fuel supply tightness in Hong Kong eases on cargo arrivals**
**Singapore (Oilgram News)**
A small fuel oil cargo arrived in Hong Kong Monday, easing slightly the supply tightness which bunker players there have been grappling with for most of this month. *Go to story...*

**AMERICAS**

**Pending BP Texas City settlement draws new ire over Jan 14 death**
**New York (Oilgram News)**
The latest fatality at BP's Texas City, Texas, refinery shows the company has failed to ensure the facility is safer since the deadly March 2005 accident, Anthony Buzbee, an attorney for the family of an employee who died on January 14, said Monday. *Go to story...*

**OIL RESOURCES**

**What's moving the oil markets?**
**London (Forward Curve Oil)**

**Quote of the day**
**London (Oilgram News)**

**Energy futures hostage to panic, historic volatility in equities**
**China (Energy Futures Weekly Review)**
Historic volatility in the stock markets, the world's biggest ever rogue trader fraud and a

*Platts Events Calendar*

**European Gas Storage**
Feb 11-12, 2008
Budapest, Hungary

**Credit & Collections for Utilities**
Feb 26-28, 2008
Miami, Florida

**Texas Power Markets Forum**
Mar 4-5, 2008
Houston, Texas

Advertisement



Advertisement

Advertisement          Advertisement          Advertisement

Copyright © 2008 - Platts, All Rights Reserved

The McGraw Hill Companies

# Exhibit 4

The New York Times

April 1, 2003

# U.S. Businessman Is Accused Of Oil Bribes to Kazakhstan

By JEFF GERTH

Federal investigators have arrested an American businessman on two charges of paying tens of millions of dollars to senior officials of Kazakhstan in connection with an oil concession awarded by the country's Oil Ministry.

The businessman, James H. Giffen, was released today by a federal magistrate on $10 million bond during a brief appearance in Federal District Court in Manhattan.

He was arrested at 8:55 p.m. on Sunday at Kennedy Airport, an assistant United States attorney, Peter G. Neiman, disclosed in court today.

Mr. Giffen did not enter a plea at the hearing, but after it ended, one of his lawyers, William J. Schwartz, said: "The charges are based on circumstantial evidence and the government's overactive imagination. Mr. Giffen will be exonerated."

A criminal complaint filed against Mr. Giffen charges the 62-year-old New Yorker with conspiring to violate the Foreign Corrupt Practices Act, which bars payments to foreign officials to influence their decisions, by transferring $25 million to unidentified Swiss bank accounts in 1995 and 1996.

The complaint, filed by the United States attorney in Manhattan, also charges Mr. Giffen with transferring $20.5 million in 1997 to a Swiss account whose beneficiaries included a "senior Kazakh official" and "his heirs."

The complaint does not identify the senior official, but legal documents from Swiss authorities, who first uncovered the bank transfers, allege that the account's beneficiary was Kazakhstan's president, Nursultan A. Nazarbayev.

Reid H. Weingarten, a Washington attorney for the Kazakh government, did not return a phone call seeking comment. Last September Mr. Weingarten wrote the Justice Department to complain that the investigation might adversely affect relations between the United States and Kazakhstan.

In his letter he also sought "a formal assurance that President Nazarbayev will not be indicted."

The criminal case has complicated the Bush administration's effort to use Kazakhstan's oil riches to reduce American dependence on the Persian Gulf.

In discussions with Vice President Dick Cheney and other senior officials, Mr. Nazarbayev and his representatives repeatedly raised the criminal inquiry in an attempt to limit the investigation, according to officials of both governments. Those pleas were rebuffed, officials from both sides said.

The complaint says that Mr. Giffen, and the merchant bank he operates, the Mercator Corporation, worked for the Kazakh government on its oil development plans dating back to 1992, generating $67 million in commissions and fees.

In 2000, the Swiss officials who first uncovered the bank transfers forwarded their information to the Justice Department for further investigation. The Swiss identified three American oil companies that they said made payments to the Kazakh government. The complaint against Mr. Giffen discussed only payments by the Mobil Oil Corporation, now part of ExxonMobil. The complaint did not allege any wrongdoing by Mobil.

The complaint said that Mobil had agreed to pay $1.05 billion in 1996 for a 25 percent share of the Tengiz field in Kazakhstan. As part of the arrangement, according to the complaint, Mobil agreed to pay Mercator five percent. Under an earlier agreement the fee to Mercator, $51 million, "was to have been included within the agreed upon purchase price," the complaint said, adding that "Mobil ultimately agreed to make its payments to Mercator in addition to the agreed-upon purchase price."

The complaint described a series of large, complicated bank transactions, beginning with the $51 million, sent via wire transfer from Mobil to Mercator's account in 1995 and 1996.

The largest of those transfers, $20.5 million in 1997 and $1.8 million in 1995, went to an account in the name of Orel Capital, an entity that was controlled by a foundation in Liechtenstein, the Semrek Foundation, according to the complaint. Swiss legal documents reviewed by The New York Times identify Semrek's apparent beneficiaries as Mr. Nazarbayev and his family.

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Back to Top

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

      - v -                                :     INDICTMENT

JAMES H. GIFFEN,                            :     S1 03 Cr. 404 (WHP)

               Defendant.    :

- - - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Commit Wire and Mail Fraud And
To Violate The Foreign Corrupt Practices Act)

The Grand Jury charges:

### Background

1.    The Republic of Kazakhstan is located in Central Asia and borders on Russia, China, Kyrgyzstan, Uzbekistan, and Turkmenistan.  Formerly a Republic within the Soviet Union, Kazakhstan has been a sovereign nation since 1991.  Kazakhstan has substantial deposits of oil and gas within its territory.  Under the Kazakhstan constitution, these natural resources are Government property.  Since declaring its independence, Kazakhstan has sold the rights to portions of its oil and gas wealth to a variety of international oil companies, including many American oil companies.

2.    At all times relevant to this Indictment, the Mercator Corporation ("Mercator"), a corporation headquartered and incorporated in New York, advised Kazakhstan in connection with various transactions related to the sale by Kazakhstan of

portions of its oil and gas wealth. Mercator is a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(h)(1)(B).

3.    At all times relevant to this Indictment, JAMES H. GIFFEN, the defendant, was an American citizen and the principal shareholder, board chairman, and chief executive officer of Mercator. As such, GIFFEN was both an officer, director, and shareholder of a "domestic concern" and a "domestic concern" in his own right, as that term is defined in the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(h)(1)(A,B). On or about August 1, 1995, GIFFEN was named as a Counselor to the President of Kazakhstan, a semi-official title that enabled him to influence and act as an advisor on numerous oil and gas transactions.

4.    On or about December 31, 1994, Mercator entered into an agreement with the Kazakh Ministry of Oil and Gas Industries pursuant to which Mercator was tasked with assisting the Ministry in developing a strategy for foreign investment in the oil and gas sector and coordinating the negotiation of numerous oil and gas transactions with foreign partners. Under the agreement, Mercator stood to receive "success" fees - that is, substantial fees paid if and only if the transactions successfully closed.

5.    Between 1995 and 2000, Mercator was paid approximately $67,000,000 in success fees for its work for

2

Kazakhstan. In addition, during the same time period, JAMES H. GIFFEN, the defendant, caused approximately $70,000,000 paid by various oil companies into escrow accounts at Banque Indosuez and its successor, Credit Agricole Indosuez ("CAI") in connection with the purchase of oil and gas rights in Kazakhstan to be diverted into secret Swiss bank accounts under his control. Out of the success fees paid to Mercator, and the funds diverted by GIFFEN from the oil transactions into the secret Swiss bank accounts, GIFFEN directly and through intermediaries made unlawful payments of more than $78 million to two very senior officials of the Kazakh Government ("KO-1" and "KO-2"). GIFFEN also spent a portion of the funds diverted from the oil transactions on luxury items, including millions of dollars in jewelry.

6.    KO-1 and KO-2 had the power to substantially influence whether JAMES H. GIFFEN, the defendant, and Mercator obtained and retained lucrative business as advisors and counselors to the government of Kazakhstan. The unlawful payments GIFFEN made to KO-1 and KO-2 ensured that GIFFEN and Mercator obtained and retained such business, and that they remained in a position from which they could divert large sums from oil transactions into accounts for the benefit of senior Kazakh officials and GIFFEN personally. The scheme thus defrauded the Government of Kazakhstan of funds to which it was

3

entitled from oil transactions, and defrauded the people of Kazakhstan of the right to the honest services of their elected and appointed officials.

## Statutory Allegations

7.    From in or about 1995, up to and including in or about 2000, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, violations of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Sections 1341, 1343 and 1346.

8.    From in or about 1995, up to and including November 10, 1998, it was a part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, being American citizens and "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, would and did make use of the mails and any means and instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official

4

capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2.

9.    From November 10, 1998 up to and including in or about 2000, it was a further part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, being American citizens and "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, would and did make use of the mails and any means and instrumentality of interstate commerce and did acts outside the United States corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing

5

such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2.

10.   It was a further part and an object of the conspiracy that JAMES H. GIFFEN, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars from various oil transactions, for the purpose of executing such scheme and artifice and attempting so to do, unlawfully, willfully and knowingly would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

11.   It was a part and an object of this conspiracy

6

that JAMES H. GIFFEN, the defendant, and others known and
unknown, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, including a scheme to deprive the people of Kazakhstan
of the honest services of KO-1 and KO-2, and a scheme to defraud
the Republic of Kazakhstan out of millions of dollars from
various oil transactions, would and did place in a post  office
and authorized depository for mail matter, matters and things to
be sent and delivered by the Postal Service, and deposited and
caused to be deposited matters and things to be sent and
delivered by private and commercial interstate carriers, and did
take and receive therefrom matters and things, and did cause to
be delivered by mail and carriers according to the direction
thereon, and at the place at which it was directed to be
delivered by the person to whom it was addressed, matters and
things, for the purpose of executing such scheme and artifice,
and attempting to do so, in violation of Title 18, United State
Code, Sections 1341 and 1346.

## I. The Tengiz Oil Field Transaction

### A.    The Transaction

12.   The Tengiz oil field is a large, producing oil
field in Kazakhstan.  Its total reserves have been estimated at
six billion barrels of oil, one billion barrels of natural gas

liquids, and fourteen trillion cubic feet of gas.  In 1994, the Tengiz oil field was jointly owned by Chevron and the Government of Kazakhstan.

13.  In or about December 1994, KO-1 retained JAMES H. GIFFEN, the defendant, and Mercator to assist in, among other things, the sale of a portion of Kazakhstan's interest in the Tengiz oil field.  GIFFEN and KO-1 eventually identified Mobil Oil Corporation ("Mobil") as a potential acquirer of an interest in the Tengiz field, and GIFFEN began negotiations with Mobil.

14.  On or about July 28, 1995, Mobil entered into a preliminary "Heads of Agreement" with the Kazakh Government under which Mobil acquired the right to negotiate with the Kazakh Oil Ministry towards a purchase of a share in the Tengiz field, in exchange for a $5 million "advance" on the eventual purchase price.  In the Heads of Agreement Mobil agreed to negotiate towards the signing of a preliminary "memorandum of understanding" ("MOU") by September 1995, in connection with which Mobil would pay another "advance" of $140 million.  KO-1 signed the Heads of Agreement on behalf of the Kazakh Government.

15.  In a separate side agreement (the "Letter Agreement") also signed on July 28, 1995 by KO-1, Mobil agreed to pay to Mercator, on behalf of Kazakhstan, Mercator's fee for consulting services to Kazakhstan.  The Letter Agreement set those fees at 5% of the eventual purchase price, with $5 million

8

due upon the execution of the Heads of Agreement, $5 million due upon the execution of the MOU, and the balance due at the closing of the Tengiz deal. On or about August 3, 1995, Mobil wired $5 million to Mercator's account at Citibank in New York, New York.

16. On or about October 6, 1995, Mobil and the Kazakh Government entered into the MOU. Under the MOU, the Kazakh Government offered to sell an unspecified portion of the Tengiz field to Mobil for an unspecified price, and Mobil and the Kazakh Government agreed to negotiate the details, with a deadline of July 28, 1996 to complete the negotiations. Pursuant to the Letter Agreement, on or about October 20, 1995, Mobil wired $5 million to Mercator's account at Citibank in New York.

17. On or about May 3, 1996, Mobil closed its purchase of a 25% interest in the Tengiz oil field for approximately $1.05 billion. Although under the Letter Agreement Mercator's fee was to have been included within the agreed upon purchase price, at the request of the Republic, Mobil ultimately agreed to make its payments to Mercator in addition to the agreed upon purchase price of $1.05 billion. Accordingly, Mobil on May 17, 1996, wired the balance of Mercator's fee, $41 million, to Mercator's account at Citibank in New York, New York.

B.    Payments To Kazakh Officials

18.    In connection with the Tengiz transaction, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused at least $22 million to be secretly paid to Swiss bank accounts in the name of offshore companies secretly controlled by senior Kazakh officials.

19.    On or about November 6, 1995, JAMES H. GIFFEN, the defendant, caused Mercator to transfer $5 million Mercator had received from Mobil in connection with the Tengiz deal to a Swiss account in the name of Nichem Energy Ltd ("Nichem"), a company controlled by a co-conspirator not named as a defendant herein ("CC-1").

20.    JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury then caused Nichem, on or about November 21, 1995, to transfer $1.8 million from Nichem's account in Switzerland, through a clearing account at Bankers Trust in New York, New York, to an account in Switzerland in the name of Orel Capital Ltd. ("Orel"). Orel is a British Virgin Islands corporation owned by the Semrek Foundation, a foundation organized under the laws of Liechtenstein. The Semrek Foundation was secretly beneficially owned by KO-2 and his heirs. Funds from the Orel account were used for various purposes, including to pay more than $45,000 to an exclusive Swiss high school attended by the daughter of KO-2.

21.    On or about November 28, 1995, JAMES H. GIFFEN,

10

the defendant, and others known and unknown to the Grand Jury caused Nichem to wire $3.2 million to an account in Switzerland in the name of Hovelon Trading S.A. ("Hovelon"), a British Virgin Islands corporation secretly controlled by GIFFEN through a co-conspirator not named as a defendant herein ("CC-2").

22.  On or about December 5, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused Hovelon to transfer $450,000 to a Swiss bank account in the name of Dundy Trading, Ltd. ("Dundy Trading"), a British Virgin Islands company secretly owned by KO-1.

23.  Upon receipt of the $41 million payment from Mobil in connection with the Tengiz transaction on or about May 17, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire a total of $20 million to Nichem, in four separate wire transfers between August and November, 1996.

24.  Between August and November 1996, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, also caused Nichem to make four corresponding wire transfers, again totaling $20 million, to GIFFEN's secret Hovelon account in Switzerland.

25.  On February 6, 1997, JAMES H. GIFFEN, the defendant, caused Hovelon to wire $20.5 million to KO-2's Orel account.

## II.   The Karachaganak Processing Transaction

### A.    The Transaction

26.  In an effort to induce Kazakhstan to close the
Tengiz deal, Mobil agreed to help Kazakhstan address difficulties
it was having in profitably selling gas condensate from the
Karachaganak oil and gas field.  On or about July 28, 1995, the
date the Tengiz Heads of Agreement and Letter Agreement were
executed, Mobil entered into an agreement to finance CC-1 in his
purchase, transport, processing, and sale of natural gas
condensate from the Karachaganak field.  The deal was structured
such that Mobil made unsecured loans to Vaeko Europe Ltd.
("Vaeko"), an assetless shell company controlled by CC-1, which,
on paper, was supposed to use the money to purchase Karachaganak
gas condensate, transport the condensate to Russia, arrange for
its processing there, and then sell the resulting product.  Vaeko
was obligated to repay Mobil each month its principal, interest,
and a small fixed fee out of the proceeds of the sale of the gas,
but was entitled to keep any profits above that fee.  Mobil thus
bore all of the financial risk from the unsecured loan to Vaeko,
but Vaeko was entitled to all potential profit above the set fee
from the sale of the gas condensate.

27.  Between September 1995 and January 1997, Mobil
advanced Vaeko more than $78 million, purportedly pursuant to the
agreement described above.  Vaeko, however, failed to repay a
significant portion of the advances during that time period.

12

Vaeko ultimately defaulted on more than $30 million of the funds borrowed from Mobil.

### B.    Payments To Kazakh Officials

28.  On or about March 8, 1996, Mobil transferred $6.356 million to Vaeko.  On or about March 13, 1996 Vaeko transferred $1.1 million to Hovelon's Swiss bank account.

29.  JAMES H. GIFFEN, the defendant, thereafter caused Hovelon to transfer $1 million of the funds received from Vaeko to Orchard Holdings, a Bahamas company secretly owned by KO-1. KO-1 used funds from the Orchard Holdings account for various personal expenses, including to purchase more than $180,000 worth of diamond jewelry and to make a downpayment of more than $20,000 to reserve a week's stay at an exclusive Swiss spa for KO-1 and his family.

### III. The Caspian Pipeline Transaction

### A.    The Transaction

30.  In or about early 1997, the American oil company Amoco negotiated to acquire from the Kazakh Government an interest in the Caspian Pipeline Consortium ("CPC"), an entity building a substantial pipeline to facilitate international distribution of oil from Kazakhstan.

31.  In March 1997, Amoco entered into an escrow agreement with the Swiss branch of a French bank, Banque Indosuez, and the Kazakh Government.  The escrow agreement

13

required Amoco to pay into an escrow account at Banque Indosuez more than $50 million, to be disbursed purportedly to pay signature bonuses and consulting fees if the transaction closed. The escrow agreement specified that if the transaction closed, $50 million of the funds deposited into escrow would be paid to an entity named TMG-CPC and that approximately $1.8 million would be paid to Mercator for its role in arranging the transaction. TMG-CPC was the legal entity through which the Kazakh government owned its interest in the CPC.   KO-1, in his official capacity, controlled TMG-CPC.

32.   On or about March 19, 1997, Amoco transferred more than $51 million from an account at Chase Manhattan Bank in New York, New York into the escrow account at Banque Indosuez.

33.  On or about May 16, 1997, Amoco advised Banque Indosuez that the transaction had closed and that the funds from the escrow account should be disbursed.  Banque Indosuez thereafter transferred approximately $50 million to TMG-CPC and approximately $1.8 million to Mercator.

## B. Payments To Kazakh Officials

34.   TMG-CPC had, in or about March 1997, entered into a purported "call option" agreement with SOGEA, a Swiss corporation affiliated with Banque Indosuez.  Under this sham agreement, SOGEA purportedly acquired for $500,000 an option to purchase for $5 million the right to receive a bonus equal to 71% of whatever TMG-CPC received from Amoco in the CPC transaction.

14

35. Although not disclosed in the call option agreement, SOGEA in entering into that agreement was secretly acting on behalf of Tulerfield Investments, Inc. ("Tulerfield"), a British Virgin Islands company beneficially owned by KO-1 personally. SOGEA secretly agreed to turn over to Tulerfield any bonus received from TMG-CPC under the call option agreement, less a $1 million fee for its services.

36. On or about May 21, 1997, SOGEA purchased and exercised the call option, paying TMG-CPC a total of $5.5 million. TMG-CPC simultaneously transferred to SOGEA $35.5 million. SOGEA retained its $1 million fee and transferred the remaining funds - $34.5 million -- to Tulerfield. Tulerfield transferred back $5.5 million to SOGEA to fund the purchase and exercise of the call option, resulting in a net deposit of $29 million to KO-1's Tulerfield account.

37. On or about May 22, 1997, Tulerfield transferred the entire net amount it had received - $29 million - to the Swiss bank account of Hovelon, secretly controlled by JAMES H. GIFFEN, the defendant.

38. On or about June 24, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused Hovelon to transfer $12 million to KO-2's Orel account.

39. On or about August 19, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $3 million to KO-1's Orchard Holdings account.

15

40.   On or about September 3, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $5 million to Brisa, Inc., a British Virgin Islands company owned by the daughter of KO-1. Funds from that account were used to pay the bills for a credit card in the name of KO-1's daughter.

IV.   **The Karachaganak PSA Transaction**

A.   **The Transaction**

41.   In or about November 1997, a group of international oil companies, including one American oil company, Texaco, entered into a Production Sharing Agreement ("PSA") with Kazakhstan in connection with the Karachaganak oil and gas field. Under the agreement, the companies acquired certain rights to the oil and gas at Karachaganak. As part of the transaction, the oil companies agreed to pay $17 million into an escrow account in Switzerland at CAI, purportedly for the purpose of paying the fees of certain advisers for Kazakhstan in connection with the transaction.

42.   On or about November 11, 1997, the Kazakh government entered into an "Exclusive Paying Agency" agreement with CAI. Under the Exclusive Paying Agency agreement, CAI agreed to accept the $17 million payment from the oil companies and to distribute it to specifically identified advisers of Kazakhstan, including Mercator, which received $4.75 million for its role in the deal.   The Exclusive Paying Agency agreement

16

made it appear that CAI would receive an $11.44 million fee for providing financial advice to Kazakhstan in the transaction.

43.    On or about January 26, 1998, the oil companies, including Texaco, transferred $17 million to CAI.  CAI distributed the $17 million as specified in the Exclusive Paying Agency agreement, and, among other things, on or about January 30, 1998, transferred $11.44 million to an account at CAI in the name "Clients Divers Geneve" (the "Geneve account"), purportedly as CAI's fee.

### B. Payments To Kazakh Officials

44.    CAI entered into a secret, sham agreement, dated November 18, 1997, with Denlay Associates, Ltd., a British Virgin Islands Company secretly owned by JAMES H. GIFFEN, the defendant (the "Denlay Agreement").  Under the Denlay Agreement, CAI agreed to pay to Denlay "finders & consulting fees" totaling $20,290,000, to the extent CAI received success fees from the Karachaganak PSA transaction, or from a second transaction related to offshore exploration in the Kazakh sector of the Caspian Sea.

45.    Accordingly, upon receiving the $11.44 million, CAI on February 2, 1998 transferred $9.94 million from the Geneve account to Denlay's account.  JAMES H. GIFFEN, the defendant, had caused the account to be opened on or about November 18, 1997, with CC-2 as the signatory, and the account had a zero balance prior to the $9.94 million transfer on February 2, 1998.

46.  On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.  On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred to KO-1's Orchard Holdings account.  On or about February 9, 1998, GIFFEN caused Denlay to transfer $2.011 million to Condor Capital Management ("Condor"), a British Virgin Islands company owned by GIFFEN.  Thus, the secret Denlay Agreement disguised the fact that almost 90% of CAI's purported fee was being paid to GIFFEN and, through GIFFEN, to Kazakh officials and GIFFEN himself.

### V.    The OKIOC Transaction

#### A.    The Transaction

47.  In 1997 and 1998, a consortium of oil companies (the "Caspian Offshore Consortium"), including Mobil, negotiated to acquire from the Kazakh government the rights to participate in a joint venture known as the "Offshore Kazakhstan International Operating Company" ("OKIOC") to explore for oil in certain offshore blocks in the Kazakh sector of the Caspian Sea. JAMES H. GIFFEN, the defendant, and Mercator were hired by the Kazakh government to assist in the negotiations.

48.  On or about November 18, 1997, the oil companies and Kazakhstan entered into a "Production Sharing Agreement" governing their participation in OKIOC's exploration.  Under the agreement, the oil companies agreed to pay the Kazakh government

18

a $175 million "signature bonus" due shortly after the signing of the agreement. KO-1 specified that the bonus should be divided amongst three bank accounts: $100 million to an account at Credit Suisse in Switzerland, $52 million to an account at Pictet & Cie, in Switzerland, and $23 million to an account at CAI in Switzerland (the "CAI escrow account").

49. On or about November 1, 1997, Kazakhstan and CAI entered into an "Exclusive Paying Agency Agreement" to govern the CAI escrow account. The agreement specified that in exchange for a small fee, CAI would distribute the funds in the CAI escrow account to various consultants who had assisted Kazakhstan in the OKIOC transaction, including Mercator, which received $5.25 million, and CAI itself, which was purportedly to receive $11.85 million for providing financial and analytical services to Kazakhstan.

## B. Payments To Kazakh Officials

50. Between on or about April 24 and 28, 1998, the oil companies participating in the consortium, including Mobil, caused a total of approximately $23 million to be wire transferred to the CAI escrow account. On or about April 28, 1998, $11,850,000 was transferred from the CAI escrow account to the Geneve account, purportedly as payment of CAI's fee. On April 30, 1998, however, pursuant to the sham Denlay agreement described in paragraph 43 above, $10,350,000 was transferred from the Geneve account to the account of Denlay, controlled by JAMES

19

H. GIFFEN, the defendant.

51. On May 4, 1998, JAMES H. GIFFEN, the defendant caused Denlay to transfer $5 million to KO-2's Orel account and $2,500,000 to KO-1's Orchard Holdings account. On June 29, 1998 and July 9, 1998, GIFFEN caused Denlay to transfer a total of $500,000 to an account in the name of NTC International, Inc. ("NTC"), a British Virgin Island's company jointly owned by GIFFEN and KO-1 for the purpose of making a private investment in a television station in Kazakhstan. Accordingly, as with the Karachaganak PSA Transaction, the Denlay Agreement disguised the fact that almost 90% of CAI's purported fee was being paid to GIFFEN and, through GIFFEN, to Kazakh officials and GIFFEN himself.

## VI. The Kazakhoil Transaction

### A. The Transaction

52. Kazakhoil, the state oil company of Kazakhstan, retained an interest in the joint venture described in paragraph 41 above. In or about September 1998, the American oil company Phillips Petroleum Company ("Phillips Petroleum") purchased from Kazakhoil fifty percent of its interest in that joint venture. JAMES H. GIFFEN, the defendant, and Mercator helped arrange and negotiate the transaction. As part of the agreement, on or about September 14, 1998, Phillips Petroleum agreed to pay shortly after signing approximately $271 million to Kazakhstan.

20

## B.    Payments To Kazakh Officials

53.    On or about September 14, 1998, KO-1 instructed Phillips Petroleum to wire $30 million of the $271 million payable to the Republic of Kazakhstan to an escrow account at CAI in Switzerland titled the "Republic of Kazakhstan - Caspian Escrow Account" (the "Caspian Escrow Account"). Acting on those instructions, on or about September 15, 1998, Phillips Petroleum wired $30 million to the Caspian Escrow Account.

54.    On or about September 12, 1998, CAI had entered into an Exclusive Paying Agency agreement with Kazakhstan controlling disposition of funds within the Caspian Escrow Account. Under the Exclusive Paying Agency agreement, CAI agreed to distribute the $30 million to specifically identified advisers of Kazakhstan, including Mercator, which received $5 million for its role in the deal. The Exclusive Paying Agency agreement made it appear that CAI would receive a $22.2 million fee for providing financial advice to Kazakhstan in the transaction. On or about September 25, 1998, $22,219,000 was transferred from the escrow account to the Geneve account, purportedly as CAI's fee.

55.    However, CAI, in a secret sham agreement dated September 25, 1998, agreed to pay Hovelon 92.349% of any success fee CAI received from the Kazakhoil transaction, purportedly as "compensation" for Hovelon's introducing CAI to the Republic of Kazakhstan and for "advisory services" supposedly rendered by Hovelon in the transaction (the "Hovelon agreement"). On or

21

about September 29, 1998, pursuant to the Hovelon agreement, CAI transferred $20,519,000 from the Geneve account into the Hovelon account secretly controlled by JAMES H. GIFFEN, the defendant.

56.  On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $7,500,000 to KO-2's Orel account.

57.  On or about April 21, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $2.58 million to KO-1's Orchard Holdings account.

58.  On or about July 9, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $10.065 million to the Swiss account of a British Virgin Islands corporation named Berkut Holdings, Ltd., secretly owned by KO-2.  Thus, the Hovelon agreement disguised the fact that over 90% of CAI's fee was paid to GIFFEN and, through GIFFEN, to Kazakh officials.

22

## VII. Other Payments To Kazakh Officials

59. On or about August 31, 1995, Dundy Trading
(controlled by KO-1) entered into a contract to purchase for
$910,000 a house in Newton, Massachusetts (the "Newton House").
Between 1995 and 2000, the Newton House was occupied by the wife
and two children of KO-1, while the children attended college in
the area. During the time that KO-1's family occupied the Newton
House, there were substantial expenses, including property taxes,
insurance, and general upkeep, that totaled more than $36,000.
At the direction of JAMES H. GIFFEN, the defendant, Mercator paid
more than $36,000 of these expenses.

60. In November and December 1997, JAMES H. GIFFEN,
the defendant, purchased two fur coats, costing together nearly
$30,000, for the wife and daughter of KO-2.

61. In or about January 1999, JAMES H. GIFFEN, the
defendant, paid the tuition for a daughter of KO-2 at George
Washington University.

62. In or about August 1999, JAMES H. GIFFEN, the
defendant, caused Mercator to purchase in the United States and
to ship to Kazakhstan a Donzi speedboat costing more than
$80,000. GIFFEN provided the boat at KO-1's request as a gift
from KO-1 to KO-2.

63. In or about November 1999, JAMES H. GIFFEN, the
defendant, caused Mercator to purchase in the United States and
to ship to Kazakhstan two snowmobiles for delivery to KO-2 and

23

his wife.

## Means and Methods Of The Conspiracy

64. Among the means and methods by which JAMES H.
GIFFEN, the defendant, and others known and unknown to the Grand
Jury, carried out the objects of the conspiracy were the
following:

A. KO-1 and KO-2 had the authority to hire JAMES H.
GIFFEN, the defendant, and Mercator to consult in connection with
various oil transactions, to pay Mercator substantial success
fees if those transactions closed, and to decide whether or not
those transactions would close. GIFFEN and Mercator were
therefore dependant upon the goodwill of KO-1 and KO-2 to
maintain their positions as Counselor to the President and
consultant to the Ministry of Oil and Gas Industries.

B. JAMES H. GIFFEN, the defendant, and co-
conspirators known and unknown to the Grand Jury, obtained the
services of a co-conspirator not named as a defendant herein
("CC-3"), who was employed at Banque Indosuez and CAI, to
purchase and open bank accounts for a series of shell companies,
incorporated in the British Virgin Islands and the Bahamas, and
controlled variously by GIFFEN, other co-conspirators, and senior
Kazakh officials, including KO-1 and KO-2.

C. To deprive the people of Kazakhstan of the honest
services of senior Kazakh officials, to enrich those Kazakh
officials at the expense of the Republic of Kazakhstan as a

24

whole, and to improperly influence those Kazakh officials so as to obtain and retain business for themselves and others, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, used various methods to divert money that would otherwise have gone to Kazakhstan from certain oil transactions into secret accounts, opened primarily at Banque Indosuez and CAI in Switzerland, in the names of British Virgin Islands and Bahamas corporations secretly beneficially owned by individual Kazakh officials including KO-1 and KO-2.

D.    In some transactions, JAMES H. GIFFEN, the defendant, CC-1, and other co-conspirators known and unknown, secretly transferred a portion of Mercator's purported fees from the transaction, through a series of secret accounts, into accounts secretly beneficially owned by senior Kazakh officials.

E.    On another occasion, JAMES H. GIFFEN, the defendant, CC-1, and other co-conspirators known and unknown, (a) created an assetless shell company; (b) obtained for that company an unsecured loan from an oil company interested in doing business in Kazakhstan; (c) funneled a portion of the borrowed funds, through a series of secret accounts, into an account beneficially owned by a senior Kazakh official, and (d) then defaulted on a substantial portion of the debt to the oil company.

F.    On yet other occasions, JAMES H. GIFFEN, the defendant, CC-3, and other co-conspirators known and unknown to

25

the Grand Jury, (a) caused oil transactions to be structured such that oil companies acquiring rights to oil properties in Kazakhstan made payments to certain escrow accounts at Banque Indosuez and CAI in Switzerland; (b) created a paper record making it appear that those funds would be used to pay Kazakhstan's consultants on the transaction, and (c) then diverted a large percentage of the funds placed in escrow, through a series of secret Swiss accounts, into secret accounts beneficially owned by senior Kazakh officials and GIFFEN himself.

G.    In addition, JAMES H. GIFFEN, the defendant, purchased luxury items, including fur coats, jewelry, speed boats, and snowmobiles, and provided those items free of charge to senior Kazakh officials.

H.    JAMES H. GIFFEN, the defendant, also paid the personal bills of, or provided cash directly to, senior Kazakh officials. These payments were sometimes disguised on Mercator's books as loans, but no loan documentation was ever created, and no loan repayments were made until after GIFFEN, Mercator, and Kazakh officials learned of criminal investigations into their conduct.

26

## Overt Acts

65.    In furtherance of the conspiracy and to effect the illegal objects thereof, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

### Tengiz

A.    On or about July 14, 1995, JAMES H. GIFFEN, the defendant, met with an executive of Mobil in New York, New York regarding the Tengiz and Karachaganak processing transactions.

B.    On or about July 26, 1995, JAMES H. GIFFEN, the defendant, faxed a draft of the Heads of Agreement and the Letter Agreement from New York, New York to an executive of Mobil.

C.    On or about August 3, 1995, JAMES H. GIFFEN, the defendant, caused Mobil to wire $5 million to Mercator's account at Citibank in New York, New York.

D.    On or about October 20, 1995, JAMES H. GIFFEN, the defendant, caused Mobil to wire $5 million to Mercator's account at Citibank in New York, New York.

E.    On or about November 6, 1995, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its account at Citibank in New York, New York to the Nichem account in Switzerland.

F.    On or about November 21, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury,

27

caused $1.8 million to be wire transferred from the Nichem account in Switzerland to KO-2's Orel account.

G. On or about November 28, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown, caused $3.2 million to be wire transferred from the Nichem account in Switzerland to the Hovelon account in Switzerland controlled by GIFFEN.

H. On or about December 5, 1995, JAMES H. GIFFEN, and others known and unknown to the Grand Jury, caused Hovelon to wire approximately $450,000 to KO-1's Dundy Trading account in Switzerland.

I. On or about May 17, 1996, JAMES H. GIFFEN, the defendant, caused Mobil to wire $41 million to Mercator's account at Citibank in New York, New York.

J. On or about May 22, 1996, JAMES H. GIFFEN, the defendant, caused Hovelon to wire $100,000 to KO-1's Orchard Holdings account.

K. On or about June 17, 1996, JAMES H. GIFFEN, the defendant, caused Hovelon to wire $900,000 to KO-1's Orchard Holdings account.

L. On or about August 26, 1996, JAMES H. GIFFEN, the defendant caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

M. On or about August 29, 1996, JAMES H. GIFFEN, the defendant, and others known and unknown, caused $5 million to be

28

wire transferred from the Nichem account in Switzerland, through
Bankers Trust in New York, New York, to the Hovelon account in
Switzerland controlled by GIFFEN.

N.    On or about September 17, 1996, JAMES H. GIFFEN,
the defendant, caused Mercator to wire $5 million from its
Citibank account in New York, New York to the Nichem account in
Switzerland.

O.    On or about September 20, 1996, JAMES H. GIFFEN,
and other co-conspirators known and unknown, caused $5 million to
be wire transferred from the Nichem account in Switzerland,
through Bankers Trust in New York, New York, to the Hovelon
account in Switzerland controlled by GIFFEN.

P.    On or about October 22, 1996, JAMES H. GIFFEN, the
defendant, caused Mercator to wire $5 million from its Citibank
account in New York, New York to the Nichem account in
Switzerland.

Q.    On or about November 5, 1996, JAMES H. GIFFEN, and
others known and unknown, caused $5 million to be wire
transferred from the Nichem account in Switzerland, through
Bankers Trust in New York, New York, to the Hovelon account in
Switzerland controlled by GIFFEN.

R.    On or about November 19, 1996, JAMES H. GIFFEN,
the defendant, caused Mercator to wire $5 million from its
Citibank account in New York, New York to the Nichem account in
Switzerland.

S. On or about November 29, 1996, JAMES H. GIFFEN, and others known and unknown, caused $5 million to be wire transferred from the Nichem account in Switzerland, through Bankers Trust in New York, New York, to the Hovelon account in Switzerland controlled by GIFFEN

T. On or about February 6, 1997, JAMES H. GIFFEN caused Hovelon to wire transfer $20.5 million to KO-2's Orel account.

## CPC

U. On or about May 22, 1997, KO-1 caused Tulerfield to transfer $29 million to GIFFEN's Hovelon account.

V. On or about June 24, 1997, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $12 million to KO-2's Orel account.

W. On or about August 19, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $3 million to KO-1's Orchard Holdings account.

X. On or about September 4, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $5 million to Brisa, Inc., a British Virgin Islands company owned by the daughter of KO-1.

## Karachaganak PSA

Y. On or about November 18, 1997, JAMES H. GIFFEN, the defendant, caused an account to be opened at a bank in Switzerland in the name of Denlay Associates Ltd.

30

Z.    On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

AA.    On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

BB.    On or about February 9, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer $2.011 million to GIFFEN's Condor account.

## OKIOC

CC.    On or about April 24, 1998, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Mobil to wire approximately $3.8 million from Mobil's account at Citibank to CAI's correspondent account at Bankers Trust in New York, New York, for further credit to an escrow account at CAI in Switzerland.

DD.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

EE.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

FF.    On or about June 29, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer approximately $350,000 to GIFFEN and KO-1's NTC account.

31

GG.  On or about July 9, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer approximately $150,000 to GIFFEN and KO-1's NTC account.

### Kazakhoil

HH.  On or about September 15, 1998, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Phillips Petroleum to wire $30 million from an account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

II.  On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused $7,500,000 to be transferred from the Hovelon account to KO-2's Orel account.

JJ.  On or about April 21, 1999, JAMES H. GIFFEN, the defendant, caused $2.58 million to be transferred from the Hovelon account to KO-1's Orchard Holdings account.

KK.  On or about July 6, 1999, JAMES H. GIFFEN, the defendant, caused $10.065 million to be transferred from the Hovelon account to KO-2's Berkut account.

(Title 18, United States Code, Section 371)

32

### COUNTS TWO to TEN

## Violation of the Foreign Corrupt Practices Act

The Grand Jury further charges:

66.   Paragraphs one through six, twelve through sixty-three, and sixty-four (A) - (H) are repeated and realleged as if set forth in full herein.

67.   On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, being an American citizen and a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, to wit, GIFFEN participated in making unlawful payments to Kazakh officials KO-1 and KO-2 as

33

described in Count One above, and in furtherance thereof, caused
the following wire transfers to be made:

| COUNT | WIRE TRANSFER | DATE |
|---|---|---|
| 2 | $41 million wire transfer from Mobil to Mercator's account at Citibank in New York, New York | May 17, 1996 |
| 3 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | August 26, 1996 |
| 4 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | September 17, 1996 |
| 5 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | October 20, 1996 |
| 6 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | November 19, 1996 |
| 7 | $51.4 million wire transfer from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland. | March 17, 1997 |
| 8 | $3.4 million wire transfer from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland | January 27, 1998 |
| 9 | $3.833 million wire transfer from Mobil's account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland | April 24, 1998 |

| 10 | $30 million wire from Phillips Petroleum's account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland. | September 15, 1998 |
|----|----|----|

(Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.)

## COUNTS ELEVEN to FOURTEEN

## Violation of the Foreign Corrupt Practices Act

The Grand Jury further charges:

68.  Paragraphs one through six, twelve through sixty-three, and sixty-four (A) - (H) are repeated and realleged as if set forth in full herein.

69.  On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, being an American citizen and a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, made use of the mails and means and instrumentalities of interstate commerce and did acts outside the United States corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and

35

(c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, to wit, GIFFEN participated in making unlawful payments to Kazakh officials KO-1 and KO-2 as described in Count One above, and in furtherance thereof, caused the wire and bank account transfers set forth below to be made:

| Count | Description | Date |
|-------|-------------|------|
| 11 | $7,500,000 transferred from GIFFEN's Hovelon account to KO-2's Orel account in Switzerland | January 22, 1999 |
| 12 | $2,580,000 transferred from GIFFEN's Hovelon account to KO-1's Orchard Holdings account in Switzerland | April 21, 1999 |
| 13 | $10,065,000 transferred from GIFFEN's Hovelon account to KO-2's Berkut account in Switzerland | July 9, 1999 |
| 14 | $80,400 wired from Mercator's account at Citibank in New York, New York to account of Willow Cove Marina, Inc. in Stony Point, New York for purchase of Donzi speedboat. | August 3, 1999 |

(Title 15, United States Code, Section 78dd-2(a) & (i) and Title 18, United States Code, Section 2.)

## COUNTS FIFTEEN TO EIGHTEEN

### (Wire Fraud - Tengiz)

The Grand Jury further charges:

70. Paragraphs one through six, twelve through twenty-four and sixty-four (A)-(D) are repeated and realleged as if set forth in full herein.

71. On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars from the sale of an interest in the Tengiz oil field to Mobil, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $22 million in unlawful payments to be made to Kazakh officials out of Mercator's purported fees from the Tengiz transaction, and in furtherance of that scheme, caused the following wire transfers to be made:

37

| COUNT | WIRE TRANSFER | DATE |
|-------|---------------|------|
| 15 | $5 million wire transfer from Mercator's account at Citibank in New York, York to Nichem's account in Switzerland | August 26, 1996 |
| 16 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | September 17, 1996 |
| 17 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | October 22, 1996 |
| 18 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | November 19, 1996 |

(Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNT NINETEEN

### (Wire Fraud - Caspian Pipeline Consortium)

The Grand Jury further charges:

72.  Paragraphs one through six, twenty-nine through forty, and sixty-four (A) through (C) and (F) are repeated and realleged as if set forth in full herein.

73.  From in or about 1996, up to and including in or about September 1997, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the

38

people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale to Amoco of an interest in the Caspian Pipeline Consortium, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $29 million to be diverted from the CPC transaction and, from this diverted money, caused at least $20 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about March 19, 1997, caused approximately $51.4 million to be wire transferred from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNT TWENTY

### (Wire Fraud - Karachaganak PSA)

The Grand Jury further charges:

74.    Paragraphs one through six, forty-one through forty-six, and sixty-four (A) through (C) and (F) are repeated and realleged as if set forth in full herein.

75.    From in or about 1997, up to and including in or about February 1998, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and

39

unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale to an interest in the Karachaganak oil and gas field to Texaco and other oil companies, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $9 million to be diverted from the Karachaganak PSA transaction and, from this diverted money, caused at least $7.5 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about January 27, 1998, caused approximately $3.4 million to be wire transferred from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

40

### COUNT TWENTY-ONE

#### (Wire Fraud - OKIOC)

The Grand Jury further charges:

76.    Paragraphs one through six, forty-seven to fifty-fifty-one, and sixty-four (A) through (C) and (F) are repeated and realleged as if set forth in full herein.

77.    From in or about 1997, up to and including in or about May 1998, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of million of dollars from its sale to Mobil and others of certain exploration and production rights in the Kazakh sector of the Caspian sea, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $10 million to be diverted from the OKIOC transaction and, from this diverted money, caused at least $7.5 million in unlawful payments to be made to Kazakh officials, and in furtherance of that

41

scheme, on or about April 24, 1998, caused approximately $3.833 million to be wire transferred from Mobil's account at Citibank in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

### COUNT TWENTY-TWO

#### (Wire Fraud - Kazakoil)

The Grand Jury further charges:

78. Paragraphs one through six, fifty-two to fifty-eight, and sixty-four (A) through (C) and (F) are repeated and realleged as if set forth in full herein.

79. From in or about 1998, up to and including in or about July 1999, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, , and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, and a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale to Phillips Petroleum of certain exploration and production rights in the Kazakh sector of the Caspian sea, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of

42

executing such scheme and artifice, to wit, GIFFEN caused at least $20.5 million to be diverted from the Kazakhoil transaction and, from this diverted money, caused approximately $20 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about September 15, 1998, caused approximately $30 million to be wire transferred from Phillips Petroleum's account in Oklahoma, through an account at Bankers Trust in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

### COUNT TWENTY-THREE

### (Mail Fraud - Other Payments To Kazakh Officials)

The Grand Jury further charges:

80. Paragraphs one through six, fifty-nine to sixty-three, and sixty-four (A) through (C) and (G) and (H) are repeated and realleged as if set forth in full herein.

81. From in or about 1995, up to and including in or about 1999, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, including a scheme to deprive the people of Kazakhstan of the honest services of KO-1 and KO-2, for the purpose of executing such scheme and artifice, and attempting so to do,

43

unlawfully, willfully and knowingly, placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carrier, and took and received therefrom matters and things, and caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, matters and things, to wit, in furtherance of the scheme to bribe Kazakh officials by providing them with luxury items and money described above, on or about August 5, 1999, JAMES H. GIFFEN, the defendant, caused a Donzi Speedboat to be shipped by private and commercial interstate carrier from Willow Cove Marina in Stony Point, New York, to Almaty, Kazakhstan.

(Title 18, United States Code, Sections 1341, 1346 and 2.)

## COUNT TWENTY-FOUR

### (Money Laundering Conspiracy)

The Grand Jury further charges:

81.    Paragraphs one through six, twelve through fifty-eight, sixty-four (A) through (H), sixty-seven, sixty-nine, seventy-one, seventy-three, seventy-five seventy-seven and seventy-nine are repeated and realleged as if set forth in full herein.

82.    From in or about 1995, until in or about August

44

1999, in the Southern District of New York, Switzerland, and
elsewhere, JAMES H. GIFFEN, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate, and agree together and with each other to
violate Title 18, United States Code, Sections 1956(a)(1)(B)(i),
1956(a)(2)(A), and 1957.

83.    It was a part and an object of the conspiracy that
JAMES H. GIFFEN, the defendant, and others known and unknown, in
an offense involving and affecting interstate and foreign
commerce, unlawfully, willfully and knowingly, would and did
transport, transmit and transfer, and attempt to transport,
transmit and transfer, and willfully cause others to transfer,
transmit and transfer, and attempt to transport, transmit, and
transfer, funds from a place in the United States to a place
outside the United States with the intent to promote the carrying
on of specified unlawful activity, to wit, violation of the
Foreign Corrupt Practices Act ("FCPA") and wire fraud, in
violation of Title 18, United States Code, Sections 1956(a)(2)(A)
and 2(b).

84.    It was further a part and an object of the
conspiracy that JAMES H. GIFFEN, the defendant, and others known
and unknown, in an offense involving and affecting interstate
commerce, knowing that the property involved in certain financial
transactions, to wit, the transfer of money between bank
accounts, represented the proceeds of some form of unlawful

45

activity, unlawfully, willfully and knowingly would and did
conduct and attempt to conduct such financial transactions which
in fact involved the proceeds of specified unlawful activities,
to wit, violations of the FCPA and wire fraud, knowing that the
transactions were designed in whole and in part to conceal and
disguise the nature, the location, the source, the ownership and
the control of the proceeds of specified unlawful activity, in
violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

85. It was a further part and an object of the
conspiracy that JAMES H. GIFFEN, the defendant, and others known
and unknown, would and did unlawfully, willfully and knowingly
engage and attempt to engage in monetary transactions by,
through, or to a financial institution, affecting interstate and
foreign commerce, in criminally derived property of a value
greater than $10,000, such property having been derived from a
specified unlawful activity, to wit, violations of the FCPA and
wire fraud, in violation of Title 18, United States Code, Section
1957.

### Means and Methods

86. Among the means and methods by which JAMES H.
GIFFEN, the defendant, and others known and unknown, would and
did carry out the conspiracy were the following:

46

## Promotion of FCPA Violation and Wire Fraud

A.    In order to promote the FCPA violations and wire frauds charged in Counts One through Six and Fifteen through Eighteen above related to the Tengiz transaction, JAMES H. GIFFEN, the defendant, caused Mercator to transfer millions of dollars from its account in the United States to Nichem's account in Switzerland.  Through a series of subsequent transfers through secret Swiss bank accounts, GIFFEN and others known and unknown to the Grand Jury thereafter caused the funds to be transferred into accounts for the benefit of KO-1, KO-2 and their families.

B.    In order to promote the FCPA violations and wire frauds charged in Counts One, Seven through Thirteen, and Nineteen through Twenty-Two, related to the CPC, Karachaganak PSA, OKIOC, and Kazakhoil transactions, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused various American oil companies, including Mobil Oil, Texaco, Phillips Petroleum, and Amoco, to transfer millions of dollars from inside the United States to special escrow accounts that GIFFEN and other conspirators had caused to be set up at CAI  and Banque Indosuez in Switzerland.

## Concealment of Wire Fraud Proceeds

C.    As charged in Counts One and Nineteen through Twenty-Two above, JAMES H. GIFFEN, the defendant, and others known and unknown, caused a substantial percentage of the funds deposited by oil companies into escrow accounts at Banque

47

Indosuez and CAI in connection with the CPC, Karachaganak PSA,
OKIOC and Kazakhoil transactions to be diverted into the Hovelon
and Denlay accounts which GIFFEN secretly controlled. As charged
in Counts One and Fifteen through Eighteen above, GIFFEN also
caused millions of dollars in his purported fees from the Tengiz
transaction to be diverted into the Hovelon account. Thereafter,
to conceal and disguise the nature, the location, the source, the
ownership, and the control of the proceeds of the wire frauds
charged in Counts One and Fifteen through Twenty-Two above, JAMES
H. GIFFEN, the defendant, caused proceeds from those wire frauds
to be transferred from the Hovelon and Denlay accounts into the
secret Swiss bank accounts for the benefit of KO-1, KO-2 and
their families, and to a secret Swiss bank account controlled by
GIFFEN personally.

## Concealment of Wire Fraud and FCPA Proceeds

D.    In or about July 1999, JAMES H. GIFFEN, the
defendant, and others known and unknown, learned that Swiss
authorities had begun an investigation related to the secret
Swiss bank accounts beneficially owned by KO-1, KO-2 and others.
Thereafter, to conceal and disguise the nature, the location, the
source, the ownership, and the control of the proceeds of the
wire frauds and FCPA violations charged in Counts One through
Twenty-Two above, JAMES H. GIFFEN, the defendant, and others
known and unknown, transferred and attempted to transfer wire
fraud and FCPA proceeds from accounts beneficially owned by KO-2

48

into accounts in Switzerland and elsewhere in the names of Kazakh government agencies.

## Overt Acts

87.   In furtherance of the money laundering conspiracy and to effect the illegal object thereof, JAMES H. GIFFEN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

## Tengiz

A.   On or about November 6, 1995, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its account at Citibank in New York, New York to the Nichem account in Switzerland.

B.   On or about August 26, 1996, JAMES H. GIFFEN, the defendant caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

C.   On or about September 17, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

D.   On or about October 20, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

E.    On or about November 19, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

## CPC

F.    On or about March 17, 1997, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Amoco to wire transfer $50 million from an account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland.

G.    On or about June 24, 1997, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $12 million to KO-2's Orel account.

H.    On or about August 19, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to make two transfers totaling $3 million to KO-1's Orchard Holdings account.

I.    On or about September 4, 1997, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Hovelon to transfer $5 million to Brisa, Inc.

## Karachaganak PSA

J.    On or about January 26, 1998, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Texaco to wire transfer $3.4 million from its account at Chase Manhattan Bank in New York, New York to an escrow account at CAI

50

in Switzerland.

K.    On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

### OKIOC

L.    On or about April 24, 1998, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Mobil Oil to wire transfer $3.833 million from its account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

M.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

N.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

### Kazakhoil

O.    On or about September 15, 1998, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Phillips Petroleum to wire transfer $30 million from an account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

P.    On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused $7,500,000 to be transferred from the Hovelon

account to KO-2's Orel account.

Q.    On or about April 21, 1999, JAMES H. GIFFEN, the
defendant, caused $2.58 million to be transferred from the
Hovelon account to KO-1's Orchard Holdings account.

R.    On or about July 9, 1999, JAMES H. GIFFEN, the
defendant, caused $10.065 million to be transferred from the
Hovelon account to KO-2's Berkut account.

## Response To Investigation

S.    On or about August 6, 1999, KO-2 directed CAI to
transfer $84 million from his Orel account (which included
approximately $51.7 million in proceeds of the crimes alleged in
Counts One through Twenty-Two above, plus interest thereon), to
an account at Pictet & Cie in Switzerland in the name of the
Treasury of Kazakhstan.

T.    On or about August 26, 1999, JAMES H. GIFFEN, the
defendant, directed CAI to transfer the balance of KO-2's Berkut
account, approximately $10 million, to an account at CAI in
Switzerland in the name of a Kazakh government agency, the Agency
for Strategic Planning and Reform of the Republic of Kazakhstan,
and to transfer the funds in that agency's account to CAI's
London branch.

(Title 18, United States Code, Section 1956(f) & (h)).

52

### COUNTS TWENTY-FIVE to THIRTY-TWO

**(International Money Laundering to Promote
Wire Fraud And Violation Of The FCPA)**

The Grand Jury Further charges:

88. Paragraphs one through six, twelve through fifty-eight, sixty-four (A) through (H), sixty-seven, sixty-nine, seventy-one, seventy-three, seventy-five seventy-seven, seventy-nine and eighty-six (A) and (B) are repeated and realleged as if set forth in full herein.

89. On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly, transported, transmitted and transferred, attempted to transport, transmit and transfer, and caused others to transport, transmit and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud and violating the FCPA, to wit, on or about the dates set forth below, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused the wire transfers set forth below to be made in order to promote wire fraud and violations of the FCPA:

53

| Count | Wire Transfer | Date |
|-------|---------------|------|
| 25 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | August 26, 1996 |
| 26 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | September 17, 1996 |
| 27 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | October 20, 1996 |
| 28 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | November 19, 1996 |
| 29 | $51.4 million wire transfer from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland. | March 17, 1997 |
| 30 | $3.4 million wire transfer from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland | January 26, 1998 |
| 31 | $3.833 million wire transfer from Mobil Oil's account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland | April 24, 1998 |
| 32 | $30 million wire from Phillips Petroleum's account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland. | September 15, 1998 |

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2).

54

## COUNTS THIRTY-THREE TO FORTY-NINE

### (Money Laundering To Conceal Proceeds of Wire Fraud)

The Grand Jury Further charges:

90.    Paragraphs one through six, twelve through fifty-eight, sixty-four (A) through (H), seventy-one, seventy-three, seventy-five, seventy-seven, seventy-nine and eighty-six (C) are repeated and realleged as if set forth in full herein.

91.    On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of money between bank accounts, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activities, to wit, wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, on or about the dates set forth below, JAMES H. GIFFEN, the defendant, and others known and unknown, caused the transfers set forth below:

55

| Count | Transfer | Date |
|-------|----------|------|
| 33 | $20.5 million transfer from Hovelon to Orel | February 6, 1997 |
| 34 | $12 million transfer from Hovelon to Orel | June 24, 1997 |
| 35 | Two transfers, totaling $3 million, from Hovelon to Orchard Holdings | August 19, 1997 |
| 36 | $5 million transfer from Hovelon to Brisa | September 4, 1997 |
| 37 | $5 million transfer from Denlay to Orel | February 5, 1998 |
| 38 | $2.5 million transfer from Denlay to Orchard Holdings | February 5, 1998 |
| 39 | $2.011 million transfer from Denlay to Condor Capital Management | February 9, 1998 |
| 40 | $5 million transfer from Denlay to Orel | May 4, 1998 |
| 41 | $2.5 million transfer from Denlay to Orchard Holdings | May 4, 1998 |
| 42 | $350,000 transfer from Denlay to NTC International | June 29, 1998 |
| 43 | $150,000 transfer from Denlay to NTC International | July 9, 1998 |
| 44 | $2.5 million transfer from Hovelon to Condor | October 20, 1998 |
| 45 | $1.5 million transfer from Denlay to Condor Capital Management | December 30, 1998 |
| 46 | $7,500,000 million transfer from Hovelon to Orel | January 22, 1999 |
| 47 | $256,000 from Denlay to Condor Capital Management | January 27, 1999 |
| 48 | $2.58 million transfer from Hovelon to Orchard | April 21, 1999 |

| 49 | $10.065 million transfer from Hovelon to Berkut | July 9, 1999 |

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2).

## COUNTS FIFTY to FIFTY-ONE

### (Money Laundering To Conceal Proceeds of FCPA and Wire Fraud)

The Grand Jury Further charges:

92.    Paragraphs one through six, twelve through fifty-eight, sixty-four (A) through (H), seventy-one, seventy-three, seventy-five, seventy-seven, seventy-nine and eighty-six (D) are repeated and realleged as if set forth in full herein.

93.    On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of money between bank accounts, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activities, to wit, wire fraud and violations of the FCPA, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to

57

wit, on or about the dates set forth below, JAMES H. GIFFEN, the
defendant, and others known and unknown, caused and attempted to
cause the transfers set forth below:

| Count | Transfer | Date |
|-------|----------|------|
| 50 | $84 million transfer from Orel to Treasury of Kazakhstan account | August 6, 1999 |
| 51 | Direction to transfer balance of Berkut account to Agency for Strategic Planning of the Republic of Kazakhstan account | August 26, 1999 |

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2).

## COUNTS FIFTY-TWO TO FIFTY-THREE

### (Unlawful Monetary Transactions)

The Grand Jury further charges:

94.    Paragraphs one through six, twelve through fifty-
eight, sixty-four (A) through (H), sixty-seven, sixty-nine,
seventy-one, seventy-three, seventy-five seventy-seven, and
seventy-nine are repeated and realleged as if set forth in full
herein.

95.    On or about the dates set forth below, in the
Southern District of New York, Switzerland, and elsewhere,
defendant JAMES H. GIFFEN did unlawfully, willfully and knowingly
engage and attempt to engage in monetary transactions by,
through, or to a financial institution, affecting interstate and
foreign commerce, in criminally derived property of a value
greater than $10,000, such property having been derived from a

58

specified unlawful activity, to wit, violations of the FCPA and

wire fraud, to wit, GIFFEN caused the transactions set forth

below:

| COUNT | TRANSACTION | DATE |
|-------|-------------|------|
| 52 | $350,000 transfer from NTC International account in Switzerland to an account in Kazakhstan | July 1, 1998 |
| 53 | $150,000 transfer from NTC International account in Switzerland to an account in Kazakhstan | July 9, 1998 |

(Title 18, United States Code, Sections 1957(a) & (d)(2) and 2.)

## COUNTS FIFTY-FOUR TO FIFTY-NINE

### (Unlawful Monetary Transactions)

The Grand Jury further charges:

96.    Paragraphs one through six, twelve through fifty-
eight, sixty-two (A) through (H), sixty-seven, sixty-nine,
seventy-one, seventy-three, seventy-five, seventy-seven, seventy-
nine, and eighty-six (C) are repeated and realleged as if set
forth in full herein.

97.    On or about the dates set forth below, in the
Southern District of New York, Switzerland, and elsewhere,
defendant JAMES H. GIFFEN did unlawfully, willfully, and
knowingly engage and attempt to engage in monetary transactions,
through, or to a financial institution, affecting interstate and
foreign commerce, in criminally derived property of a value
greater than $10,000, such property having been derived from a

59

specified unlawful activity, to wit, wire fraud, to wit, GIFFEN engaged in the transactions set forth below:

| Count | Transaction | Date |
|-------|-------------|------|
| 54 | $132,318 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 55 | $26,253.60 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 56 | $32,748.76 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 57 | $113,253.42 check from Condor to a jewelry store in Geneva | December 28, 1998 |
| 58 | $51,293.08 check from Condor to a jewelry store in Geneva | December 28, 1998 |
| 59 | $159,714.35 check from Condor to a jewelry store in Geneva | December 28, 1998 |

(Title 18, United States Code, Sections 1957(a) & (d)(2) and 2.)

## COUNTS SIXTY to SIXTY-THREE

### (Subscribing to False Tax Returns)

The Grand Jury further charges:

98. On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, unlawfully, willfully, and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, for himself for the calendar years set forth below, which returns contained and were verified by the written declaration of GIFFEN that they were made under penalty of perjury, and which returns GIFFEN did not believe to be true and correct as to every material matter, in that (1) GIFFEN stated that he did not have

60

an interest in or a signature or other authority over a financial account in a foreign country, whereas, as GIFFEN then and there well knew and believed, he had interests in and signature and other authority over the foreign bank accounts set forth below at CAI and Banque Indosuez in Switzerland; and (2) that GIFFEN omitted from the returns identified below substantial income, generally received by way of payments from these accounts, including at least the approximate amounts from the Condor account listed below:

| Count | Tax Year | Date Subscribed | Foreign Accounts | Omitted Income |
|-------|----------|-----------------|------------------|----------------|
| 60 | 1996 | March 27, 1997 | Hovelon Condor | |
| 61 | 1997 | March 26, 1998 | NTC Hovelon Condor Denlay | $1,188,422 |
| 62 | 1998 | April 6, 1999 | NTC Hovelon Condor Denlay | $813,552 |
| 63 | 1999 | April 4, 2000 | NTC Hovelon Condor Denlay | $5,415 |

(Title 26, United States Code, Section 7206(1)).

### COUNT SIXTY-FOUR

### (Conspiracy To Defraud The United States)

The Grand Jury further charges:

99.    Paragraphs one through six and twelve through

61

sixty-three are repeated and reallaged as if set forth in full
herein.

100.    In 1995 and 1996, J. Bryan Williams was a senior
executive at Mobil Oil Corporation ("Mobil").  Williams, an
American citizen, was responsible for among other things Mobil's
oil trading operations in Russia and other parts of the former
Soviet Union, including Kazakhstan.

101.    Senior Executive One ("SE-1"), also an American
citizen, was a senior executive at Mercator Corporation from in
or about 1994, up to and including in or about 1999.  SE-1 was
responsible for, among other things, assisting JAMES GIFFEN, the
defendant, in representing the Republic in oil transactions.

102.    From in or about 1995, up to and including in or
about 1999, CC-3 was a banker at Banque Indosuez and its
successor, CAI, in Switzerland.

## The Tengiz Kickback

103.    On or about April 5, 1996, negotiations between
Mobil and the Kazakh Government over the Tengiz oil field broke
down.  On or about April 7, 1996, Mobil's Chairman dispatched J.
Bryan Williams to Kazakhstan in an effort to restore the
negotiations and bring them to closure.  Two days later, Mobil
and the Kazakh Government reached an agreement in principle on
the Tengiz deal.

104.    On May 17, 1996, Mobil wired $41 million to
Mercator's account at Citibank, in New York, New York, as payment

62

of Mercator's purported fee for the Tengiz transaction.

105.   On or about June 18, 1996, CC-3 sent a fax to Mercator indicating that Banque Indosuez anticipated receiving a $4 million transfer from Mercator, and that the transfer would contain a reference line indicating it was for "advisory services" purportedly provided by Banque Indosuez in connection with various oil transactions in Kazakhstan.

106.   On or about June 20, 1996, JAMES GIFFEN, the defendant, caused Mercator to wire $4 million from its account at Citibank in New York, New York to the Hovelon account at Banque Indosuez.  GIFFEN caused the payment to be directed to the attention of CC-3 and to be described in bank records as a payment to Banque Indosuez for "financial  advisory services" supposedly provided to the Republic of Kazakhstan.  In fact, only approximately $100,000 of the $4,000,000 went to pay the fees of Banque Indosuez.

107.   On or about June 24, 1996, JAMES GIFFEN, the defendant, caused $2 million to be transferred from the Hovelon account to a secret account that CC-3 had established at Banque Indosuez for the benefit of J. Bryan Williams.  The account was in the name of Alqi Holdings Ltd. ("Alqi"), a British Virgin Islands corporation secretly beneficially owned by Williams.

108.   Although the $2 million payment constituted income to J. Bryan Williams, Williams did not report it as income on his tax return in 1996, failed to pay the substantial tax he

63

owed as a result of the $2 million payment, and failed to disclose his control of a foreign bank account on his 1996 tax return.

109.    Although the $2 million payment came from Mercator's funds (transferred through Hovelon), JAMES H. GIFFEN, the defendant, caused the payment not to be reported to the IRS on a form 1099 or otherwise.

### The Offshore Bonus TO SE-1

110.    In or about December 1997, JAMES H. GIFFEN, the defendant, met with SE-1 to discuss the bonus to be paid to SE-1 for his work at Mercator in 1997. During the meeting, GIFFEN informed SE-1 that he wished to pay SE-1 a total bonus of $800,000, of which $400,000 would be paid to SE-1 at SE-1's account in New York. GIFFEN urged SE-1 to open an offshore account where he could receive the other $400,000. GIFFEN then arranged for CC-3 to assist SE-1 in opening an account at CAI in Switzerland in the name of an offshore entity, Lamin Securities, Inc. ("Lamin"), secretly for the benefit of SE-1.

111.    Between February and May, 1998, JAMES H. GIFFEN, the defendant, caused a total of $400,000 to be transferred from his Condor account to SE-1's Lamin account.

112.    Although the complete $800,000 paid to SE-1 was compensation for SE-1's work at Mercator, JAMES H. GIFFEN, the defendant, caused Mercator to report to the IRS only the $400,000 paid to SE-1 in the United States and to fail to report to the

64

IRS the $400,000 in compensation paid to SE-1 that was
transferred to SE-1's Lamin account in Switzerland.

## Giffen's Offshore Compensation

113.    With the assistance of CC-3, JAMES H. GIFFEN,
the defendant, maintained substantial proceeds of the oil
transactions described in paragraphs 12 through 58 above in
accounts in the name of Condor, Hovelon, and Denlay.

114.    JAMES H. GIFFEN, the defendant, used the funds
in those accounts to pay various personal expenses, including to
purchase lavish jewelry for GIFFEN's paramours.

115.    JAMES H. GIFFEN, the defendant, caused Mercator
not to report GIFFEN's receipt of these funds to the IRS on a
form 1099 or otherwise, and hid his receipt of those funds by,
among other things, failing to acknowledge his ownership and
control of the Condor, Hovelon and Denlay accounts on his
personal income tax returns, failing to file required forms with
the United States Department of Treasury disclosing the accounts,
and failing to report the income on his federal income tax
returns. GIFFEN also failed to report to the IRS income
attributable to interest earned on funds on deposit in the
Condor, Denlay, and Hovelon accounts.

## Statutory Allegations

116.    From in or about 1995, up to and including in or
about 2000, in the Southern District of New York and elsewhere,
JAMES H. GIFFEN, the defendant, and others known and unknown,

unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS"), by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes.

## Means and Methods

117.    Among the means and methods by which JAMES H. GIFFEN, the defendant, and others known and unknown, carried out the objects of the conspiracy were the following:

A.    CC-3 opened bank accounts at Banque Indosuez and its successor, CAI, in the names of various offshore entities, including Condor, Denlay, Hovelon, Alqi, and Lamin.

B.    JAMES H. GIFFEN, the defendant, with the assistance of CC-3, caused secret bonuses to be paid to Williams and SE-1 by causing funds to be secretly transferred to the Alqi and Lamin accounts.

C.    JAMES H. GIFFEN, the defendant, caused funds to be distributed from the Condor, Denlay and Hovelon accounts to pay GIFFEN's personal expenses.

D.    JAMES H. GIFFEN, the defendant, caused Mercator to file false tax reporting documents with the IRS which omitted the payments to SE-1 and Williams.

E.    JAMES H. GIFFEN, the defendant, filed false

66

personal income tax returns which ommited GIFFEN's control of Condor, Denlay and Hovelon, and income he received from those accounts.

## Overt Acts

118.    In furtherance of the conspiracy and to effect the illegal objects thereof, JAMES H. GIFFEN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

A.    On or about June 18, 1996, CC-3 sent a fax to the Merchant Bank.

B.    On or about June 20, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $4 million from its Citibank account in New York, New York to the Hovelon account in Switzerland.

C.    On or about June 24, 1996, JAMES H. GIFFEN, the defendant, caused $2 million to be wired from the Hovelon account in Switzerland to the Alqi account in Switzerland.

D.    On or about April 15, 1997, J. Bryan Williams filed a false federal income tax return, omitting the $2 million received in the Alqi account on June 24, 1996.

E.    On or about October 28, 1997, JAMES H. GIFFEN, the defendant, caused approximately 246,000 Swiss Francs to be paid from the Condor account to Gubelin, SA, a jeweler in Geneva, Switzerland.

F.    On or about October 28, 1997, JAMES H. GIFFEN, the

defendant, caused approximately 369,000 Swiss Francs to be paid from the Condor account to Les Ambassadeurs, SA, a jeweler in Geneva, Switzerland.

G.    In or about December 1997, JAMES H. GIFFEN, the defendant, met with SE-1 in New York, New York.

H.    On or about February 6, 1998, JAMES H. GIFFEN, the defendant, caused $200,000 to be transferred from his Condor account to SE-1's Lamin account.

I.    On or about May 25, 1998, JAMES H. GIFFEN, the defendant, caused $200,000 to be transferred from his Condor account to SE-1's Lamin account.

J.    On or about December 15, 1998, JAMES H. GIFFEN, the defendant, caused $132,318.41 to be paid from the Condor account to Bucherer, a jeweler in Geneva, Switzerland.

K.    On or about December 28, 1998, JAMES H. GIFFEN, the defendant, caused $159,714.35 from the Condor account to be paid to Elie Chatila SA, a jeweler in Geneva, Switzerland.

L.    On or about March 17, 1999, JAMES H. GIFFEN, the defendant, caused Mercator to file a false form 1120S with the IRS, omitting the $400,000 offshore bonus paid to SE-1.

(Title 18, United States Code, Section 371)

## COUNT SIXTY-FIVE

### (Obstructing The Enforcement Of The Revenue Laws)

The Grand Jury further charges:

119.    Paragraphs 99 through 115, 117(A) through (E) and 118(A) through (N) are repeated and realleged as if set forth in full herein.

120.    From in or about December 1997, up to and including in or about 1999, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, corruptly obstructed and impeded, and endeavored to obstruct and impede, the due administration of the internal revenue laws, to wit, GIFFEN corruptly arranged to pay SE-1 a $400,000 bonus from GIFFEN's secret Condor account in Switzerland to SE-1's secret Lamin account in Switzerland, and to cause that payment not to be reported to the IRS, in order to enable SE-1 to evade taxes on the bonus payment.

(Title 26, United States Code, Section 7212(a))

### FORFEITURE ALLEGATIONS

121.    As a result of committing one or more of the money laundering offenses alleged in Counts 24 through 59 of this Indictment, JAMES H. GIFFEN, the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 982 all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to:

A.    A sum of money equal to $84.33 million, and
      all interest and proceeds traceable thereto,
      in that such sum in aggregate is property
      which was involved in the money laundering
      offenses or is traceable to such property.

B.    The contents of the following accounts:

      (1)    Account No. 1244450D in the name of
             Berkut Holdings Ltd. at CAI, Geneva,
             Switzerland;

      (2)    Account No. 1221320 in the name of Brisa
             Inc. at CAI, Geneva, Switzerland;

      (3)    Account No. 1051073Z in the name of
             Condor Capital Management Ltd. at CAI,
             Geneva, Switzerland;

      (4)    Account No. 1225580N in the name of
             Denlay Associates Ltd. at CAI, Geneva,
             Switzerland;

      (5)    Account No. 1063954 in the name of Dundy
             Trading Corp. at Banque Bruxelles
             Lambert (Suisse) SA, Geneva,
             Switzerland;

      (6)    Account No. 1200035 in the name of
             Hovelon Trading S.A. at CAI, Geneva,
             Switzerland;

      (7)    Account No. 431-5003660-65 in the name

of Mercator Corporation at Chase
Manhattan, New York, New York;

(8)  Account No. 1220420L in the name of NTC
International Inc. at CAI Indosuez,
Geneva, Switzerland;

(9)  Account No. 1200067Z in the name of
Orchard Holdings Ltd. at CAI Indosuez,
Geneva, Switzerland;

(10) Account No. 1017789E in the name of Orel
Capital Limited at CAI Indosuez, Geneva,
Switzerland;

(11) Account No. 1215300V in the name of
Tulerfield Investment Inc., at CAI
Indosuez, Geneva, Switzerland.

C.  $51.7 million on deposit in the Treasury of
the Republic of Kazakhstan, account T-94025,
at Pictet & Cie, Geneva, Switzerland, and all
interest and proceeds traceable thereto.

## SUBSTITUTE ASSETS PROVISION

122. If any of the property described above as being
subject to forfeiture, as a result of any act or omission of the
defendant--

(A) cannot be located upon the exercise of due
diligence;

(B) has been transferred or sold to, or deposited with,

71

a third party;

        (C) has been placed beyond the jurisdiction of the court;

        (D) has been substantially diminished in value; or

        (E) has been commingled with other property which cannot be divided without difficulty; it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property, including but not limited to the following:

        123.    All right, title, and interest of JAMES H. GIFFEN, the defendant, in all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1000 Old White Plains Road, Mamaroneck, New York, 10543.

        124. All right, title, and interest of JAMES H. GIFFEN, the defendant, in all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 25 Beechtree Drive, Larchmont, New York 10538.

125. All right, title, and interest of JAMES H.
GIFFEN, the defendant, in the Mercator Corporation.

(Title 18, United States Code, Sections 982, 1956 & 1957.)


_____              _____
FOREPERSON                                 DAVID N. KELLEY
                                           United States Attorney

73

E
08-301
JDB

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jack J. Grynberg et. al. | BP P.L.C. et. al. |

88888

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Denver
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Indianapolis
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pride Law Office LLC
Kelly Pride Hebron, Esq.
1400 Mercantile Lane, Suite 208
Largo, MD 20774

Case: 1:08-cv-00301
Assigned To : Bates, John D.
Assign. Date : 2/21/2008
Description: General Civil

## II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

◉ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☒ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

11

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans**<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ **1 Original Proceeding**　○ **2 Removed from State Court**　○ **3 Remanded from Appellate Court**　○ **4 Reinstated or Reopened**　○ **5 Transferred from another district (specify)**　○ **6 Multi district Litigation**　○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Violation of RICO § 1962 (a)  Plaintiff seeking recovery from Defendants' proportionate share of bribes charged unknowingly and unwittingly to Plaintiff.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** 6,075,000.00  **JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES** ☒ **NO** ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**　(See instruction)　**YES** ☐　**NO** ☐　If yes, please complete related case form.

DATE  2-21-08　　**SIGNATURE OF ATTORNEY OF RECORD**  *Kelly Pride Hebron*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**　COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**　CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**　CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**　CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**　RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.