IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  )
JACK J. GRYNBERG, GRYNBERG                                         )
PRODUCTION CORPORATION (TX),                                      )
GRYNBERG PRODUCTION CORPORATION                                   )
(CO) and PRICASPIAN DEVELOPMENT                                   )
CORPORATION (TX),                                                 )         08 Civ. 301
                                                                  )         Judge Bates
                                    Plaintiffs,                   )
                                                                  )
            -and-                                                 )
                                                                  )
BP P.L.C., a United Kingdom corporation d/b/a                     )
BP CORP NORTH AMERICA INC., an Indiana                            )
corporation, STATOILHYDRO ASA, a Norwegian                        )
corporation, BG GROUP P.L.C., a United                            )
Kingdom corporation, BG NORTH AMERICA, a                          )
Texas corporation, JOHN BROWNE, ANTHONY                           )
HAYWARD, PETER SUTHERLAND, HELGE                                  )
LUND, EIVIND REITEN, ROBERT WILSON,                               )
FRANK CHAPMAN, individuals,                                       )
                                                                  )
                                    Defendants.                   )
                                                                  )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## <u>DECLARATION OF DANIEL L. ABRAMS</u>

1.      I am a member in good standing of the bar of the State of New

York and am the principal of the Law Office of Daniel L. Abrams,

PLLC.  I have been admitted *pro hac vice* for purposes of serving as

counsel for the Plaintiffs in this case.  I submit this Declaration in

opposition to the motions to dismiss submitted by Defendants BP,

p.l.c., StatoilHydro ASA. John Browne, Anthony Heyward, Peter Sutherland and Helge Lund.

2.      Attached hereto as Exhibit A is an Alexander's Oil and Gas Connections Article dated February 12, 2001.

3.      Attached hereto as Exhibit B is a "Kazakhstan Fact Sheet" downloaded from Chevron's website.

4.      Attached hereto as Exhibit C is an Article Published on August 13, 2004 in the International Freedom Network publication.

5.      Attached hereto as Exhibit D is the Order Instituting Cease-and-Desist Proceedings, Making Finding, and Imposing a Cease-and-Desist Order on Statoil, Dated October 13, 2006.

6.      Attached hereto as Exhibit E is a May 16, 2007 News Digest published by the Central Asia-Caucasus Institute.

7.      Attached hereto as Exhibit F is a copy of a Proposed Bill (H.R. 6188) introduced by Congressman Ed Permutter of Colorado.

8.      Attached hereto as Exhibit G is a compilation of materials concerning Defendant Anthony (a/k/a Tony) Hayward.

9.      Attached hereto as Exhibit H is a copy of the Complaint in the case of SEC v. Monty Fu, 07 Civ. 01735 (EGS) (D.D.C. 2007).

10.      Attached hereto as Exhibit I is a copy of the Complaint in the case of SEC v. Philip, 07 Civ. 01836 (D. Ore. 2007).

11.    Attached hereto as Exhibit J is an interactive Map of BP's American operations, downloaded from the BP website.

12.    Attached hereto as Exhibit K is a compilation of materials concerning Defendant John Browne.

13.    Attached hereto as Exhibit L is a document on file with the SEC concerning Defendant John Browne.

14.    Attached hereto as Exhibit M is a document downloaded from BP's website containing biographical information about Defendants Browne and Hayward.

15.    Attached hereto as Exhibit N is a document downloaded from BP's website containing biographical information about Defendant Sutherland.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 26, 2008

_____
Daniel L. Abrams



**Company News: Central Asia**

Volume 6, issue #5 - 08-03-2001

  
sponsored by:

# Oil and Gas of Uzbekistan

# Agip to singly operate Kashagan oil field

12-02-01 The long battle to manage the world's biggest oil field development project was set to end when members of an international consortium drilling Kazakhstan's Kashagan field will formally announce that they have elected Agip of Italy as single operator, sources in Almaty said. The decision was taken in London at a meeting of the nine members of the consortium operating Kashagan, known as the Offshore Kazakhstan International Operating Co. (OKIOC), the sources said.

It will be formally presented to Vladimir Shkolnik, Kazakhstan's energy and mineral resources minister, and an announcement will follow, they added. The Kazakh government sold its share in OKIOC two years ago and has little say in the selection of an operator.

Until now, Shell provided 80 % of the expatriate staff but had to take each major decision after consulting its eight partners in monthly meetings, a decision-making structure that was becoming unacceptably inefficient as OKIOC prepares to bring in a second drilling platform and expand exploration, OKIOC officials said.

Agip is the smallest of the four candidates, which campaigned hard for the position. Agip is already the operator for a gas and condensate field in Karachaganak, north of the Caspian near the Russian border.

"This kind of opportunity comes only once in a lifetime," said Robert Ebel of the Centre for Strategic and International Studies in Washington. The other candidates were ExxonMobil, the world's biggest oil company; world No. 2 Shell; and No. 4 TotalFinaElf.

Each started the campaign with 14.29 % of the shares of OKIOC. British Gas has an identical share but was not a candidate for operator. BP, the world's third-largest major, bought into the consortium late and only had 9.52 %. Faced with the impossibility of becoming operator, it agreed 10 days ago to sell its stake to TotalFinaElf.

The French company will further increase its stake to 28.59 % by buying Statoil's 4.76 %, an executive close to the deal said. The sale has not yet been announced.At stake is a huge structure that is believed likely to yield more than 2 mm bpd. It is probably the world's fifth-largest oil field, though exactly how much of its oil is recoverable is not certain.

The oil field is 85 by 25 km, a 350-mm-year-old coral reef buried 5 km beneath the shallows of the north Caspian Sea. It is located about 50 km south of the Caspian's sparsely populated northern coast.

Together with Tengiz, a smaller, similar oil-bearing structure located onshore 160 km east of Kashagan, and several other fields, Kashagan will likely boost Kazakhstan's production to 4 mm bpd in 15 years, experts say. The total investment required for Kashagan's development is estimated to be close to $ 20 bn.

Kashagan had been considered too difficult to drill by the Soviet authorities, who preferred to

concentrate on easier fields in Siberia. Soon after independence, the Kazakh government invited oil companies to bid for the project, and OKIOC was the result.

Only two test wells have been drilled so far. But the positive results, along with a seismic survey conducted two years ago and a striking geological similarity with the Tengiz structure - both are part of what is known as the Pre-Caspian Basin - lead oilmen to conclude that the field will probably be extremely profitable in the long run.

"The only possible problem is that there could be too much gas," said one oilman knowledgeable of the drilling results. As operator, Agip will face a daunting array of technical challenges. None is unique, but their presence in a single oil field is, say the oilmen.

Kashagan - named after a turn-of-the-century Kazakh poet - is located in the middle of a nature preserve zone, which will entail strict environmental constraints. The oil is highly pressured and has a high content of gas and sulphur, requiring the construction of expensive treatment plants on shore. And the field is located in depths of 10 meters or less, so a berm or an island must be created for every drilling platform.

Furthermore, the level of the Caspian rises and falls unpredictably. It rose 2 meters in the 1980s and 1990s, only to fall half a meter and level off. No one is sure why. In summer, storm winds can cause the level to rise by a meter. In winter, the north Caspian freezes and the ice drifts, so each platform must have an ice shield. And because of the ice, no platform can be displaced between November and March.

But the most delicate problem is that the Caspian is far from any open sea. Five governments are vying for Kashagan's oil to flow through their territories, bringing lucrative transit fees and the promise of political influence: Russia offers existing pipeline networks to Europe as well as a new pipeline from Tengiz to Novorossisk, a Russian port on the Black Sea, that is due to start carrying oil in July; Turkey and Georgia, backed by Washington, are pushing for the construction of an all-new pipeline from Baku to Ceyhan on Turkey's Mediterranean coast.

Turkey, fearing an environmental disaster, is anxious to staunch the already-steep increase in tanker traffic through the Bosporus; Iran argues that the cheapest pipeline route lies through the Persian Gulf, the nearest point to Asia's growing energy markets. Oil companies tend to agree, though there are questions about financing because of US sanctions against Tehran; a pipeline to China's Sin-Kiang province, which abuts Kazakhstan, is also a possibility.

Oilmen involved in the drilling predict that ultimately a combination of routes will be used to export Kashagan's oil. First, some will be sent through the existing pipeline network to Europe via Russia. Then, the Tengiz-Novorossisk pipeline will absorb some more.

Finally, in a few years' time, US sanctions against Iran may be lifted. If they are not, the share of the two US companies that are members of OKIOC (ExxonMobil and Philips Petroleum), or about 22 %, will have to flow through non-Iranian routes, which the oilmen say does not present a problem.

No decision on transport is likely to be made until the appraisal phase is completed, with another six or so wells drilled this year and next. By then, a decision on the Baku-Ceyhan pipeline may already have been taken.

Some oilmen involved in the OKIOC consortium believe there will be more buying and selling of OKIOC shares in the next two years. "I think that by the time the appraisal is over, the big decisions will have to be taken and real money is going to have to be spent," said one oilman close to OKIOC. "There will have been a consolidation of the ownership. Instead of nine partners, there will be four or five, and the biggest shareholder will naturally become the operator."

Source: The Moscow Times

Alexander's Gas & Oil Connections / 1996 - 2007



**Chevron Corporation**
6001 Bollinger Canyon Road
San Ramon, CA 94583
+1.925.842.1000

**www.chevron.com**

# Kazakhstan Fact Sheet

## Highlights of Operations

As Kazakhstan's largest private oil producer, Chevron holds important stakes in the nation's two biggest producing oil projects — Tengiz and Karachaganak. Both fields were discovered in 1979.

Chevron became the first major Western oil firm to gain a presence in Kazakhstan with the formation of Tengizchevroil in 1993. Known as TCO, the partnership also is developing the nearby Korolev Field. Chevron holds a 50 percent interest in TCO.

The Tengiz is the world's deepest operating super-giant oil field, with the top of the reservoir at about 12,000 feet deep (3,657 m).

TCO is undergoing a significant expansion composed of two integrated projects referred to as the Sour Gas Injection (SGI) and Second Generation Plant (SGP). At a total combined cost of approximately $7.2 billion, these projects are designed to increase TCO's crude oil production capacity from approximately 300,000 barrels per day to approximately 540,000 barrels per day. The SGI portion of the project started up in 2007. Full facilities are expected to start up in the second half of 2008.

In 1997, Chevron legacy company Texaco acquired a 20 percent stake in Karachaganak, Kazakhstan's second-largest producing petroleum reserve.

In 2001, Chevron — in conjunction with 10 companies and government partners – opened the 935-mile (1,505-km) Caspian Pipeline Consortium (CPC) pipeline from Tengiz to the Black Sea port of Novorossiysk. Chevron is the largest private shareholder in the CPC. A separate 24-inch, 400-mile (644-km) pipeline that links the Karachaganak Field to the CPC system at Atyrau began operations in 2003. The pipelines provide a critical export route for crude oil from Tengiz and Karachaganak.

Another Chevron initiative is the polyethylene pipe plant in Atyrau. The plant is the first such facility in Kazakhstan.

Chevron has been a strong supporter of programs that enhance human development and social infrastructure in Kazakhstan. The company's efforts were recognized when it received the Best Social Partner 2005 award

bestowed by the city administration of Almaty. Chevron was the only foreign company honored at the awards ceremony.

## Business Portfolio

### Exploration and Production

Total daily production in Kazakhstan in 2007 was 558,000 barrels of crude oil and natural gas liquids and 1.3 billion cubic feet of natural gas (242,000 barrels of net oil equivalent). We are involved in two of the country's largest projects: Tengizchevroil and Karachaganak.

### Tengizchevroil

Tengizchevroil's total production in 2007 averaged 305,000 barrels of crude oil per day (132,000 net). In the second half of 2008, TCO's total crude oil capacity is expected to increase to approximately 540,000 barrels per day.

This dramatic increase will be driven by two integrated projects: SGI and SGP, at a total cost of about $7.2 billion. In addition to the crude oil increase, the projects are expected to increase total natural gas production capacity to approximately 760 million cubic feet per day and natural gas liquids production capacity to approximately 46,000 barrels per day.

About one-third of the total natural gas produced from the expansion is expected to be reinjected into the Tengiz reservoir. We expect this will have two key effects. First, SGI reduces the sour gas processing capacity required at SGP, which increases liquid production capacity and lowers the quantities of sulfur and gas that would otherwise be generated. Second, SGI is expected, over time, to increase production efficiency and recoverable volumes as the injected gas maintains higher reservoir pressure and displaces oil toward producing wells. Most important, success with SGI will pave the way to apply the technology more broadly within the Tengiz reservoir, with the potential to increase recoverable reserves.

First oil from the expansion was achieved in 2007. Full startup of gas processing, LPG extraction and sulfur facilities at the second generation plant is anticipated in the second half of 2008.

The SGP is a large processing train for treating crude oil and the associated sour gas. Since 2002, 56 wells were drilled, deepened and/or completed in the Tengiz and Korolev reservoirs to generate the volumes required for the new SGP train.

### Karachaganak

Karachaganak is a natural gas and condensate field located in northwest Kazakhstan. Operated by Karachaganak Petroleum Operating, it is one of the

© 2001-2008 Chevron Corporation. All rights reserved.

world's largest hydrocarbon reserves. Chevron has a 20 percent share in the field. In 2007, total production from Karachaganak averaged 225,000 barrels of liquids per day (41,000 net) and 805 million cubic feet of natural gas per day net of reinjection volumes (166 million net).

During 2007, Chevron and our Karachaganak partners continued work on a fourth oil stabilization train designed to process 56,000 total barrels of condensate per day into stabilized oil for export to high-value world crude oil markets. The fourth train is expected to start up in 2009.

**Marketing and Retail**

Chevron has a 15 percent interest in the 935-mile (1,505-km) CPC crude oil export pipeline that runs from the Tengiz Field in Kazakhstan to the Black Sea port of Novorossiysk in Russia. CPC has 11 transportation agreements in place, and it transported an average of 700,000 barrels of crude oil per day in 2007, including 545,000 barrels per day from Kazakhstan and 155,000 barrels per day from Russia.

As of early 2008, essentially all TCO's production was being exported through the CPC pipeline. CPC is seeking stockholder approval to expand the pipeline to accommodate higher TCO volumes anticipated in 2009. In the meantime, rail car loading and rail exporting facilities were expanded in 2007 to handle increases in SGI/SGP production.

Chevron- and Texaco-branded lubricants are available in selected markets throughout Eurasia region.

In April 2003, Chevron opened a $24 million polyethylene pipe plant in Atyrau, the first such facility in Kazakhstan. The plant has state-of-the-art equipment and technology and can produce 15,000 tons per year of high-density polyethylene pipe.

**In the Community**

As a partner in TCO and independently, Chevron has been a strong contributor to community programs in Kazakhstan.

In 1999, TCO launched the Egilik (Kazakh for "benefit") program to support a range of community outreach efforts. Since then, TCO has allocated more than $71 million to meet community health, education and social infrastructure needs, including hospitals, university buildings, schools, gasification and power lines, upgrading of sewage systems, water supply, resurfacing of roads, and the beautification of buildings within Atyrau and the Zhylyoi region (home of the Tengiz Field).

© 2001-2008 Chevron Corporation. All rights reserved.

The Egilik program follows TCO's five-year, $50 million Atyrau Bonus Fund, which sponsored social infrastructure projects such as health clinics, a local bakery, a boiler plant and new homes for flood victims.

TCO has also provided financial assistance to local entrepreneurs in such areas as agriculture, catering, and medical and community services. Since 1997, TCO has allocated more than $7.2 million to these small-business development programs.

Between 1993 and the end of 2007 Chevron has provided more than $121 million in support — through the Egilik and Atyrau Bonus programs — for community health, education and social infrastructure programs within the Atyrau Oblast.

TCO's educational sponsorships are wide-ranging, including equipping several schools in Atyrau and the Zhylyoi region with computer classes, supporting an applied economics seminar at Atyrau University, and funding school presentations on oil and gas and summer camp presentations on environmental issues.

In 2004, as part of Chevron's effort to promote economic development and entrepreneurship, the company established the first business incubation facility in Atyrau. This innovative project, which supplements other entrepreneurship programs in Atyrau, helps create a favorable environment for small businesses and startups. A joint project was supported by the United Nations Development Program, Chevron, the CitiGroup Corp. and local government. The business incubation initiative facilitates links between small service companies and manufacturing and other large companies.

Since 2004, Chevron has been carrying out a unique pilot vocational training project for children in the city of Almaty. Through this program, in 2006 more than 100 students between the ages of 14 and 17 years old from Almaty Orphanage No. 2 and Boarding School No. 8 learned professional skills in basic carpentry and furniture making, plumbing and pipe fitting, and construction, including interior completion and basic wiring. In 2007, the project expanded to Atyrau with joint funding from TCO. Plans call for an outreach to Astana in 2008.

In 2006 Chevron, the Eurasia Foundation, and the Ministry of Culture and Information started a business development program for artisans. The multiyear project aims to increase their competitiveness in both domestic and international markets and ultimately increasing their standard of living while preserving national cultural heritage.

Chevron initiated We Share the Planet Earth, a long-term umbrella program that includes the development and implementation of a nationwide environmental curriculum in the primary and secondary schools, an annual

© 2001-2008 Chevron Corporation. All rights reserved.

ecology art contest, a nationwide contest of practical scientific projects among high school students, and volunteer environmental actions.

Chevron also supports health care projects and cultural groups.

At Karachaganak, in western Kazakhstan, Chevron and its partners commit $10 million each year to a social fund that supports sustainable development projects in the areas of health, education, and environmental awareness and protection.

## Record of Achievement

### Health, Environment and Safety

Chevron is committed to protecting the environment wherever it operates in Kazakhstan. During pipeline construction, for example, the CPC spent about $300 million for environmental protection. To minimize its ecological footprint, the CPC used advanced fiber-optic sensing and monitoring systems, buried the entire length of the pipeline and drilled horizontally under riverbeds. Now the CPC employs X-ray inspection techniques at the operational phase and is acutely aware of environmental sensitivity in choosing sites of key mooring facilities.

For 2007, the combined TCO employees' and contractors' days-away-from-work rate was 0.021 (incidents per 200,000 hours worked), an achievement that compares very favorably with worldwide industry data.

Another safety milestone occurred in October 2007, when the Chevron-operated polyethylene plant in Kazakhstan surpassed 500,000 hours worked without accidents. The plant, located in Atyrau, has had a perfect lifetime safety record since it opened in April 2003.

### Economy

Chevron's direct financial payments to the nation of Kazakhstan include employee salaries, purchases of goods and services from national suppliers, tariffs and fees paid to state-owned companies, and royalties paid to the government.

Overall, TCO's investment is expected to reach $20 billion over a 40-year period. From 1993 to the end of 2007, TCO's direct payments to Kazakhstan entities, including employees, reached $21.7 billion. In 2007 alone, those payments exceeded $5 billion. Kazakh citizens make up about 80 percent of the Tengiz workforce (up from 50 percent in 1993) and constitute more than 69 percent of its supervisors, managers and specialists.

In 2006, the Tengiz field produced its billionth barrel of oil.

© 2001-2008 Chevron Corporation. All rights reserved.

At Karachaganak, new commitments in the period 2004–2005 included more than 50 percent local resources, or $260 million of direct investment in Kazakh goods and services. This high level of local participation is possible because of the improved ability of local companies to provide goods and services and because of their status as preferred partners with foreign contractors servicing the field.

As Kazakhstan's largest enterprise, TCO supports the republic's efforts to increase the utilization of goods and services provided by Kazakh companies. In the past two years, TCO has spent more than $2.3 billion on goods and services purchased through Kazakh companies.

Chevron applies the most up-to-date equipment, technology, methods and expertise to its oil and gas business in Kazakhstan. The company applies all of its technologies with the goal of increasing reserves and production, accelerating development, and reducing costs. By adapting advanced downstream processing technologies to upstream applications, Chevron is ensuring that national workers are exposed to the latest developments in oil field operations.

In addition, select national employees receive opportunities to advance their professional training, either in Kazakhstan or in the United States.

## Contact Us

**Chevron Eurasia Business Unit**
CDC-1 Center, 8th Floor
240G Furmanov Street
Almaty, Kazakhstan 050059
Telephone: +7.327.298.0662

Updated: March 2008

*This document contains contains forward-looking statements about future events and the future operational and financial performance of Chevron. Words such as "anticipates," "expects," "intends," "plans," "targets," "projects," "believes," "seeks," "schedules," "estimates," "budgets" and similar expressions are intended to identify such forward-looking statements. These statements are based on management's current expectations, estimates and projections; are not guarantees of future performance; and are subject to certain risks, uncertainties and other factors, some of which are beyond our control and are difficult to predict. Actual results may differ significantly from results discussed in the forward-looking statements. You should not place undue reliance on these forward-looking statements. For a detailed listing of the potential factors affecting Chevron's business and these forward-looking statements, please refer to Chevron's periodic reports on Forms 10-Q and 10-K that are filed with the United States Securities and Exchange Commission. Unless legally required, Chevron undertakes no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.*

© 2001-2008 Chevron Corporation. All rights reserved.



business in eurasia

HOME
ABOUT
NEWS

- Press Releases
- Open Letters
- Statements
- Publications
- Surveys
- Democratic Struggle
- Business in Eurasia
- Newsletter

EVENTS
RESOURCES



## Kazakhgate Trial Moved to January 2005

By Marlena Telvick
13 August 2004



NEW YORK (August 13) – Just two months prior to the start of one of the largest anti-bribery cases in U.S. history: U.S. vs. James Giffen, observers in a pre-trial hearing held July 29th learned that the trial date would not hold and were ushered out of the federal courtroom less than thirty minutes into the proceedings for national security reasons.

In postponing the October 4th start date, Judge William Pauley III cited delays in receiving documents from prosecutors, the complexity of the arguments on both sides of the case and "a whole range of issues that need to be ventilated," including whether Swiss authorities would agree to permit "American-style cross-examination" in depositions that prosecutors will take in Switzerland. A day later, he officially moved the trial to January 18, 2005.

It wasn't the best showing by federal prosecutors. At the start of the proceedings, the judge admonished them for submitting a 35-page brief and other documents at 6:25 pm the night before the hearing "without any prior notice" and "with the expectation that I'm sitting there waiting for nothing but to drop everything and read the government's submission and then rule on it without ever hearing from the defendant."

Assistant U.S. Attorney Peter Neiman cited delays in talking to "government agencies that were implicated" as the reason for their ninth-hour submission, a process he says did not get completed until just three days before the hearing. Neiman expressed "unending regret" that his team was unable to issue their response sooner.

Despite his attempts to mollify the judge, a prickly undercurrent directed against prosecutors peppered the hearing.

### The matter at hand

James Giffen, 63, the CEO of Mercator Corp., a small New York-based merchant bank is the target of a massive four-year Department of Justice investigation that resulted in a 62-count indictment in 2003. As counselor to the President of Kazakhstan, starting in 1995, Giffen advised the Republic on numerous oil and gas transactions. Giffen is accused of paying $78 million in cash and luxury items between 1995 and 1999 to Kazakh President Nursultan Nazarbayev and then-Prime Minister Nurlan Balgimbayev in violation of the U.S. Foreign Corrupt Practices Act (FCPA) of 1977.

Giffen allegedly bribed Nazarbayev and Balgimbayev with funds paid by U.S. oil companies Mobil, (now ExxonMobil), Texaco (now ChevronTexaco), Phillips Petroleum (now ConocoPhillips) and Amoco, (now British Petroleum (BP) in connection with various fees for the purchase of oil and gas rights in the 1990s.

### Classified CIA documents

In the July 29th hearing, one of the key issues discussed involved complying with the requirements of the Classified Information Procedures Act. Access to classified CIA documents was granted in a successful motion by Giffen's defense team in June.

The Classified Information Procedures Act of 1980, known as "CIPA" is essentially a procedural statute that provides framework for judges to view and later rule on the



admissibility of classified information as evidence in open court. Commonly used in espionage and terrorism cases, CIPA procedures are generally conducted in closed and sealed sessions so the judge can evaluate the classified nature of the information and determine whether there is a balance that can be reached to protect national security and allow the case to move forward.

Once they have these documents in hand, Giffen's attorneys can evaluate whether they substantiate assertions made earlier this year that "close and repeated contact" with officials at the CIA, FBI and State Department could provide for a possible "public authority" defense.

The public authority defense is available when a defendant commits an illegal act based on a statement or act of a government agent with actual legal authority to empower the commission of that illegal act. In July, the judge agreed that this defense may be viable when ruling that, "if the United States was encouraging Giffen to ingratiate himself to senior Kazakh officials through his financial dealings with them, [he] may be able to assert a public authority defense."

Giffen's attorney Steven Cohen said in an interview last week "it remains to be seen" whether his team will seek a public authority defense. By law, they must make known their intention to mount this defense sixty days before trial.

**Skepticism of Public Authority Defense**

A former CIA agent familiar with the case, speaking on the condition of anonymity expressed deep skepticism of the viability of a public authority defense in this case. "Giffen did not say, 'I'm going to send money to Nazarbayev in Switzerland' – he never had authority from the CIA to take kickbacks. It just didn't happen," the former agent says.

"This is a case of the U.S. outsourcing both diplomacy and intelligence during the 1990s when the CIA lost its mission," says the former agent. He describes Giffen as a political gadfly with "overt" as opposed to covert relations with U.S. government agencies; an elbow-rubber with interesting insights into Russia and Kazakhstan, but "was never an agent for the CIA."

If the defense does proceed with a public authority defense, they will most likely face hurdles with the CIA, according to those familiar with such cases. "While Giffen will try to establish that the series of contacts with U.S. government officials led him to believe he was acting with the blessing of the government, the CIA will probably argue that contacts were solely for obtaining information from Giffen with no imputation of authority to act for the Agency in any way," says Dr. Michael Douglas Smith, a professor of intelligence studies at American Military University who worked nineteen years at the CIA.

"The CIA has had for decades an outreach program to U.S. businesses to obtain information about countries and their leaders, economic conditions, and any other information that might be useful to policymakers in Washington," Smith says "but only in very rare occasions [are] requests actually asking for the person to act as an agent. The CIA doesn't want to place cooperating U.S. persons in danger of criminal prosecution because that would result in most people refusing to help the Agency in any way. If [Giffen] was really an agent of the CIA, I would have expected this to have never reached the present stage."

The CIA would not comment on specific questions relating to a possible preparation of a public authority defense, spokesman Tom Crispell said this week, "As this is a matter before the court, it would be inappropriate for us to comment on the case."

Giffen's lawyers say he had contact with a host of high-powered individuals, including Brent Scowcroft of the National Security Council, Secretaries of State James Baker and Lawrence Eagleburger, and former U.S. ambassador to Kazakhstan Elizabeth Jones, now assistant secretary at the State Department. Yet, it is unclear at this stage what role these individuals could have in the trial if Giffen presents the 'public authority' defense.

However, it is known that exiled former Prime Minister Akezhan Kazhegeldin will serve as a witness for the prosecution. In a recent posting to his web site, it states that in August 1999, before the investigation began in the U.S., Giffen passed a memorandum to him in the Dorchester Hotel in London offering a guarantee that he would not be arrested or detained by Kazakh authorities on his return to Kazakhstan if he "keeps silent about the oil deals."

Kazhegeldin's U.S. attorney could not be reached for comment, but the scenario is corroborated in a September 25, 2000 Washington Post article by Michael Dobbs on the subject. According to the site, the details will be uncovered at the upcoming trial

in New York. "They will come as a real surprise to Giffen and his co-conspirators in Astana."

**Reaction from Kazakhstan**

In a June hearing, Giffen's lawyer, William Schwartz asserted "The best intelligence the CIA got on Kazakhstan they got from Giffen," and that the classified documents they sought "may corroborate the kind of missions that Giffen was sent on" by intelligence agencies.

The Kazakhstan Embassy in Washington declined to comment on President Nazarbayev's reaction to the defense put forth by Giffen's attorneys that his advisor had provided information to the CIA, but in a written statement provided last week, spokesman Roman Vassilenko said "It is the official policy of the Republic of Kazakhstan not to comment on matters that take place in the United States courts. However, we are hopeful that nothing in the litigation relating to James Giffen will affect the positive relationship between the Republic of Kazakhstan and the United States. In light of current world events, it is now more important than ever that the Republic of Kazakhstan and the United States continue to work together within a mutually beneficial relationship."

"After three to four years, the case has become a non-event in the policy making community in the U.S.," says Martha Brill Olcott, an author and Senior Associate at the Carnegie Endowment for International Peace who has been working in the region for a quarter-century. She says there are no indicators that this case has affected U.S./Kazakh relations. "The Kazakh-U.S. relation is based on pragmatism, and this is a very important relation for the U.S."

Moreover, Olcott sees no thawing in relations from the Kazakh government side after Giffen's defense team's assertion that he provided information to the U.S. government while acting as an advisor to the country became public. "If anything, Giffen is closer to the Kazakhs than he was six months ago. The hypothesis that the Kazakhs might be offended by Giffen providing information to the U.S. intelligence community does not appear to be sustained by reality," Olcott says. "This relationship was one that suited Giffen's commercial interests, but it also served Kazakhstan's interests."

**Clearing the Court**

Increasingly, much of this case is being withheld from public view, in part because the prosecution is responsible for taking 'reasonable precautions against the unauthorized disclosure of classified information' during a case, even when it is the defendant who seeks to use classified information.

In addition to filing the government's latest brief under seal, in it U.S. Attorney Peter Neiman requested that the discussion of CIPA issues be held "in camera," which typically limits access to sensitive materials to a judge's chambers. Neiman made the request "not because the government would be planning to make any classified disclosures in the context of such a discussion, but inevitably in these cases there's always the possibility that the defense, perhaps even inadvertently, would do so."

"Just to be safe, it's better not to have the discussion in open court. The court can always unseal it later," Neiman told the court.

Giffen's attorney William Schwartz opposed the sealed brief and asked the judge to unseal it since it did not contain "a single sentence about classified information...it is all about procedure." He also expressed surprise that the portion of the hearing to discuss CIPA issues before the judge would be closed. "I am now told that I might inadvertently have classified information that I am about to reveal, even though they haven't given me any," he said.

Judge Pauley responded that "It may well be that other eyes, more informed, are looking at these proceedings... apparently we have someone in the courtroom who can provide information to us, and I am going to afford that individual an opportunity in camera."

That "someone" was likely Clifford Rones from the Counterespionage Section of the Department of Justice brought in by prosecutors to provide CIPA expertise, according to court documents. The Counterespionage Section typically supervises the investigation and prosecution of cases affecting national security and foreign relations, but also coordinates criminal cases involving the application of CIPA.

Pauley then directed that the courtroom be cleared. Twenty-four pages of the hearing transcripts remain under seal.

**Additional developments**

Last week, Sabine Zaugg of the Swiss Federal Office of Justice (FOJ) confirmed a July report from Switzerland-based Aktion Finanz Platz that "$7.8 million was handed over to the U.S. District for the Court of New York" in November 2003. These funds were reportedly used to pay fees and restitution to the U.S. government by former Mobil employee J. Bryan Williams, another defendant in the case. Williams is currently serving a 46-month prison sentence for tax evasion, including on a $2 million kickback paid by Giffen out of fees from Mobil's (now ExxonMobil) $1.05 billion stake in the massive Tengiz oil field in 1996, according to court records.

It is unclear whether the $7.8 was part of the $120 million frozen by Swiss authorities in June 2000 in response to a Mutual Legal Assistance Treaty (MLAT) request from the United States Department of Justice and supplemental requests made in 2001. Since the MLAT requests are under seal, the U.S. Attorney's Office cannot comment on these funds.

The Swiss FOJ confirmed in June that these assets are to remain frozen until the end of the ongoing MLAT proceedings. Typically in a criminal case, if a defendant is found guilty the court will order an ancillary hearing where interested parties can argue for their right to these funds.

Giffen's attorney William Schwartz also arranged a deal with the U.S. Attorney's Office to return his American passport so that he can travel to Switzerland to attend foreign depositions.

A case status conference has been set for September 9. Jury selection will begin January 18th.

*Marlena Telvick is an independent journalist based in San Francisco. Her work has appeared in the New York Times, Washington Post, San Francisco Chronicle and in reports by PBS FRONTLINE and the Center for Investigative Reporting. This story is one in a series of reports on the ongoing "Kazakhgate" case.*

Home | Print | Contact

© 2004 IFN Ltd.

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 54599 / October 13, 2006**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-12453**

| | |
|---|---|
| **In the Matter of**<br><br>**STATOIL, ASA,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Statoil, ASA ("Statoil" or the "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over the Respondent and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934 ("Order"), as set forth below.

**III.**
**FACTS**

On the basis of this Order and the Respondent's Offer, the Commission finds[1] that:

**Summary**

1.      In June 2002 and January 2003, Statoil paid bribes to an Iranian government official (the "Iranian Official") in order for him to use his influence to: (i) assist Statoil in obtaining a contract to develop three phases of the South Pars oil and gas field in Iran (the "South Pars Project") and (ii) open doors to additional projects in the Iranian oil and gas exploration industry.  The Iranian Official was the head of the Iranian Fuel Consumption Optimizing Organization ("IFCOO"), a subsidiary of the National Iranian Oil Company ("NIOC").  Statoil agreed to pay the Iranian Official through a consulting contract (the "Contract") with an intermediary company (the "Consulting Company") organized in the Turks and Caicos Islands and nominally owned by a third party located in London, England.  The Contract obligated Statoil to make initial payments of $200,000 and $5 million, and ten subsequent annual payments of $1 million each.  In October 2002, Statoil obtained the contract to develop the South Pars Project. Statoil made the initial payments to the Iranian Official, but in June 2003, Statoil suspended payments under the Contract.  On September 6, 2003, the Contract was publicly disclosed in the Norwegian press.  On September 10, 2003, Statoil terminated the Contract.  The next day, the Norwegian authorities announced an investigation into the Contract.  During the relevant time period, Statoil employees circumvented Statoil's internal controls and procedures that were in place to prevent illegal payments, and Statoil lacked sufficient internal controls.  In addition, by mischaracterizing the payments as legitimate consulting fees, Statoil violated the books and records provisions of the federal securities laws.

**Respondent**

2.      Statoil is a public company organized under the laws of the Kingdom of Norway and headquartered in Stavanger, Norway.  Statoil explores for and develops oil and gas resources around the globe, and has American Depositary Shares that trade under the symbol STO on the New York Stock Exchange and are registered pursuant to Section 12(b) of the Exchange Act (15 U.S.C. § 78l(g)).  Statoil is required to file reports with the Commission under Section 13 of the Exchange Act (15 U.S.C. § 78m), and is an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1.

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

**Background**

3.        Statoil is an international oil and gas company involved primarily in the exploration for, development, production, and sale of oil and natural gas from the Norwegian Continental Shelf and elsewhere.  In late 2000 and early 2001, under its former Chief Executive Officer ("CEO"), Statoil was pursuing opportunities to expand its business internationally.  At that time, Statoil held participation interests in several exploration and production licenses outside of Norway, but held only a few small operatorships outside of Norway.  In the fall of 2000, Statoil hired a new senior executive to direct Statoil's International Exploration and Production Department ("Senior Executive"), who reported directly to the CEO.

4.        Statoil identified Iran as a country to focus on to secure operatorships.  The Iranian Ministry of Oil, through NIOC and various wholly-owned companies, controls the rights to develop the oil and gas resources of Iran.  In November 2000, Statoil and NIOC entered into a Cooperation Agreement, which identified areas of mutual interest for future cooperation between Statoil and NIOC.

5.        In the spring of 2001, certain Statoil employees in Iran accepted an invitation from one of the Iranian Official's relatives to meet with the Iranian Official.  These Statoil employees learned that the Iranian Official's father was a former president of Iran who led the Expediency Council, a body that mediated between the politically-elected and the clerically-controlled parts of Iran's government.  After meeting with the Iranian Official, Statoil tested and assessed the Iranian Official's influence by, among other things, having the Iranian Official send a message back to Statoil through the Iranian Oil Minister.  A Statoil employee described the test as demonstrating that the Iranian Official was "powerful" and was the "link" to opportunities to obtain business in Iran.  After the initial contacts, Statoil determined that the Iranian Official was an advisor to the Oil Minister, and that the Iranian Official's family was powerful and highly influential in the oil and gas business in Iran.  At the time Statoil employees made contact with the Iranian Official, Statoil employees knew of publicly reported accusations of corruption against the Iranian Official's family, but did not perform any due diligence to investigate the accusations.

6.        In August 2001, the Iranian Official visited Statoil's facilities in Stavanger, Norway, and met with senior Statoil employees, including a chief adviser to the CEO, the Senior Executive, and a senior employee in Statoil's International Exploration and Production Department who had direct responsibility for Statoil's activities in Iran (the "E & P Executive").  The Iranian Official's position and influence were well known to Statoil management participating in this meeting.  The written agenda for the visit referred to the Iranian Official as "President NIOC, Iranian Fuel Cons. Org."  The Iranian Official was also described in internal Statoil documents as an "advisor[] to the Iranian Oil Minister" and a "very important guest[]."  At the time, internal Statoil memoranda described the Iranian Official's family as "control[ling] all contract awards within oil and gas in Iran."

## **The Bribery**

7.      In the second half of 2001 and into 2002, the Senior Executive discussed with Statoil's CEO the possibility of entering into a consulting contract to arrange payments to the Iranian Official, and began negotiating the terms with the Iranian Official.  In November 2001, Iranian authorities proposed that Statoil consider seeking a participation interest in a subcontract to develop the South Pars Project, under a contract awarded to an Iranian oil and gas development company (the "Development Company") that was indirectly owned and controlled by the Iranian Ministry of Oil.

8.      In December 2001, the Iranian Official sent a sample consulting contract and payment proposal to the Senior Executive, which the Iranian Official represented had previously been used in his dealings with other multinational oil companies.  In January 2002, the Senior Executive provided the CEO with a memorandum that described a proposal from the Iranian Official that would have required Statoil to (i) pay a "success fee" payable upon Statoil's being awarded a participation interest in the development of the South Pars Project; (ii) provide money for "charities" of the Iranian Official's choice; and (iii) make payments through an offshore company.

9.      Although the CEO objected to the Iranian Official's proposal, the CEO ultimately approved Statoil's entering into a contract with the Iranian Official in the total amount of $15.2 million to be paid over approximately 11 years.  The final Contract was structured as a payment for vaguely-defined consulting services through a third-party offshore company.  The Iranian Official was not named in the Contract because disclosing Statoil's relationship with the Iranian Official could likely jeopardize Statoil's ability to obtain business in Iran.

10.      In return for the payments, the Iranian Official used his influence to assist Statoil in obtaining business in Iran.  For example, the Iranian Official (i) provided Statoil employees in Iran nonpublic information concerning oil and gas projects in Iran and (ii) showed Statoil copies of bid documents of competing companies that Statoil could not access through appropriate channels.

11.      On May 15, 2002, Statoil and the Development Company entered into an agreement in principle that provided the central terms for Statoil's participation in the offshore portion of the Development Company's contract for the South Pars Project.  At that time, it was contemplated that the contract for the South Pars Project would be finalized by June 15, 2002, although several issues remained to be negotiated.

12.      On June 12, 2002, the E & P Executive, acting on a power of attorney from the CEO, signed the Contract on behalf of Statoil.  When Statoil signed the Contract, the Senior Executive believed that Statoil would be awarded a participation interest in the development of the South Pars Project.  Statoil and the Development Company signed a Participation Agreement in October 2002, which Statoil expected would yield millions of dollars in profit.

13.    In late June 2002, Statoil received an invoice from the Consulting Company instructing it to pay $200,000 under the terms of the Contract, and instructing that the money be routed through a United States bank in New York, New York to a bank account in Switzerland held by a company not named in the Contract.  Statoil made the payment on June 26, 2002, according to the instructions in the invoice.  In December 2002, Statoil received a second invoice from the Consulting Company instructing it to pay $5 million, with payment instructions identical to those in the June 2002 invoice.  On January 15, 2003, Statoil paid $5 million pursuant to the instructions in the invoice.

14.    Statoil violated the anti-bribery provisions of the federal securities laws contained in the Foreign Corrupt Practices Act when it arranged for the payments to the Iranian Official.  The payments were intended to (i) induce the Iranian Official to use his influence with NIOC; (ii) influence NIOC's decision about whether to award Statoil a participation interest in the development of the South Pars Project that would net Statoil several millions of dollars; and (iii) secure improper advantage for Statoil by positioning it to obtain future business in Iran, potentially worth hundreds of millions of dollars.

### Books and Records Violations

15.    Statoil failed to properly account for the illegal payments and failed to accurately describe the Contract in its books and records.  Instead, Statoil improperly characterized the payments it made as legitimate payments for "consulting fees for special consultants and analyses relating to technical, administrative, tax, and financial matters…," and improperly characterized the Contract as an ordinary consulting agreement.

### Internal Controls Violations

16.    In entering into the Contract, certain Statoil management responsible for the Contract circumvented Statoil's internal controls designed to prevent illegal payments.  They concealed the Contract's true nature and true parties, and violated Statoil's procurement policies by directing that the Contract should be entered into and that payments be made under the Contract to parties not named in the Contract.  Statoil management responsible for the Contract performed no due diligence concerning the named or unnamed parties to the Contract.  Statoil had inadequate systems for review of the Contract and lacked controls sufficient to provide reasonable assurances that the Contract complied with applicable laws.  Statoil's lack of sufficient internal controls enabled executives responsible for the Contract to conceal the illegal payments to the Iranian Official.

### Statoil's Response and Recent Events

17.    In late March 2003, Statoil's internal audit department reported to Statoil's Chief Financial Officer ("CFO") that Statoil had paid $5.2 million under a consulting agreement to an entity that had not been named in the Contract.  In compliance with Statoil's internal procedures, and at the direction of the CFO and head of internal audit,

Statoil's security group began an inquiry into the Contract. As part of its inquiry, the security group determined that even though he was not named in the Contract, the Iranian Official was the "consultant" under the Contract, and confirmed his position and family ties in Iran. In early June 2003, the security group prepared an "internal investigative report" which concluded that there was "a strong indication of the consultant being involved in corrupt-like practices," and that by entering into the Contract, Statoil may have violated Norwegian and U.S. anti-bribery laws.

18.    In spite of the security group's troubling report, Statoil's senior management failed to take appropriate action to address the Contract and Statoil's relationship with the Iranian Official. On June 5, 2003, the security group and Statoil's chief internal auditor presented their findings to Statoil's then-Chairman of the Board, who, instead of taking up the matter, told them that the matter should be investigated further and taken up by the CEO. Later in June 2003, the security group presented its findings to the CEO, recommending that no more payments be made under the Contract and that the Contract be terminated. The CEO agreed to suspend payments under the Contract, but the CEO refused to terminate the Contract or to address further the principal concerns of the security group.

19.    On September 6, 2003, the Contract was disclosed in the Norwegian press and on September 10, 2003, Statoil terminated the Contract, while Statoil's internal audit and security group divisions were still working to finalize a letter to the Board of Directors addressing the Contract. After the Contract's existence became public knowledge, the Senior Executive and the Chairman of the Board resigned. As a consequence of Statoil's Board of Directors expressing no confidence in him, the CEO also resigned.

20.    On September 23, 2003, the Commission staff contacted Statoil to inform Statoil of the staff's inquiry. Since then, Statoil has cooperated with the staff's investigation, producing all documents and information that the staff requested, including voluntary production of documents protected by the attorney-client privilege pursuant to a non-waiver agreement and early production and identification to the staff of relevant documents. Statoil also agreed to make employees available for interviews and encouraged employee cooperation by agreeing to pay travel expenses and attorneys' fees. Statoil's Board of Directors has taken remedial actions, including retaining outside counsel to conduct an investigation of the Contract, and a separate investigation into other non-Norwegian contracts, the results of which were provided to the staff. Statoil has also designed and is implementing a remedial plan, which includes (i) the creation of a corporate compliance officer and ethics committees, (ii) expanded roles for Statoil's Audit Committee to oversee compliance with the FCPA and other applicable foreign bribery laws, (iii) new reporting lines directly to the Audit Committee and Board of Directors, (iv) new ethics, procurement, and due diligence policies, (v) enhanced programs for educating and training executives and employees on ethical matters, including FCPA/anti-bribery compliance training, and (vi) an ethical help-line operated by a third-party, which provides anonymity for callers.

6

### Norwegian Authorities' Actions

21.    On September 11, 2003, Norwegian government authorities from the National Authority for Investigation and Prosecution of Economic and Environmental Crime ("Økokrim") seized documents from Statoil's offices as part of an investigation of Statoil.  On June 29, 2004, following its investigation, Økokrim issued penalty notices to Statoil in the amount of approximately $3 million and to the Senior Executive in the amount of approximately $30,000, charging them with violating Norway's trading-in-influence statute.  Statoil and the Senior Executive agreed to pay the penalties without admitting or denying the violations.

## IV.
## FEDERAL SECURITIES LAW VIOLATIONS

1.    As a result of the conduct described above, Statoil violated Section 30A of the Exchange Act, which prohibits any issuer with a class of securities registered pursuant to Section 12 of the Exchange Act, in order to obtain or retain business, from giving, or authorizing the giving of, anything of value to any foreign official for purposes of influencing the official or inducing the official to act in violation of his or her lawful duties, or to secure any improper advantage; or to induce a foreign official to use his influence with a foreign government or foreign governmental instrumentality to influence any act or decision of such government or instrumentality.

2.    As a result of the conduct described above, Statoil violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect their transactions and disposition of their assets.

3.    As a result of the conduct described above, Statoil violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded in accordance with management's general or specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

4.    As a result of the conduct described above, Statoil violated Section 13(b)(5) of the Exchange Act, which prohibits any person or company from knowingly circumventing or knowingly failing to implement a system of internal accounting controls as described in Section 13(b)(2)(B), or knowingly falsifying any book, record, or account as described in Section 13(b)(2)(A).

5.      As a result of the conduct described above, Statoil violated Rule 13b2-1 of the Exchange Act, which prohibits any person or company from, directly or indirectly, falsifying or causing to be falsified, any book, record or account subject to Section 13(b)(2)(A).

## V.

In determining to accept the Offer, the Commission considered remedial acts undertaken by the Respondent and cooperation afforded the Commission staff.

## VI.
## UNDERTAKINGS

Respondent undertakes to:

1.      Retain, through its Board of Directors, within sixty (60) calendar days of the issuance of this Order, and for a period of three years from the date of retention, an independent compliance consultant ("Compliance Consultant"), not unacceptable to the staff of the Commission, to review and evaluate Statoil's internal controls, record-keeping, and financial reporting policies and procedures as they relate to Statoil's compliance with the books and records, internal accounting controls, and anti-bribery provisions of the FCPA, codified at Sections 13(b)(2)(A), 13(b)(2)(B), and 30A of the Exchange Act. This review and evaluation shall include an assessment of those policies and procedures as actually implemented in practice. The compensation and expenses of the Compliance Consultant, and of the persons hired under his or her authority, shall be paid by Statoil. Statoil may extend the time period for retention of the Compliance Consultant with prior written approval of the Commission staff.

2.      Statoil shall cooperate fully with the Compliance Consultant. The Compliance Consultant shall have the authority to take such reasonable steps, in the Compliance Consultant's view, as necessary to be fully informed about the operations of Statoil within the scope of his or her responsibilities under this Order. To that end, Statoil shall provide the Compliance Consultant with access to files, books, records, and personnel that fall within the scope of his or her responsibilities under this Order, provided that Statoil shall not be obligated to provide the Compliance Consultant with files, books and records that are protected by the attorney-client privilege or work product doctrine and that are not the subject of a non-waiver of privilege agreement with the Commission. However, if the Compliance Consultant requests access to materials or information that Statoil reasonably believes to be protected by the attorney client privilege or the work product doctrine, Statoil shall in good faith consider that request, and shall consider whether providing access would assist the Compliance Consultant in performing his or her duties. It shall be a condition of the Compliance Consultant's retention that the Compliance Consultant is independent of Statoil and that no attorney-client relationship shall be formed between them.

3.      Statoil shall require the Compliance Consultant to assess whether Statoil's policies and procedures are reasonably designed to detect and prevent violations of the

FCPA, and during the three-year consultancy, Statoil shall require the Compliance Consultant to conduct an initial review and prepare an initial report, followed by two follow-up reviews and follow-up reports as described below.  With respect to each of the three reviews, after initial consultations with Statoil, the United States Department of Justice ("DOJ"), and the Commission staff, Statoil shall require the Compliance Consultant to prepare a written work plan for each of the three reviews, which shall be submitted to Statoil, the Commission staff, and DOJ.  Statoil shall require the Compliance Consultant to submit the same work plan to the Commission staff and DOJ, and the work plan as finally adopted by the Compliance Consultant shall be the same for both agencies.  In order to conduct an effective initial review and to fully understand any existing deficiencies in controls, policies, and procedures related to the FCPA, the Compliance Consultant's initial work plan shall include such steps as are necessary to develop an understanding of the facts and circumstances surrounding the violations described above in Section III.  As a condition of the Compliance Consultant's retention by Statoil, the Compliance Consultant shall agree to maintain the confidentiality of Statoil's trade secrets and other confidential business information in conformity with Norwegian law, and to give due consideration to Statoil's need for operational flexibility and preservation of business relationships with third parties, provided that nothing in this paragraph shall preclude the Compliance Consultant from sharing such confidential information with the Commission staff and DOJ.

4.      In connection with the initial review, Statoil shall require the Compliance Consultant to issue a written report, within one hundred twenty (120) calendar days after being retained, setting forth the Compliance Consultant's assessment and making recommendations reasonably designed to improve Statoil's program, policies, and procedures for ensuring compliance with the FCPA.  Statoil shall require that the Compliance Consultant provide the report to Statoil's Board of Directors and contemporaneously transmit a copy to the following individuals or their successors: (1) Bruce Karpati, Assistant Regional Director, Division of Enforcement, Securities and Exchange Commission, 3 World Financial Center, Room 4300, New York, NY 10281-1022; (2) Deborah E. Landis, Assistant United States Attorney, 1 St. Andrews Plaza, New York, NY 10007; and (3) Mark F. Mendelsohn, Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 10th and Constitution Ave., N.W. (Bond), Washington, D.C. 20530.  Statoil shall allow the Compliance Consultant to extend the time period for issuance of the report with prior written approval of the DOJ and the Commission staff.

5.      Within one hundred twenty (120) calendar days after receiving the report, Statoil shall adopt all recommendations in the report of the Compliance Consultant; provided, however, that within one hundred twenty (120) calendar days after receiving the report, Statoil shall advise the Compliance Consultant and the Commission staff in writing of any recommendations that it considers to be unduly burdensome, impractical, costly, or contrary to Norwegian law. With respect to any recommendation that Statoil considers unduly burdensome, impractical, costly, or contrary to Norwegian law, Statoil need not adopt that recommendation within that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or

purpose.  As to any recommendation on which Statoil and the Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within sixty (60) calendar days after Statoil serves the written advice.  In the event Statoil and the Compliance Consultant are unable to agree on an alternative proposal, Statoil shall abide by the determinations of the Compliance Consultant, to the extent such proposal would not cause Statoil to violate Norwegian law.  With respect to any recommendation that the Compliance Consultant determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, Statoil shall allow the Compliance Consultant to extend the time period for implementation with prior written approval of the Commission staff and DOJ.

6.      Statoil shall require the Compliance Consultant to undertake two follow-up reviews to determine whether Statoil's policies and procedures are reasonably designed to detect and prevent violations of the FCPA.  Within one hundred twenty (120) calendar days of initiating each follow-up review, the Compliance Consultant (i) shall complete the review, (ii) certify whether Statoil's anti-bribery compliance program, including its policies and procedures, is appropriately designed and implemented to ensure compliance with the FCPA, and (iii) report on the Compliance Consultant's findings in the same fashion as set forth in paragraph VI.4 with respect to the initial review. Statoil shall adopt the follow-up recommendations in the same fashion as set forth in paragraph VI.5 with respect to the initial review.  The first follow-up review shall commence one year after retention of the Compliance Consultant, and the second follow-up review shall commence at least one year after completion of the first follow-up review.  Statoil shall allow the Compliance Consultant to extend the time period for these follow-up reviews with prior written approval of the Commission staff and DOJ, provided that the tenure of the Compliance Consultant shall only exceed three years if Statoil has not fulfilled its responsibilities as described in this Undertakings section.

7.      In undertaking the reviews described in Paragraphs VI.1 through VI.6 above, Statoil shall require the Compliance Consultant to formulate conclusions based on sufficient evidence obtained through, among other things, (i) inspection of documents, including, but not limited to, all of Statoil's policies and procedures relating to Statoil's anti-bribery compliance program; (ii) onsite observation of Statoil's systems and procedures, including, but not limited to, Statoil's internal controls, recordkeeping and internal audit procedures; (iii) meetings with and interviews of Statoil employees, officers, directors and any other relevant persons; and (iv) analyses, studies and testing of Statoil's anti-bribery compliance program.   In undertaking such assessment and reviews, the Compliance Consultant, at his or her own discretion, may rely, to a reasonable extent and after reasonable inquiry, on reports, studies, and analyses issued or undertaken by other consultants hired by Statoil prior to the date of this Order.

8.      The Compliance Consultant's charge, as described above, is to review Statoil's controls, policies and procedures related to the compliance with the FCPA.  To the extent the Compliance Consultant, during the course of his or her assessment, discovers that corrupt payments or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by any Statoil entity or person, or any entity

or person working directly or indirectly for Statoil, Statoil shall require the Compliance Consultant to promptly report such payments to Statoil's Corporate Compliance Officer, to its Audit Committee, and to its outside counsel for further investigation. If the Compliance Consultant refers the matter to Statoil's Corporate Compliance Officer, its Audit Committee, and its outside counsel, Statoil shall promptly report the same to the Commission staff and DOJ at the addresses listed in paragraph VI.4. If the Compliance Consultant reasonably concludes that disclosure to Statoil's Corporate Compliance Officer, its Audit Committee, or its outside counsel would be inappropriate for any reason, the Compliance Consultant may limit such disclosure to any one or more of the foregoing parties. If the Compliance Consultant reasonably concludes that disclosure to even one of the foregoing parties would be inappropriate for any reason, Statoil shall allow the Compliance Consultant to refer the matter directly to the Commission staff, DOJ, or Norwegian law enforcement officials or authorities. In the event of such a direct referral, Statoil shall require the Compliance Consultant to make a similar disclosure to Statoil's Corporate Compliance Officer, its Audit Committee, or its outside counsel as soon as the reason for the nondisclosure has abated, unless directed not to do so by the Commission staff, DOJ, or other relevant authorities. If Statoil fails to make such disclosure within ten (10) calendar days of the report of such payments to Statoil's Corporate Compliance Officer, to its Audit Committee, or to its outside counsel, Statoil shall allow the Compliance Consultant to independently disclose his/her findings to the staff of the Commission and DOJ at the addresses listed in paragraph VI.4. Further, in the event that any Statoil entity or person, or any entity or person working directly or indirectly for Statoil, refuses to provide information necessary for the performance of the Compliance Consultant's responsibilities, Statoil shall require the Compliance Consultant to disclose that fact to the Commission staff and to DOJ. Statoil shall not take any action to retaliate against the Compliance Consultant for such disclosures. The Compliance Consultant is not precluded from reporting other criminal or regulatory violations discovered in the course of performing his or her duties, in the same manner as described above.

9.      It is understood that no provision of this Order is intended to, or can, prejudice or otherwise affect Norway's jurisdiction and right to enforce within Norway its relevant national laws and treaty obligations, nor shall any provision of this Order require Statoil to take any action that constitutes a breach of Norwegian law.

10.     Statoil shall require the Compliance Consultant to enter into an agreement with Statoil that provides that for the period of engagement and for a period of two years from completion of the engagement, the Compliance Consultant shall not enter into any additional employment, consultant, attorney-client, auditing or other professional relationship with Statoil, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Compliance Consultant will require that any firm with which he or she is affiliated or of which he or she is a member, and any person engaged to assist the Compliance Consultant in performance of his or her duties under this Order shall not, without prior written consent of the Securities and Exchange Commission's Division of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional

relationship with Statoil, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.  To ensure the independence of the Compliance Consultant, Statoil shall not have the authority to terminate the Compliance Consultant without the prior written approval of the Commission staff and the DOJ.

## VII.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Statoil's Offer.

Accordingly, it is hereby ORDERED that:

i.      Respondent Statoil cease and desist from committing or causing any violations and any future violations of Exchange Act Sections 30A, 13(b)(2)(A), 13(b)(2)(B), 13(b)(5), and Rule 13b2-1 thereunder;

ii.     Respondent Statoil comply with the undertakings enumerated in Section VI. above; and

iii.    Respondent Statoil, within ten days of the entry of this Order, pay disgorgement of $10,500,000 to the United States Treasury.  Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (D) submitted under cover letter that identifies Statoil as a Respondent in these proceedings and the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Helene T. Glotzer, Associate Director, Northeast Regional Office, Securities and Exchange Commission, 3 World Financial Center, Suite 4300, New York, NY 10281.

By the Commission.

Nancy M. Morris
Secretary

# Central Asia-Caucasus Institute
## Analyst

Published on Central Asia-Caucasus Institute Analyst (http://www.cacianalyst.org)

# 16 May 2007 News Digest

By Alima Bissenova (05/16/2007 issue of the CACI Analyst)

**Swiss to Hand Over $84 Million in Blocked Assets to Kazakhstan**
4 May
Switzerland said Friday it has agreed to send $84 million in blocked assets to Kazakhstan. The Foreign Ministry said the cash had been frozen in Switzerland as the result of a corruption case involving an American businessman and oil concessions in the Central Asian nation. It said Switzerland, the United States and Kazakhstan agreed to the arrangement earlier this week. While the ministry's statement did not identify the businessman, the details of the case appear to correspond with U.S. investigations of James H. Giffen, a New York banker indicted in 2003 on charges of making more than $78 million in unlawful payments to two senior Kazakh officials. Giffen allegedly made the payments in the 1990s on behalf of U.S. oil companies, including Mobil Oil Corp, to obtain concessions to exploit oil resources. The indictment accused Giffen of defrauding Kazakhstan out of millions in oil dollars. Ambassador Paul Seger, head of the Swiss ministry's international law department, said only that the transfer of funds had been agreed to as part of a deal between U.S. authorities and the American businessman, whom he also declined to identify. "The funds will be used for the benefit of needy children in Kazakhstan," the ministry said. The U.S. and Switzerland will both be allowed to veto the transfer of any funds, it said. The World Bank will help the three countries in monitoring payments. (AP)

Â

**MINISTER SAYS KAZAKHSTAN SUPPORTS TURKMENISTAN-CHINA PIPELINE PROJECT**

**4 May**

Kazakh Energy Minister Baktykozha Izmukhambetov told Interfax that Kazakhstan supports the construction of a natural gas pipeline from Turkmenistan to China through Kazakhstan. Izmukhambetov said that Kazakh Prime Minister Karim Masimov "specifically discussed the issue of the route of the future gas pipeline from Turkmenistan to China" on a recent visit to Turkmenistan. Izmukhambetov added, "We have various proposals and options. If the option [of building the gas pipeline] through Uzbekistan directly through southern Kazakhstan and on to China is passed, we also have some of our own proposals." Turkmenistan and China signed a framework agreement in 2006 to build a pipeline to export Turkmen gas to China by 2009 with an annual capacity of 30 billion cubic meters. (Interfax)

Â

**DAUGHTER OF KYRGYZ EX-PRESIDENT FACES CHARGES**

**5 May**

Prosecutors in Chuy Province on May 5 charged Bermet Akaeva, daughter of former Kyrgyz President Askar Akaev, with obstruction of justice, contempt of court, and the destruction of documents. Prosecutor Jumadyl Makeshov said the charges stemmed from the actions of Akaeva's supporters in Kemin during her disputed bid to run in an April 29 parliamentary by-election. Akaeva signed a statement agreeing not to leave Bishkek and to remain home at night. In a statement to 24.kg on May 5, ex-president Akaev said, "I am sure that these charges have no legal grounds. It is painful for me to see that she has been subjected to unprecedented moral and physical torture since 28 April." (24.kg)

Â

**TURKMENISTAN HOPES FOR COOPERATION WITH U.S. OIL COMPANY**
7 May
Turkmen President Gurbanguly Berdymukhammedov told managers from U.S.-based Chevron on May 3 that he would like Chevron to take part in exploration, oil refining, and development projects in the

Turkmen sector of the Caspian Sea, turkmenistan.ru reported. The meeting in Ashgabat was attended by Guy Hollingsworth, managing director of Chevron Eurasia, and Ian MacDonald, who heads Chevron's Russian operations, "The Moscow Times" reported. No further details were provided in the official Turkmen report, but a Chevron spokesman said in a statement, "We believe Turkmenistan has all the opportunities for becoming one of the world's oil majors and hope Chevron will be capable of rendering support to the development of the Turkmen oil and gas sector." (RFE/RL)

Â

## BRITISH POLITICAL, CULTURAL ELITE SLAMS RUSSIAN ABUSES IN CHECHNYA

**7 May**

More than 100 British luminaries have appended their signatures to a letter, published on May 7 in "The Independent," deploring "persistent human rights abuses and war crimes" in Chechnya and calling on President Putin to "take whatever action he can to restore peace and the rule of law." The signatories implicitly rejected Putin's argument that the installation of Ramzan Kadyrov as pro-Moscow republic head will expedite a return to peace and stability, pointing out that, on the contrary, Kadyrov's administration represents for the majority of Chechens "little more than a regime of fear and oppression." The signatories include the present and former leaders of the Liberal Democrats, Charles Kennedy and Menzies Campbell, and former Conservative Foreign Secretary Malcolm Rifkind. (RFE/RL)

Â

## AZERBAIJANI PRESIDENT CLAIMS ARMENIA HAS MADE CONCESSIONS OVER KARABAKH SETTLEMENT

**7 May**

Speaking on May 4 at the ceremonial inauguration of a new settlement near Baku for displaced persons who fled their homes during the Karabakh conflict, Azerbaijan's President Ilham Aliyev claimed that Armenia has made key concessions regarding how that conflict is to be resolved. Specifically, Aliyev claimed that Yerevan has agreed to relinquish over a period of several years control of seven Azerbaijani districts bordering on Nagorno-Karabakh, after which a decision will be taken on the disputed region's status within Azerbaijan. But both Armenian Prime Minister Serzh Sarkisian and Foreign Ministry spokesman Vladimir Karapetian denied later on May 4 that Yerevan's negotiating position has changed in any way. Armenian Foreign Minister Vartan Oskanian explained in June 2006 that Armenian forces will not be withdrawn from Lacin and Kelbacar until after a referendum is held to determine Karabakh's future status. (RFE/RL)

Â

## TWO AZERBAIJANI JOURNALISTS SENTENCED
**7 May**
Baku's Sabayil district court passed sentence on May 4 on journalist Rafiq Tagi and editor Samir Sadatoglu in connection with an article published in November 2006 in Sadatoglu's newspaper "Sanat."Â  The court

deemed the publication of Tagi's article "Europe and Us," which discussed relations between Islam and Christianity, an attempt to incite religious hatred, and sentenced Tagi to three and Sadatoglu to four years' imprisonment. The press watchdog Reporters without Borders (RSF) issued a statement on May 4 branding the sentences "disproportionate" and an indication of the extent to which free speech in Azerbaijan is threatened. Presidential administration official Ali Hasanov told day.az on May 7 that RSF is "biased" in its assessments, and for that reason the Azerbaijani authorities will no longer cooperate with it. (day.az)

Â

## KAZAKHSTAN REPORTS SHARP INCREASE IN FOREIGN DEBT
**8 May**
In a press conference in Almaty, Kazakh Central Bank Deputy chairwoman Gulbanu Aymanbetova reported on May 8 that Kazakhstan's foreign debt has risen sharply, from $42.6 billion in 2005 to $73.8 billion at the end of 2006. She noted that the sharp increase in the country's external debt was "mainly due to the banking sector's borrowing." She added that the foreign debt of the Kazakh banking sector grew by more than $18 billion in 2006, reaching a total of $33.3 billion at the end of the year. (Interfax)

**SOUTH OSSETIAN LEADER SUSPENDS CONTACTS WITH TBILISI**

**8 May**

Eduard Kokoity, de facto president of the unrecognized breakaway republic of South Ossetia, warned on May 7 that his regime will not resume talks with the central Georgian government until Tbilisi abjures any further contacts with Dmitry Sanakoyev. South Ossetia's Georgian minority elected Sanakoyev its "president" in a ballot last November that neither the Georgian authorities nor the international community recognized as legal and valid. The Georgian parliament passed last month in the first and on May 8 in the second reading a bill drafted by President Saakashvili creating a "provisional" administration in South Ossetia that is intended to legalize Sanakoyev's position. Sanakoyev is to address the Georgian parliament on May 11, at which juncture he will be formally named head of the new temporary administration, Caucasus Press reported on May 8. (Caucasus Press)

Â

**ESTONIAN PRESIDENT VISITS GEORGIA**

**9 May**

Georgian President Mikhail Saakashvili told his visiting Estonian counterpart Toomas Hendriks Ilves in Tbilisi on May 7 that Georgians are shocked by the violent response by Russians in Estonia to the relocation from central Tallin of a Soviet memorial to World War II dead, Caucasus Press reported. Saakashvili said that "we should all assist Estonia in creating a strong democratic society and in preventing undemocratic activities." On May 8, the Georgian parliament adopted a resolution similarly condemning the backlash to the relocation of the monument, including protests outside the Estonian Embassy in Moscow. The resolution expressed support for all measures taken by the Estonian government to restore order. (RFE/RL)

Â

**Kazakhstan to use Russia as main oil transit route â€" Nazarbayev**
**10 May**
Kazakhstan's cooperation with Russia in transporting energy is strategic in nature, Kazakh President Nursultan Nazarbayev said. "Kazakhstan is absolutely committed to shipping most of oil, if not all of it, through Russian territory. We have always said this," Nazarbayev said at negotiations with Russian President Vladimir Putin in Astana on Thursday. (Interfax)

Â

**POLICE, DEMONSTRATORS CLASH IN ARMENIAN CAPITAL**

**10 May**

Police used truncheons and tear gas on May 9 against some of the several thousand participants in an election rally in Yerevan jointly convened by former Prime Minister Aram Sargsian's Hanrapetutiun, Aram

Karapetian's Nor Zhamanakner, and Aylentrank (Alternative). Some demonstrators were detained briefly but then released. Former Yerevan Mayor Vahagn Khachatrian told the gathering that there is no longer any alternative to the impeachment of the current leadership. Sargsian warned that if the May 12 parliamentary elections are falsified, the bloc will convene a mass demonstration on May 13 on Freedom Square in Yerevan "to decide what to do next." Demonstration participants marched to the National Security Ministry building to protest the detention of Karabakh war veterans Zhirayr Sefilian and Vartan Malkhasian and of former Foreign Minister Alexander Arzoumanian. Also on May 9, Arzoumanian's lawyer Hovik Arsenian told RFE/RL's Armenian Service that the authorities do not have sufficient evidence to substantiate the charges of money laundering against Arzoumanian and will probably release him from detention later this week. (RFE/RL)

Â

**Russia, Kazakhstan, Turkmenistan agree on Caspian Pipe**
**12 May**
Russia, Kazakhstan and Turkmenistan agreed to build a gas pipeline along the Caspian coast and will sign

the deal by September 1, a joint declaration of the three presidents said Friday. Following the summit meeting in Turkmenistan, Vladimir Putin, Nursultan Nazarbayev and Gurbanguly Berdymukhammedov instructed their governments to order the construction of the pipeline starting from the second half of 2008. The pipeline, which will run from Turkmenistan along the Caspian coast of Kazakhstan and on to Russia, is a rival project to U.S. and European proposals to build a pipeline under the Caspian Sea, which would carry Turkmen gas to southern Europe bypassing Russia, the sole re-exporter of the Turkmen gas. Putin's Central Asian tour, which includes Kazakhstan and Turkmenistan, coincided with an energy summit in Poland May 11-13 aimed at reducing energy dependence on Russia. Nazarbayev, its key participant, pulled out from the forum also being attended by Azerbaijan, Georgia, Ukraine and Lithuania. (RIA Novosti)

Â

## Caspian gasline reconstruction to boost its throughput capacity â€" Putin
**12 May**

The reconstruction and development of a Caspian gas pipeline will help boost its throughput capacity by 2012, Russian President Vladimir Putin has said. "We will reconstruct the existing facilities and build new ones. We will do this in the near future, and this would increase their throughput capacity by at least 12 billion cubic meters by 2012," Putin told journalists in Turkmenbashi on Saturday. "We opened the Caspian gas pipeline route at Turkmenistan's request," Putin said. This pipeline is pumping 4.2 billion cubic meters of gas a year now, although it "can pump even 10.5 billion cubic meters," Putin said. (Interfax)

Â

## Opposition rally under way in Yerevan
**13 May**

A rally organized by a number of Armenian opposition parties has begun on Sunday afternoon in Yerevan. Up to several thousand people are said to take part in the rally. Initially, three opposition parties, including the Republic Party, the New Times Party and the Impeachment opposition bloc planned to stage the rally. Later, a number of other Armenian opposition parties, which according to final results failed to overcome a 5% barrier and secure seats in the parliament, joined them in the protest action. Opposition politicians presented at the rally information on violations and falsifications, which as they claim were registered at the May 13 parliamentary elections. "We cannot acknowledge the results of the elections, because such elections humiliate the dignity of our nation. We are ready to cooperate will all forces that will fight for fair elections," leader of the opposition Armenian People's Party Stepan Demirchian said. (Interfax)

## Republican Party leading in Armenian elections
**13 May**

With 812,930 ballot papers processed, which makes 59% of the votes cast in Saturday's parliamentary elections, Armenia's Republican Party is leading, having won 35% of the counted votes, officials with the Central Elections Commission told Interfax on Sunday. Prosperous Armenia is in second place with 16% of the counted votes, Dashnaktsyutyun in third with 14% and the opposition Orinats Yerkir party (Law-Based State) is in fourth place with 6.6% of the votes. The United Labor Party has won 4.5% of the counted votes, the Heritage Party 3.9% and the National Union Party 3.7%. All of these parties have a good chance of overriding the 5% barrier required for parliamentary representation. But the votes counted do not fully reflect the situation in the Armenian capital, which has no on-line system of transferring data, the commission said. After figures are obtained for Yerevan, the picture could change seriously, it said. The Central Elections Commission refrained from commenting on opposition parties' claims regarding mass vote rigging. A mission of observers representing the Commonwealth of Independent States is likely to publish a report shortly. Their colleagues from the Organization for Security and Cooperation in Europe are expected to produce an account of the work done at 2:30 p.m., local time (1:30 p.m., Moscow time) Sunday. (Interfax)

## Georgian policeman, Tskhinvali resident wounded in shootout â€"peacekeepers
**13 May**

Peacekeepers have reported shoot-outs in the Georgian-Ossetian conflict zone, in which a Georgian police officer and a resident of Tskhinvali were wounded. "An intensive exchange of fire, involving the conflicting parties' law enforcement squads, lasted from 8:05 p.m. until 8:45 p.m. on May 12 between the southern limit of Tskhinvali, the outskirts of the village of Ergneti and the northern limit of the village of Nikozi," sources in the headquarters of the Joint Peacekeeping Force in the Georgian-Ossetian conflict zone told Interfax on Sunday. "A three-way monitoring mission and observers from the Organization for Security and Cooperation in Europe failed to establish the initiator. The first shots were fired on the eastern bank of the Bolshaya Liakhva near an irrigation canal between the northern limit of the Georgian village of Ergneti and the southern outskirts of the Ossetian village of Gudzhabauri," the report says. The conflicting sides used firearms and grenade launchers. Heavy weapons were not used. A Georgian police officer was wounded and hospitalized in Gori," it said. Exchanges of fire also occurred between the Georgian and South Ossetian sides from 11:30 p.m. to midnight between the

northern limit of Tskhinvali, the village of Kverneti and the southern outskirts of Tamarasheni," the headquarters said. "The sides used firearms and grenade launchers. A resident of Tskhinvali was wounded. He was hospitalized," the peacekeepers said. Â The monitoring groups continued investigating the incident on May 13, they said. (Interfax)

**E.U. extends sanctions against Uzbekistan**
**14 May**
The European Union will drop a visa ban against four Uzbek officials, EU foreign ministers decided Monday while extending other sanctions against the Central Asian nation imposed after a crackdown on an uprising in 2005. The arms embargo on Uzbekistan remains in place, but only eight Uzbek officials will now be banned from traveling to the EU, down from 12, Ferrero-Waldner said, adding that the sanctions will be reviewed again in six months. The sanctions were imposed after government troops opened fire on a crowd of mostly peaceful protesters in Andijan, a city in the east of the country, two years ago, killing at least 700 people, according to rights groups and witnesses. The government insisted 187 died and blamed Islamic militants for instigating the violence. The Uzbeks have refused to meet EU demands for an independent investigation into the crackdown. But the bloc seized on President Islam Karimov's increased willingness to discuss the May 13, 2005, events. The EU "appreciates the readiness of the Uzbek side to engage in this dialogue," the ministers said in a statement. Ferrero-Waldner said the modified visa ban "gives a chance to the Uzbeks to show that they really mean what they say … and we think this is a way of engaging with the Uzbeks." (AP)

**Central Asian Pipeline would bypass Russia**
**14 May**
Ukraine, Lithuania, Azerbaijan, Georgia and Poland are setting up a consortium to transport Central Asian energy to Europe, bypassing Russia [1]. "We discussed energy security at the Polish summit," Azerbaijani Industry and Energy Minister Natiq Aliyev told APA news agency Sunday. "An ad hoc group will be set up to facilitate the creation of a joint consortium on the transportation of energy resources to Europe [2]." In a meeting Friday, the leaders of five countries met in Krakow, Poland [3], and decided to extend the Odessa-Brody pipeline to Polish energy facilities to create a corridor to Europe, bypassing Russia. The move is a boost to efforts by Europe to reduce its energy dependence on Russia. (UPI)
<!--[if !supportLineBreakNewLine]-->
<!--[endif]-->

Opposition MP Questions Saakashviliâ€™s Border Remarks
14 May
The Georgian Foreign Ministry and President Saakashvili should clarify the latterâ€™s remarks vis-a-vis a border agreement with Azerbaijan, opposition lawmaker from the Conservative Party Zviad Dzidziguri said on May 14. President Saakashvili said on May 12, after talks with his visiting Azerbaijani counterpart, Ilham Aliyev,Â that the two countries would soon reach an agreement on the disputed border section of Davit Gareji, a complex of cave monasteries. â€œJoint working groups will meet soonâ €¦ Strategic heights should remain under Azerbaijani control, whileÂ the complex of monasteries has to remain on Georgian territoryâ€¦ I am sure we will be able to sign [a border delimitation] agreement very soon,â€ Saakashvili told reporters. ButÂ Dzidziguri said at a news conference on May 14 that it was impossible to separate â€œstrategic heightsâ€ from the monasteries complex.Â â€œIt is impossibleÂ because part of the monastery is located on those very same strategic heights. It is impossible to consider the monastery and the strategic heights separately,â€ Â Dzidziguri said. (Civil Georgia)

Â

Â

**Azerbaijan: Former oil Co. Head on Trial**
**15 May**
The trial opened on Tuesday for the former chief of Azerbaijan's largest private oil company and his brother, a former Cabinet minister who also has been charged in an alleged coup plot. Opposition figures and supporters of the brothers, Rafiq and Farhad Aliyev, say the charges they face of economic crimes, including bribe-taking and tax evasion, are politically motivated. Journalists and diplomats were not allowed into the opening session of the trial, which local human rights activist Elchin Behbudov said "bears witness to the fact that this is a made-to-order legal process and will be carried out unobjectively." Rafiq Aliev is former chief of the private oil company Azpetrol. His brother is a former Economic Development Minister and one of a dozen people arrested in 2005 in connection with the alleged coup plot. The opposition says the arrests were part of an effort by the government to manipulate the vote in parliamentary elections that year. The arrests came shortly before the elections. Rafiq Aliev had not been charged with participation in the plot. (AP)
<!--[if !supportLineBreakNewLine]-->
<!--[endif]-->

**Berlin Bashes U.S. Afghanistan Strategy**
**15 May**
Germany is making its objections clear to the U.S. military strategy for Afghanistan [4] after an anti-terror operation killed civilians. "We need to make sure that future operations don't take place in this way," German Defense Minister Franz Josef Jung said Monday in Brussels at a meeting with his European Union counterparts, according to German online daily Netzeitung. Jung was referencing a bombing of the U.S.-led Operation Enduring Freedom, which fights the Taliban and other terror groups in Afghanistan; the air raid was directed against the Taliban but killed at least 21 civilians in the Helmand province. Jung warned that OEF would undermine the goal of the NATO-led International Security Assistance Force, which is tasked with reconstruction efforts. Â "We don't want the population against us," Jung said. "We have to prevent that." Jung has in the past lobbied to win over the hearts and minds of the Afghan population, and pair security missions with an increasing number of civilian reconstruction efforts. The death of civilians was "just the wrong tactic," he said, adding that he had discussed the unfortunate incident with NATO Secretary-General Jaap de Hoop Scheffer. Meanwhile, EU defense ministers agreed to send some 160 police to Afghanistan to provide training for the domestic police force. "This mission represents a major contribution to establishing a professional police sector in Afghanistan," Javier Solana, the EU's foreign policy chief, said in a statement. (UPI)


Â


**Air Strikes Kill 60 Taliban in Afghanistan: Police**
**15 May**
Sixty Taliban fighters including three commanders were killed in overnight air strikes on two rebel bases in the southern Afghan province of Kandahar, a provincial police chief said on Tuesday. A spokesman for the Afghan Defense Ministry gave a lower death toll. "I can confirm only 11 dead, including a Taliban commander," Zahir Azimi said. The joint operation involving foreign and Afghan security forces took place in the Zharai district of Kandahar, police chief Esmatullah Alizai told Reuters. He said there were no casualties among the foreign or Afghan forces. A U.S. military spokesman said he was aware of the reports and was checking them. NATO said it was not aware of any involvement in such an operation. Violence has surged in Afghanistan in recent weeks after the traditional winter lull. Hundreds have been killed already this year after more than 4,000 people died last year. In the latest attack, a roadside bomb killed seven Afghan soldiers in the eastern province of Nuristan on Monday, the defense ministry said. Four soldiers were missing after the blast. The Taliban, who lost their top field commander in a clash at the weekend, could not be contacted immediately for comment about their reported losses in Kandahar. Mullah Dadullah was killed in a battle with U.S.-led forces in what was seen as the most serious blow to the Taliban since the insurgency began. Afghans have protested the deaths of civilians in air strikes by the U.S.-led coalition. (Reuters)


Â


**Kazakhstan long-time leader proposes cutting term after 2012 -1**
**16 May**
Kazakhstan's president, who has led the Central Asian state for 18 years, proposed cutting a presidential term from seven to five years after 2012 as a "democratic" measure. In a speech to parliament Nursultan Nazarbayev, whose term is due to expire in 2012, also proposed a series of constitutional amendments which he said were aimed at transforming the energy rich Central Asian state from a presidential republic into a presidential-parliamentary one. "We want to emphasize our democratic commitments," said the president of the former Soviet republic, which has posted high economic growth and relative stability stemming from vast oil and gas reserves. The country's GDP grew 10.6% last year and 9.4% in 2005. Nazarbayev also said parliament should be given the right to control the government, which will be accountable both to the president and the legislature. "A simple majority rather than two thirds of votes should be enough for the lower house to pass a vote of no-confidence in the government," the president said. Nazarbayev's initiatives also included giving the parliament wider rights in forming bodies of the Central Election Commission and the committee auditing the implementation of the budget. The president also called for lifting the ban on state funding for public organizations. "A plan must be developed to provide partial financing of political parties from the state budget," he said. (RIA Novosti)


Â


Â


Â


**Source URL:**
http://www.cacianalyst.org/?q=node/4620

**Links:**
[1] http://www.upi.com/Energy/
Briefing/2007/05/14/central_asian_pipeline_would_bypass_russia/9343/##
[2] http://www.upi.com/Energy/
Briefing/2007/05/14/central_asian_pipeline_would_bypass_russia/9343/##
[3] http://www.upi.com/Energy/
Briefing/2007/05/14/central_asian_pipeline_would_bypass_russia/9343/##
[4] http://www.upi.com/International_Intelligence/
Briefing/2007/05/15/berlin_bashes_us_afghanistan_strategy/3317/##

110TH CONGRESS
2D SESSION

# H. R. 6188

To authorize certain private rights of action under the Foreign Corrupt Practices Act of 1977 for violations by foreign concerns that damage domestic businesses.

---

## IN THE HOUSE OF REPRESENTATIVES

Mr. PERLMUTTER introduced the following bill; which was referred to the Committee on Foreign Affairs

---

# A BILL

To authorize certain private rights of action under the Foreign Corrupt Practices Act of 1977 for violations by foreign concerns that damage domestic businesses.

1    *Be it enacted by the Senate and House of Representa-*
2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Foreign Business Brib-
5    ery Prohibition Act of 2008".

6    **SEC. 2. ACTIONS AUTHORIZED.**

7    Section 104A of the Foreign Corrupt Practices Act
8    of 1977 (15 U.S.C. 78dd-3) is amended—

2

1      (1) by redesignating subsection (f) as sub-
2  section (g); and

3      (2) by inserting after subsection (e) the fol-
4  lowing:

5  "(f) PRIVATE RIGHTS OF ACTION AUTHORIZED.—

6      "(1) AUTHORIZED PLAINTIFFS.—Any foreign
7  concern that violates subsection (a) shall be liable in
8  an action brought in accordance with this subsection
9  in any court of competent jurisdiction to any issuer
10  which is subject to section 30A of the Securities Ex-
11  change Act of 1934, domestic concern which is sub-
12  ject to section 104 of this Act, or other United
13  States person that is damaged by the violation of
14  subsection (a) of this section for damages caused to
15  such issuer, domestic concern, or other person by
16  the violation.

17      "(2) PROOF OF DAMAGES.—For purposes of
18  this subsection, a plaintiff in an action under this
19  subsection must allege and prove that—

20          "(A) the defendant foreign concern vio-
21          lated subsection (a); and

22          "(B) the defendant foreign concern's viola-
23          tion of subsection (a)—

3

| | |
|---|---|
| 1 | "(i) prevented the plaintiff from ob- |
| 2 | taining or retaining business for or with |
| 3 | any person; and |
| 4 | "(ii) assisted the foreign concern in |
| 5 | obtaining or retaining such business. |
| 6 | "(3) MEASURE OF DAMAGES.— |
| 7 | "(A) IN GENERAL.—The damages which a |
| 8 | plaintiff may obtain in an action under this |
| 9 | subsection may be equal to the higher of the |
| 10 | two following amounts that are established by |
| 11 | the plaintiff's allegations and proof: |
| 12 | "(i) The total amount of the contract |
| 13 | or agreement that the defendant gained in |
| 14 | obtaining or retaining business by means |
| 15 | of the violation of subsection (a). |
| 16 | "(ii) The total amount of the contract |
| 17 | or agreement that the plaintiff failed to |
| 18 | gain because of the defendant's obtaining |
| 19 | or retaining business by means of the vio- |
| 20 | lation of subsection (a). |
| 21 | "(B) TREBLE DAMAGES.—In assessing |
| 22 | damages under subparagraph (A), the court |
| 23 | shall enter judgment for three times the |
| 24 | amount determined under clause (i) or (ii) of |
| 25 | such subparagraph (whichever is greater), to- |

4

1 gether with a reasonable attorney's fee and

2 costs, for any violation of subsection (a).

3 "(4) EXCEPTION FOR ROUTINE GOVERNMENTAL

4 ACTION.—The exception in subsection (b) shall apply

5 to an action under this subsection.

6 "(5) AFFIRMATIVE DEFENSES.—The affirma-

7 tive defenses in subsection (c) shall apply to an ac-

8 tion under this subsection.

9 "(6) CONTRIBUTION.—Every person who be-

10 comes liable to make payment under this subsection

11 may recover contribution as in cases of contract

12 from any person who, if joined in the original suit,

13 would have been liable to make the same payment.

14 "(7) STATUTE OF LIMITATIONS.—No action

15 shall be maintained to enforce any liability created

16 under this subsection unless brought within three

17 years after the discovery of the facts constituting the

18 cause of action and within six years after such cause

19 of action accrued.

20 "(8) DEFINITIONS.—

21 "(A) FOREIGN CONCERN.—For purposes

22 of this subsection, the term 'foreign concern'

23 means any person other than an issuer which is

24 subject to section 30A of the Securities Ex-

25 change Act of 1934, a domestic concern which

5

| | |
|---|---|
| 1 | is subject to section 104 of this Act, or another |
| 2 | United States person. |
| 3 | "(B) UNITED STATES PERSON.—The term |
| 4 | 'United States person' has the meaning given |
| 5 | such term in section 104(i)(2) of this Act.". |



Capgemini.
Together. Free your energies.

SEE HOW WE CAN TRANSFORM YOUR BUSINESS



Capgei
CONSULTING TECHNOLOGY OU

SUCCESS STORIES



**BusinessWeek**

keyword or company    [ Search ]

Register   Sign In

Companies Home    Sectors & Industries    Industry News    Learning Center    People Overview    Windows Mobile Application





100 FREE TRADES
E*TRADE Securities LLC

E*TRADE FINANCIAL

Lock in profits
Cut losses
charles SCHWAB

Hear what you're missing.

ENERGY SECTOR | OIL, GAS & CONSUMABLE FUELS INDUSTRY          June 23, 2008 1:21 PM ET

# BP Plc (BP:NYSE)

**LAST $67.99 USD    CHANGE TODAY +0.64 0.95%    VOLUME 3.1M**          BP On Other Exchanges

As of 1:06 PM 06/23/08 All times are local (Market data by Reuters is delayed by at least 15 minutes).

| Snapshot | News | Charts | Financials | Earnings | People | Ownership | Transactions | Options |

Overview    Board of Directors    Committees

**EXECUTIVE PROFILE***

## Anthony B. Hayward



Chief Executive Officer and Executive Director, BP plc

| Age | Total Annual Compensation | |
|---|---|---|
| **49** | **£2,139,000 GBP**<br>As of Fiscal Year 2007 | This person is connected to **40** board members in **4** different organizations across **2** different industries.<br><br>See Board Relationships |

**BACKGROUND***

Anthony B. Hayward, Tony has been the Chief Executive Officer of BP plc since May 2007. Dr. Hayward serves as the Chief Executive of BP America, Inc. Dr. Hayward serves as the Chief Executive of Exploration and Production of BP Solar International Inc. He served as the Chief Executive Officer of Exploration and Production of BP Plc, Yorktown Virginia Refinery since 2003. He served as Chief Executive, Exploration and Production of Bp PLC from 2002 to February 1, 2007. Dr. Hayward joined BP Plc in 1982 and served as its Group Managing Director. He served as Executive Assistant of Lord Browne since 1990. Two years later he moved to Colombia as Exploration Manager, and in September 1995, he became President of the BP group in Venezuela. He became Group Vice President of BP Amoco Exploration and Production as well as a Member of its Upstream executive committee in 1999. He served as a Director of Exploration and Production at BP since 1997, the segment in which he held a series of roles. At BP, he was made Group Treasurer in September 2000 and became an Executive Vice President in 2002. He was appointed Chief Operating Officer for exploration and production of BP in November 2002. He has been a Non-Executive and Independent Director of Tata Steel Ltd.

since May 17, 2007. He serves as an Executive Director of BP Solar International Inc. He has been an Executive Director of BP plc since February 2003. He has been a Director of Corus Group Limited (Corus Group Plc) since April 2002. He served as a Director of BP Exploration since August 1997. He served as an Executive Director of BP Plc, Yorktown Virginia Refinery since 2003. He holds a PhD in Geology from University of Edinburgh in 1982.

Collapse Detail

## CORPORATE HEADQUARTERS*

1 St James's Square
London, Greater London SW1Y 4PD



**Committee, Member of Health, Safety &
Environment Committee and Member of
Nominations Committee**

## COMPETITOR COMPENSATION

| Name | Position/Company | Total |
|---|---|---|
| **Chief Executive of Exploration & Production and** Executive Director BP International Inc. | | |
| Christophe de Margerie | Executive Director and Chief Operating Officer Total SA | €2.7M |
| | Chairman, Chief Executive Officer, President, Chairman of Finance Committee and Chairman of Executive Committee Total SA | |
| Rex Tillerson | | $5.1M |
| | Chairman of the Board, Chief Executive Officer ExxonMobil Corp | |
| | Chief Executive Officer, Group Executive, Executive Director, Chief Executive of Non-Ferrous, | |
| Kloppers MBA, Ph.D. (Materials Science), BE (Chem) | Group President of Non-ferrous Materials Businesses, Member of the Office of Chief Executive, Member of Operating Committee, Chairman of Strategy Committee and Director of BHP Billiton Limited BHP Billiton plc | $2.0M |
| | Chief Executive Officer, Executive Director, Chief Executive of Royal Dutch Petroleum Company, President of Royal Dutch | |

## EDUCATION

PhD 1982
University of Edinburgh in Scotland

## OTHER AFFILIATIONS

Corus Group Limited.
Tata Steel Limited
BP Solar International Inc.
University of Edinburgh in Scotland
BP America, Inc.

*Data is at least as current as the most recent Definitive Proxy.

## ANNUAL COMPENSATION*

| | |
|---|---|
| Salary | £877,000 |
| Bonus | £1,262,000 |
| **Total Annual Compensation** | **£2,139,000** |

## STOCK OPTIONS*

| | |
|---|---|
| All Other Compensation | £14,000 |
| Exercised Options | 3,302 |
| Exercised Values | £792 |
| Exercisable Options | 766,400 |
| Exercisable Values | £1,141,542 |
| Unexercisable Options | 3,220 |
| Unexercisable Values | £3,703 |
| Total Value of Options | £1,146,037 |
| **Total Number of Options** | **772,922** |

## TOTAL COMPENSATION*

| | |
|---|---|
| Total Annual Cash Compensation | £2,139,000 |
| Total Short Term Compensation | £2,139,000 |
| Other Long Term Compensation | £14,000 |
| **Total Calculated Compensation** | **£2,153,000** |

# United Kingdom

## Corus

United Kingdom

T  0800 008 400

E  customer-services@ corusgroup.com

Back to Top

# United States

## Corus International Americas

Chicago office

475 N. Martingale Road, Suite 400

Schaumburg, IL 60173

United States

T  +1 847 619 0400

F  +1 847 619 0468

E  CAI@ corusgroup.com

T  +1 (800) 542-6244

Back to Top

# Vietnam

## Corus Asia Ltd - Vietnam

3/F Jardine House

58 Dong Khoi Street, District 1

Ho Chi Minh City

Vietnam

T  +84 88 276 353-4

# Tony Hayward

*You can support Wikipedia by making a tax-deductible donation.*

From Wikipedia, the free encyclopedia

**Dr Anthony Hayward CCMI** (born 1957) is the Chief Executive of oil and energy company BP Group, taking over from John Browne, Baron Browne of Madingley on 1 May 2007.

## Contents

- 1 Biography
    - 1.1 Replacement of Lord Browne
    - 1.2 Other positions
    - 1.3 Personal life
- 2 References
- 3 External links

# Biography

Hayward gained a first class geology degree from Birmingham University[1] followed by a PhD from Edinburgh University[2]. Joining BP in 1982, with his first job as a rig geologist in Aberdeen[3], he quickly rose through the ranks in a series of technical and commercial roles in BP Exploration in London, Aberdeen, France, China and Glasgow. Hayward first came to Lord Browne's attention during a leadership conference in 1990 in Phoenix, Arizona. As a result he was made Browne's executive assistant[4].

In 1992, Hayward moved to Colombia as exploration manager and became president of BP's operations in Venezuela in 1995. In August 1997 he returned to London as a director of BP Exploration. He became group vice president of BP Amoco Exploration and Production as well as a member of the BP group's Upstream executive committee in 1999.

Hayward was appointed BP group treasurer in September 2000 where his responsibilities included global treasury operations, Foreign exchange dealing, corporate finance, project finance and mergers and acquisitions. Hayward became an executive vice president in April 2002, and Chief Executive of exploration and production in January 2003.

## Replacement of Lord Browne

In light of safety and resultant production issues in Alaska and the report in to the explosion at the Texas City refinery, Peter Sutherland BP's non-executive chairman accelerated the process for replacing Lord Browne, bringing the timetable forward from end 2008 (when Browne would be 60, and nominally forced to retire under BP's rules), to July 2007. Hayward, having been termed CEO designate by both internal and media commentators, came to the fore amid the competition[5], including Robert Dudley, chief executive of TNK-BP, the company's Russian joint venture, and John Manzoni, head of refining and marketing[6][7].

On 18 December 2006 in the run up to replace Lord Browne as Chief Executive of BP Group, the Financial Times reported that Hayward had criticised BP's management at an internal management meeting, in the wake of a blast at the firm's Texas City refinery which killed 15 people[8]. Hayward made the comments at a town hall meeting in Houston: *"We have a leadership style that is too directive and doesn't listen sufficiently well. The top of the organisation doesn't listen sufficiently to what the bottom is saying."*[9]

On 12 January 2007 it was announced that Hayward would replace Lord Browne as BP Chief Executive[10]. In preparation for Hayward's take up as Group CEO, on 2 February Andy Inglis was appointed managing director of the BP Group, and succeeds Hayward as chief executive of BP's Exploration & Production (E&P) business[11].

Hayward was appointed to the Chief Executive position with immediate effect on 1 May 2007, after Lord Browne resigned following the lifting of a legal injunction preventing Associated Newspapers from publishing details about his private life.

## Other positions

Hayward was a member of the Citibank advisory board, from 2000 to 2003[12]. Hayward is presently senior independent non-executive director of Corus Group, appointed in April 2002, and a non-executive director of Tata Steel. Hayward is a committee member of Audit, Nominations and Health, Safety and Environment[13]. Hayward was appointed a Companion of the Chartered Management Institute in September 2005[14].

## Personal life

Hayward is married with two children, and lives in London[15].

A keen fan of football club West Ham United F.C., Hayward lists his interests as sailing, triathlons and watching football, rugby union and cricket[16]

# References

1. ^ BP_MAG_B3569_19-35.qxd (http://www.bp.com/liveassets/bp_internet/globalbp/STAGING/global_assets/downloads/B/BPM_04one_P19-22_Profile.pdf)
2. ^ BBC NEWS | Business | Tony Hayward - BP's new boss (http://news.bbc.co.uk/1/hi/business/6257149.stm)
3. ^ Profile: Tony Hayward | Business | guardian.co.uk (http://business.guardian.co.uk/story/0,,1989300,00.html)
4. ^ Tony Hayward |Executive management | Investor centre | bp.com (http://www.bp.com/genericarticle.do?categoryId=9014282&contentId=2015521)
5. ^ Alexander's Gas & Oil Connections - Tony Hayward ready to take over BP after Lord Browne (http://www.gasandoil.com/GOC/company/cne70715.htm)
6. ^ http://www.telegraph.co.uk/money/main.jhtml?xml=/money/2007/01/12/bcnbp412.xml
7. ^ I am going in 2008, says BP boss | Business | The Guardian (http://www.guardian.co.uk/oil/story/0,,1830296,00.html)
8. ^ BBC NEWS | World | Americas | Texas oil plant blast 'kills 14' (http://news.bbc.co.uk/1/hi/world/americas/4377519.stm)
9. ^ http://www.telegraph.co.uk/money/main.jhtml?xml=/money/2006/12/18/bcnbp218.xml
10. ^ BBC NEWS | Business | BP's Browne to stand down in July (http://news.bbc.co.uk/1/hi/business/6256935.stm)
11. ^ Andy Inglis joins BP board and succeeds Tony Hayward as Head of Exploration & Production (Scandinavian Oil-Gas Magazine) (http://www.scandoil.com/moxie-bm2/news/company_news/andy-inglis-joins-bp-boar.shtml)
12. ^ Tony Hayward (http://www.tnk-bp.com/company/governance/directors/hayward)
13. ^ http://www.corusgroup.com/en/investors/company_information/board
14. ^ Tony Hayward | Group Chief Executive (http://www.bp.com/profile.do?categoryId=32&contentId=2015141)
15. ^ BBC NEWS | Business | Tony Hayward - BP's new boss (http://news.bbc.co.uk/1/hi/business/6257149.stm)
16. ^ BBC NEWS | Business | Tony Hayward - BP's new boss (http://news.bbc.co.uk/1/hi/business/6257149.stm)

# External links

- Bio at BP.com (http://www.bp.com/genericarticle.do?categoryId=9014282&contentId=2015521)
- Presentation by Hayward to the IAEE re North Sea Oil (http://www.iaee.org/documents/a02hayward.pdf)

Retrieved from "http://en.wikipedia.org/wiki/Tony_Hayward"
Categories: 1957 births | Living people | Alumni of Aston University | Alumni of the University of Edinburgh | British businesspeople | English chief executives | BP

- This page was last modified on 28 March 2008, at 11:02.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

**Alexander's
Gas & Oil Connections
Company News: Europe**

volume 12, issue #3 - Tuesday, February 13, 2007

sponsored by:

## Oil industry of South Eastern Europe (SEE)

# Tony Hayward ready to take over BP after Lord Browne

by Roland Gribben

16-01-07 Tony Hayward became a BP "Turtle" at 31. Sixteen years later he is preparing to take over as "King Turtle". He was the second of a new breed of high-flyers earmarked for the top back in 1991, when BP was wrestling with another management crisis, and is now ready to assume a role he has coveted since he was a junior Turtle.

John, now Lord Browne, head of exploration and production at the time but with his eye on the chief executive's seat, launched a programme to fast-track promising young executives through the BP bureaucracy. The chosen few acquired the Turtles sobriquet after being compared with the Teenage Mutant Ninja Turtles, the toy figures designed to "kick butt".

Tony Hayward has done his share of kicking, but in a gentlemanly way that befits a determined executive with the looks of a cherub. His resume makes impressive reading: from geologist to group treasurer and now head of exploration and production.
He has been burdened with the unofficial title of chief executive-in-waiting because of Browne's mentoring and rapid promotions and he has struggled to make the most out of his troublesome spells in Colombia and Venezuela and ensure BP gets more "bang for its buck" from exploration.

There will be changes in style if not strategy during the Hayward era and the chief executive's suite will become a cigar-free zone. But management changes are in the offing: head-hunters are expected to be sounding out the unsuccessful candidates for the top job, including John Manzoni, the refinery chief, Iain Conn, head of safety and environment and Robert Dudley, who handles the complex Russian business.
Hayward and Peter Sutherland, BP's non-executive chairman, are anxious to limit the bloodshed and ensure a smooth handover but much will depend on the relationship between the new chief executive and Sutherland's successor. Sir William Castell, former chief executive of Amersham International, is tipped as a front runner for the post.

Hayward's "personal reflectionson 2006" represented a management manifesto as well as veiled criticism of his mentor and is something of a mea culpa. He bluntly declared: "We have a leadership style that probably is too directive and doesn't listen sufficiently well. The top of the organisation doesn't listen hard enough to what the bottom of the organisation is saying." Hayward will be more cautious politically. It is too early for gong hunting but the cosy relations between No 10 and BP's headquarters in St James's Square, are unlikely to be as close with the change in tenants at both addresses.

Lord Browne has wooed and been wooed by Tony Blair and BP has provided Labour with a minister (Lord Simon, its former chairman) and a job for Anji Hunter, one of the Prime Minister's former minders. The recently wed Ms Hunter is head of internal affairs at BP and there is speculation she may follow Nick Butler, former vice-president for strategy and policy development, who had close ties with Downing Street, into a new job outside BP.
The slimline Hayward emerged head if not shoulders above his rivals when Sutherland accelerated the succession process after the rift with Lord Browne over the departure timetable. Mr Sutherland, an astute Irish politician, diplomat and ex-EU commissioner, is no stranger to executive upheavals at BP. He was a junior member of the group of non-executive directors instrumental in ousting Robert Horton as chairman and chief executive 14 years ago.

There are parallels, although not sharp, between the Horton and Browne episodes. Horton, energetic and abrasive, lost the confidence of BP's part-time executives, heavyweights such as Sir Patrick Sheehy of BAT, over a series of issues from strategy to leadership style. As BP struggled in difficult markets, he found little support from his fellow executive directors when the crunch came.
Mr Sutherland has given Lord Browne more rope but a string of BP disasters and the damage to its reputation, technical and managerial, has unnerved non-execs and forced the chief executive out of office earlier than planned.

The part-timers have been persuaded to throw their weight behind the youthful Hayward, who will now no longer be forced to endure one of the less enjoyable roles of a Turtle: eating the ears of a sheep at a presidential banquet in Kazakhstan.

Source: www.telegraph.co.uk

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549,

                              Plaintiff,

          v.

MONTY FU,

                              Defendant.

Case: 1:07-cv-01735
Assigned To : Sullivan, Emmet G.
Assign. Date : 9/27/2007
Description: General Civil

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## NATURE OF THE ACTION

1.      From 1985 through December 2002, Syncor International Corporation ("Syncor"),
a provider of radiopharmaceutical products and services, violated the books and records and
internal controls provisions of the Foreign Corrupt Practices Act ("FCPA") (Sections 13(b)(2)(A)
and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§
78m(b)(2)(A), 78m(b)(2)(B)]) in connection with certain payments made through its wholly-
owned Taiwanese subsidiary, Syncor Taiwan, Inc. ("Syncor Taiwan").  During the seventeen-
year time period, Syncor, through Syncor Taiwan, paid commissions and referral fees to doctors
employed by private and public hospitals in Taiwan.  The total payments to doctors averaged
over $30,000 per year from 1989 through at least 1993 and increased to average over $170,000
per year from at least 1997 through the first half of 2002.  Syncor Taiwan improperly recorded

the payments in its accounting books and records as "Advertising and Promotions" expenses.
Syncor Taiwan's books and records were then consolidated into the books and records of its
parent, Syncor, and included in financial statements filed with the Commission.

2.    Defendant Monty Fu ("Fu"), was Syncor's founder and, at various times, Syncor's
Chief Executive Officer and Chairman of Syncor's board of directors. As described below, Fu
had the authority to maintain compliance with existing internal controls, and to implement
additional internal controls designed to comply with the FCPA's books and records and internal
controls provisions, yet failed to do so.

3.    By engaging in such conduct, defendant violated Section 13(b)(5) of the Exchange
Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-
1], and aided and abetted Syncor's books and records and internal controls violations of Sections
13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B)] in
violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

4.    Unless restrained and enjoined by this Court, defendant will continue to engage in
transactions, acts and practices that violate these provisions of the federal securities laws. The
Commission seeks a permanent injunction against future violations and other relief requested in
this Complaint.

## JURISDICTION

5.    This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(e),
and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (e), and 78aa].

## DEFENDANT

6.       Defendant Monty Fu, at all relevant times a resident of Chatsworth, California,

founded Syncor in 1974.  He held a variety of positions within Syncor, including as Chief

Executive Officer from 1985 to 1989 and as Chairman of its board from 1985 to November 6,

2002, when he was placed on paid leave until his resignation in December 2002.  From at least

1996 through early 2002, Fu also served as Director, Asia Region of Syncor Overseas Ltd., the

holding company of Syncor's foreign subsidiaries.

## OTHER RELEVANT ENTITIES

7.       Syncor, founded in 1974, was a Delaware corporation with its headquarters in

Woodland Hills, California.  Syncor was a provider of radiopharmaceutical products and services

both in the United States and, through various wholly and partially owned subsidiaries, in 18

foreign countries.  At all relevant times, Syncor's common stock was registered with the

Commission pursuant to Section 12(g) of the Exchange Act and was listed on the NASDAQ

National Market.  On January 1, 2003, Syncor became a wholly owned subsidiary of Cardinal

Health, Inc. through a stock-for-stock acquisition.

8.       Syncor Taiwan, Inc. was established at Fu's direction in 1985 as a wholly-owned

subsidiary operating in Taiwan.  At all relevant times, Syncor Taiwan's financial results were

included in the consolidated financial statements of Syncor.

3

## FACTS

### A.  Syncor Taiwan's Payment of Commission and Referral Fees

9.      From 1985 through 1996, Syncor Taiwan's business consisted chiefly of selling radiopharmaceuticals and medical equipment to end-users.  Syncor Taiwan undertook in 1996 to establish medical imaging centers in conjunction with public and private hospitals which would generate management fees for Syncor Taiwan.

10.     Commencing in or around 1985 and continuing through December 2002, Syncor Taiwan made payments to doctors at private and public hospitals, for the purpose of influencing the doctors' decisions to purchase radiopharmaceutical products from Syncor Taiwan and to refer patients to Syncor Taiwan's medical imaging centers.  The total payments to doctors averaged over $30,000 per year from 1989 through at least 1993 and increased to average over $170,000 per year from at least 1997 through the first half of 2002.

11.     From approximately 1985 onward, these payments included commissions to doctors who made the purchasing decisions for the nuclear medicine departments of their respective hospitals.  Beginning in or about 1997, the commission payments included "medicine fees" which compensated doctors for prescribing medicine purchased, or for using component parts purchased, from Syncor Taiwan for use in tests conducted at a medical imaging center. Commissions typically were based on a percentage (between 10% and 20%) of sales transacted, and typically took the form of a cash payment that was hand-delivered by Syncor Taiwan personnel.

4

12.    Also beginning in or about 1997 and continuing through September 2002, Syncor

Taiwan paid referral fees to doctors at private and public hospitals who referred patients to

medical imaging centers owned and operated by Syncor Taiwan. These referral fees typically

were based on a percentage (between 3% and 5%) of the service fees payable to each medical

imaging center from the patients referred, and typically took the form of a cash payment that was

hand-delivered to the referring doctor by a bookkeeper at the center after funds had been wire-

transferred by Syncor Taiwan to the center for that purpose.

**B.    Syncor Taiwan's Lack of Sufficient**
**Internal Controls and Misrecordation of the Payments**

13.    Under the FCPA, Syncor was required to design and implement a system of

internal controls to ensure that its wholly-owned subsidiary complied with the FCPA's books and

records and internal controls provisions. It failed to do this with respect to Syncor Taiwan,

which circumvented existing internal controls and failed to implement other controls designed to

detect and prevent non-compliance at the company.

14.    Syncor's internal accounting policy manual in use from at least 1993, a copy of

which was provided to Syncor Taiwan, specified that the "Advertising and Promotions" account

on its books and records was to include local and national advertising, convention displays,

convention expenses and convention space rental. The manual designated selling-related

expenses for other accounts.

15.    An employee handbook issued by Syncor in 2001 under Fu's signature specified

that "[n]o false or misleading entries shall be made in the books and records of the Company for

5

any reason, . . . [and] [n]o payment on behalf of the Company shall be approved without adequate supporting document or made with the intention or understanding that any part of such payment is to be used for any purpose other than that described by the document supporting the payment."

16.    At various times during the relevant period, Syncor Taiwan improperly recorded the commissions and referral payments paid to the doctors at public and private hospitals as "Advertising and Promotions" expenses. These entries were rolled up into Syncor's consolidated books and records.

C.    **Fu's Violative Conduct**

17.    Throughout the relevant time period, Fu had the authority to implement a system of internal controls in the subsidiary sufficient to ensure that transactions were executed in accordance with management's general or specific authorization and that transactions were recorded in a manner that fairly reflected the transactions.  His authority derived from the various positions he held throughout the relevant time period.  Fu directed the creation of Syncor Taiwan in 1985.  Fu's brother was country manager for Taiwan.  Fu's brother, who was promoted to various positions in the Asia region during the relevant period, consulted and, at times, reported to Fu about Syncor Taiwan's operations throughout the relevant period, including the making of payments to doctors.

18.    At all relevant times, Fu was aware that Syncor Taiwan was paying commissions and, commencing in 1997, referral fees to doctors at private and public hospitals in Taiwan.

6

19.    In 1994, in connection with the outside auditor's audit of Syncor's 1993 financial statements, Syncor's then chief executive officer and president inquired about the nature of certain payments by Syncor Taiwan and cautioned Fu that Syncor could not make payments for the purpose of influencing doctors' decisions to purchase or use Syncor's products and services. As a result, Fu knew or was reckless in not knowing that the commissions and referral fees were improperly recorded on the books and records of Syncor Taiwan and, thus, of Syncor.

20.    Nonetheless, Fu failed to maintain compliance with existing internal controls and also failed to implement additional internal controls to determine whether payments by Syncor Taiwan complied with Syncor's management's specific directive and more generally with the FCPA.

## FIRST CLAIM

### *Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1*

**(Direct violations of books and records and internal controls provisions)**

21.    Paragraphs 1 through 20 are realleged and incorporated by reference.

22.    By engaging in the conduct described above, Fu knowingly failed to implement a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded in Syncor's books and records in accordance with Section 13(b)(2)(A) of the Exchange Act.

23.    Fu thereby caused the commissions and referral fees to be improperly recorded as "Advertising and Promotions" expenses on the books and records of Syncor Taiwan and Syncor.

7

24.    By virtue of the conduct described above, defendant Fu violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

## SECOND CLAIM

### *Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act*

**(Aiding and Abetting Syncor's Books and Records Violations)**

25.    Paragraphs 1 through 24 are realleged and incorporated by reference.

26.    As described above, Syncor, by and through its foreign subsidiary in Taiwan, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

27.    By virtue of the conduct described above, Syncor violated Section 13(b)(2)(A) of the Exchange Act.

28.    As described above, defendant Fu knowingly provided substantial assistance to Syncor in connection with Syncor's violations of the aforesaid provisions.

29.    By virtue of the conduct described above, and pursuant to Section 20(e) of the Exchange Act, defendant Fu aided and abetted Syncor's violations of Section 13(b)(2)(A) of the Exchange Act.

## THIRD CLAIM

### *Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act*

**(Aiding and Abetting Syncor's Internal Controls Violations)**

30.    Paragraphs 1 through 29 are realleged and incorporated by reference.

31.     As described above, Syncor, by and through its foreign subsidiary in Taiwan, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and to maintain accountability for its assets.

32.     By virtue of the conduct described above, Syncor violated Section 13(b)(2)(B) of the Exchange Act.

33.     As described above, defendant Fu knowingly provided substantial assistance to Syncor in connection with Syncor's violations of the aforesaid provision.

34.     By virtue of the conduct described above, and pursuant to Section 20(e) of the Exchange Act, defendant Fu aided and abetted Syncor's violations of Section 13(b)(2)(B) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Final Judgment against defendant Monty Fu:

1.     permanently enjoining him, pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], from violating, directly or indirectly, Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; and

9

2.     ordering him, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)], to pay civil penalties; and

3.     granting such other relief as this Court deems appropriate.

Dated: **9/28**_____, 2007          Respectfully submitted,

                                        _Jordan A. Thomas (Bar No. 452886)_
                                        Scott W. Friestad
                                        Robert B. Kaplan
                                        Nina B. Finston (Bar No. 431825)
                                        Stephen G.Yoder

                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission
                                        100 F Street, N.E.
                                        Washington, D.C.  20549-4030
                                        Tel:  (202) 551-4475 (Thomas)
                                        Fax:  (202) 772-9245

MARC J. FAGEL (Admitted in California)
    FagelM@sec.gov
CARY S. ROBNETT (Admitted in California)
    Robnettc@sec.gov
SUSAN F. LAMARCA (Admitted in California)
    LaMarcaS@sec.gov
TRACY L. DAVIS (Admitted in California)
    DavisTL@sec.gov
44 Montgomery Street, Suite 2600
San Francisco, CA 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

FILED'07 DEC 13 9:42USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | CV. CV'07 - 1836 - MO |
| Plaintiff, | |
| v. | **COMPLAINT** |
| **ROBERT W. PHILIP,** | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      This matter involves violations of the Foreign Corrupt Practices Act of 1977

("FCPA") by defendant Robert W. Philip, the former President, Chief Executive Officer and

Chairman of the Board of Schnitzer Steel Industries ("Schnitzer"), an Oregon-based steel company. From at least 1999 through 2004, Schnitzer paid more than $1.9 million in bribes to managers of steel mills in China and South Korea to induce them to purchase scrap metal from Schnitzer, generating over $500 million in gross revenue for the company. Defendant Philip authorized the payment of the bribes, aided and abetted Schnitzer's failure to make and keep accurate books and records, and failed to implement internal controls reasonably designed to detect and prevent Schnitzer's FCPA violations.

2.     As a result of the profits generated from these illicit payments, Philip received excess bonus compensation from Schnitzer totaling $169,863.79. The Commission seeks a court order requiring that Philip disgorge his improper compensation, plus prejudgment interest; pay a civil monetary penalty; and be enjoined from future violations of the FCPA.

## JURISDICTION

3.     This Court has jurisdiction over this action pursuant to Sections 21(d)(1) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d)(1) and 78aa]. Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce and the mails in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

## AUTHORITY TO BRING THIS ACTION

4.     The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

## DEFENDANT

5.     Philip, age 60, resides in Portland, Oregon. Philip served as Schnitzer's President beginning March 1991. Philip also served as Schnitzer's Chief Executive Officer beginning

January 2002, and Chairman of the Board beginning January 2004. Philip resigned from all of his positions at Schnitzer in May 2005.

## OTHER RELEVANT ENTITY

6.    Schnitzer is incorporated in Oregon and headquartered in Portland, Oregon. Schnitzer operates three business segments that include a steel manufacturer, a metals recycling business and an auto parts business. At the time of the conduct described below, Schnitzer's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)] and was listed on the NASDAQ National Market. In addition, Schnitzer filed quarterly and annual reports with the Commission pursuant to Section 13 of the Exchange Act [15 U.S.C. § 78m].

## FACTS

### A.    Background

7.    The Foreign Corrupt Practices Act prohibits any company that issues securities to the public from offering a bribe (i.e., cash or anything else of value) to a foreign official to persuade that official to use his influence to assist the company in obtaining or retaining business. In addition, the FCPA requires that public companies keep books and records that accurately reflect their operations, and that they put in place internal controls that are reasonably designed to ensure that their books and records are accurate.

### B.    Sales to Government-Owned Steel Mills in China

8.    From at least 1999 through 2004, defendant Philip violated the anti-bribery provisions of the FCPA by causing Schnitzer to pay approximately $205,000 in bribes to managers of steel mills in China that were owned, in whole or part, by the Chinese government. The purpose of the payments was to induce the managers to purchase scrap metal from

3

Schnitzer. Because the mills were at least partially government-owned, the managers were foreign officials within the meaning of the FCPA, and the payments were improper.

9.      Schnitzer paid two types of bribes, or kickbacks, to the managers. For the first type, Schnitzer paid a "standard" kickback, which was generally $3,000 to $6,000 per shipment. Schnitzer paid these kickbacks out of the revenue it earned on the scrap metal sale. For the second type, Schnitzer participated in a scheme in which the manager of a steel mill would cause the steel mill to overpay Schnitzer for the steel purchase. The manager would then personally recover the "overpayment" from Schnitzer, in amounts ranging from $3,000 to $15,000. Philip knew of and authorized the payments.

10.      In addition to the cash payments, personnel at a Schnitzer subsidiary, SSI International, Inc. ("SSI") gave gifts to the managers of the government-owned customers to induce the managers to purchase scrap metal from Schnitzer. Philip knew of and authorized the gifts.

11.      In order to conceal the improper payments, Schnitzer falsely described the payments as "sales commissions," "commission to the customer," "refunds," or "rebates" in Schnitzer's books and records. Philip instructed SSI personnel to describe the payments in that manner.

12.      From at least 1999 through 2004, Philip authorized SSI personnel to pay over $205,000 in bribes to managers of Schnitzer's government-owned customers in China in connection with 30 sales transactions. Schnitzer's gross revenue for these transactions totaled approximately $96 million, and Schnitzer earned approximately $6.3 million in net profits on the sales.

13.     Based on the revenue that Schnitzer realized from the bribes to foreign officials, described above, Philip received bonus compensation of $169,863.79.

**C.     Sales to Privately-Owned Steel Mills in China and South Korea**

14.     From at least 1999 through 2004, Philip authorized Schnitzer to pay approximately $1.7 million in bribes to managers of privately-owned steel mills in China and South Korea.  These mills were privately-owned and the managers were not foreign officials. However, Schnitzer violated the FCPA by failing to properly account for and disclose the bribes in its internal records and public filings.

15.     In China, Schnitzer paid approximately $420,000 in such bribes, in transactions that produced approximately $214 million in gross revenue for the company.  In South Korea, Schnitzer paid approximately $1.3 million in such bribes, in transactions that produced approximately $290 million in gross revenue.  SSI personnel also provided non-cash gifts to general managers of South Korean customers, which Philip authorized.

16.     In its books and records, Schnitzer falsely described these bribes to managers in China and South Korea as "sales commissions," "commission to the customer," "refunds," or "rebates."  Philip authorized SSI personnel to describe the payments in that manner.

**C.     Schnitzer's Lack of Internal Controls**

17.     Under the FCPA, Schnitzer was required to design a system of internal controls to ensure that its foreign sales agents and distributors complied with the law.  Philip, as Schnitzer's President and CEO, had the authority to implement internal controls relating to the FCPA.

18.     During the period of the foreign transactions described above, Schnitzer provided no training or education to any of its employees, agents or subsidiaries regarding the

requirements of the FCPA. Schnitzer also failed to establish a program to monitor its employees, agents and subsidiaries for compliance with the FCPA.

19.    As the Chairman, CEO and President of Schnitzer, Philip aided and abetted Schnitzer's internal controls failures by failing to require any training regarding the requirements of the FCPA. Philip also failed to require the Company to devise a system of internal controls adequate to detect and prevent Schnitzer's violations of the FCPA.

**D.    Schnitzer's Investigation and Subsequent Events**

20.    In May 2004, Schnitzer's compliance department uncovered the improper payments described above, and Schnitzer began to investigate the potential FCPA violations. Although Schnitzer's compliance department prohibited any further payments, Philip authorized SSI personnel to make two additional payments to managers in South Korea.

### FIRST CLAIM

*Violations of Section 30A of the Exchange Act*
*(Anti-bribery provision of the Foreign Corrupt Practices Act)*

21.    Paragraphs 1 through 21 are re-alleged and incorporated by reference.

22.    Philip authorized payments, through money and gifts, to foreign officials for the purpose of influencing their official acts and decisions and inducing them to use their influence to assist Schnitzer in obtaining or retaining business with foreign steel mills. Throughout the relevant period, the recipients of these offers and payments were foreign officials within the meaning of the FCPA, and the relevant foreign steel mills were instrumentalities of foreign governments within the meaning of the FCPA.

23.    By reason of the foregoing, Philip violated the illegal offers and payments provisions of the FCPA, codified as Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

6

## SECOND CLAIM

*Aiding and Abetting Violations of Section13(b)(2)(A) of the Exchange Act*
*(Books and Records)*

24.    Paragraphs 1 through 21 are re-alleged and incorporated by reference.

25.    With respect to the offers and payments described above, Schnitzer failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

26.    Philip, knowingly or with extreme recklessness, provided substantial assistance to Schnitzer's violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

27.    By reason of the foregoing, Philip aided and abetted Schnitzer's failure to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CLAIM

*Aiding and Abetting Violations of Section13(b)(2)(B) of the Exchange Act*
*(Books and Records)*

28.    Paragraphs 1 through 21 are re-alleged and incorporated by reference.

29.    During the relevant period, Schnitzer lacked a system of internal controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

30.    Philip, knowingly or with extreme recklessness, provided substantial assistance to Schnitzer's violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

31.    By reason of the foregoing, Philip aided and abetted Schnitzer's failure to devise and maintain a system of internal controls, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## FOURTH CLAIM

*Violations of Section 13(b)(5) of the Exchange Act*
*and Rule 13b2-1 thereunder*
*(Internal Controls)*

32.    Paragraphs 1 through 21 are re-alleged and incorporated by reference.

33.    By engaging in the conduct described above, Philip knowingly circumvented or knowingly failed to implement a system of internal controls relating to Schnitzer, or knowingly falsified Schnitzer's books, records, or accounts.

34.    By reason of the foregoing, Philip violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

1.    Permanently enjoin Philip and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the judgment by personal service or otherwise from directly or indirectly violating, or aiding and abetting violations of, Sections 30A, 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act, and Rule 13b2-1 thereunder;

2.    Order Philip to disgorge all wrongfully obtained benefits, plus prejudgment interest;

3.    Order Philip to pay civil penalties under Sections 21(d) and 32(d) of the Exchange Act [15 U.S.C. §§ 78u(d) and78ff];

4.     Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

5.     Grant such other and further relief as the Court may deem just, equitable, and appropriate.


Dated: December 11, 2007

                                        Respectfully submitted,


                                        By: _____
                                            Marc J. Pagel
                                            Cary S. Robnett
                                            Susan F. LaMarca
                                            Tracy L. Davis

                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION

9

BP Interactive Map


**DEAL**BREAKER
A WALL STREET TABLOID

## Will Goldman Add Insult To Injury? (Typical)



There's a new sheriff in BP town but will there be one at Goldman Sachs, too? The boys at Rupert Murdoch's Deal Journal note that Lord Browne (John Browne, Baron Browne of Madingley) has been a director at Goldman since 1999 and wonder if recent revelations might threaten that position. The London Times reports that Browne will lose his night job (and the $500,000/year that comes with), though their sources were unnamed and Goldman representatives declined to comment. The Lord will retain his role on the advisory board (as chairman) of Apax Partners Worldwide, the U.K. p.e. firm, but, as Deal Journal points out, us provincial Americans, and the extremely image conscious Goldman Sachs in particular, may not be willing to overlook Browne's use of company funds (and perjury).

While we can vouch that Goldman—more so than other banks we've encountered—is a bit fanatical about its reputation, and has instilled a certain fear in its employees (whenever we IM our friends at 85 Broad for insider information or for a recap on their nights at Tejune, they hardly ever write back), perhaps they'll overlook what happened across the pond in light of Browne's business acumen (and because he wasn't using *their* money, hence, not their problem). It's not like Lloyd Blankfein doesn't have any skeletons of his own (Magic Mountain is all we can say and we've already said too much).

Lord Browne and an Unlucky Number at Goldman [Deal Journal]
Browne-Goldman II: Apax Stands Firm [Deal Journal]
Apax Keeps Browne as Chairman After He Lied to Court [Bloomberg]
Lie over gay partner ends BP chief's career [London Times]

**By Bess Levin | 05. 2.07 at 01:41 PM**



Posted In: Goldman Sachs , Lloyd Blankfein , London , Oil

---

### Sidebar


**Recent comments**
**Send us tips**

**Subscribe** (RSS/XML)
 Daily newsletter

## Blogroll


AndyKessler.com

About        Advertising
Archive      Syndicate
Career Center  Free Finance Mags

# Bloomberg.com

Updated: **New York,** Jan 18 13:44  **London,** Jan 18 18:44  **Tokyo,** Jan 19 03:44

Enter Symbol

► SYMBOL LOOKUP

■ HOME ■ NEWS   ■ MARKET DATA   ■ INVESTMENT TOOLS   ■ TV and RADIO

■ BloombergAnywhere  | ►SoftwareSupport |  ►Feedback

Search News

■ ABOUT BLOOMBERG ■ CAREERS ■ CONTACT US

## Bloomberg

BLOOMBERG RADIO™ on bloomberg.com.

Click here.

## Investment tools

□ Portfolio Tracker
□ Market Monitor
□ Fund Center
□ Calculators
□ Wireless
□ Financial Glossary

**RESOURCES**

□ Bloomberg TV
□ Bloomberg Radio
□ Audio/Video Reports
□ Bloomberg Podcasts
□ Bloomberg Markets Magazine
□ Bloomberg Press

## Company News

QUOTE | CHARTS | **NEWS**

BP:US
**BP PLC**

### Apax Keeps Browne as Chairman After He Lied to Court (Update1)

By Edward Evans

May 2 (Bloomberg) -- Apax Partners Worldwide LLP will keep John Browne as

chairman of its advisory board after he lied to a U.K. court about his private life.

``Browne is a man of enormous talent and we look forward to continuing to work

with him in his capacity as chairman of the advisory board,'' Apax spokesman Ben

Harding said in a telephone interview today.

Browne quit as chief executive officer of BP Plc yesterday after ne failed to block

the Mail on Sunday newspaper from publishing claims he used company resources

to help support a former boyfriend. He lied to the High Court in London about how

he met the man, a Canadian named Jeff Chevalier, according to a court ruling.

Bloomberg.com: Investment Tools

Private equity firms hire senior businessmen and statesmen as advisers to use their contacts and knowledge to find new takeover targets and buyers for their assets. Browne, 59, built BP into what was once Europe's biggest company through more than $100 billion of acquisitions.

Browne is set to lose his job as chairman of Goldman Sachs Group Inc.'s audit committee, the London-based Times reported today, citing a person it didn't identify.

Browne has been a board member at Goldman since May 1999, making him one of only two board members who have served since the New York-based investment bank's initial public offering. Erlendas Grigorovic, a London-based Goldman spokesman, declined to comment on the report.

At Apax, Browne chairs a group that oversees the firm's five main investment areas: technology and telecommunications, retail and consumer goods, media, health care and financial and business services. He joined Apax's advisory board in November last year, and will devote more time to the job after September.

Browne said in a statement released yesterday the allegations about his relationship with Chevalier were ``full of misleading and erroneous claims.'' He denied ``categorically any allegations of improper conduct relating to BP.'' David Nicholas, a spokesman for BP in London, declined to comment today.

To contact the reporters on this story: Edward Evans in London at **eevans3@bloomberg.net**

*Last Updated: May 2, 2007 06:03 EDT*

News tools 

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| | | OMB APPROVAL |
|---|---|---|
| | | OMB Number: 3235-0287 |
| | | Expires: January 31, 2008 |
| | | Estimated average burden hours per response 0.5 |

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

□

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| BROWNE LORD OF MADINGLEY | GOLDMAN SACHS GROUP INC/ [ GS ] | X Director   10% Owner   Officer (give title below)   Other (specify below) |
| (Last)     (First)     (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) 12/15/2006 | |
| C/O GOLDMAN, SACHS & CO. 85 BROAD STREET | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK, NY     10004 | | X Form filed by One Reporting Person   Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 1 E E ( |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Restricted Stock Units | (1) | 12/15/2006 | | A | | 514 | | (1) | (1) | Common Stock | 514 | (1) | 23,906 | D | |

**Explanation of Responses:**

1. These Restricted Stock Units vested immediately upon grant and the shares of Common Stock underlying these Restricted Stock Units will be deliverable, without the payment of any consideration, on the last business day in May in the year following the year of the retirement of the Reporting Person from the Issuer's Board of Directors.

/s/ Roger S. Begelman, Attorney-in-fact     12/19/2006

** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

## bp

Site Index | Contact us | Reports and publications | BP worldwide | Home

Search:

**About BP**

**Environment and society**

**Products and services**

**Investors**

**Press**

**Careers**

> BP Global    > Press    Press releases

**Press releases**

Speeches

Features and news

Images and graphics

Contact Information

**RSS**

> What is RSS?

## BP Announces Lord Browne Succession Plan

Release date: 12 January 2007

BP announced today that after more than a decade in the CEO role Lord Browne has decided to retire as chief executive at the end of July 2007.

The board is pleased to announce that Tony Hayward, currently BP's head of exploration and production, will succeed Lord Browne following his retirement as group chief executive.

Peter Sutherland, BP's chairman, said: "John Browne is the greatest British businessman of his generation and has transformed BP into one of the biggest energy groups in the world. His performance over the past 12 years has been extraordinary, which is no doubt why he has constantly been named by his fellow CEOs as the most impressive businessman in Britain. His vision, intellect, leadership and skill have been a wonder to behold and he will be a difficult act to follow.

"Last summer, John and I had agreed that he would stay as CEO until the end of 2008. John decided that it would be in the company's interest to name a successor now in order to provide an orderly transition. Having made that decision, which the board fully supports, we came to the conclusion that a six month handover would be more appropriate than 18 months.

"It is a testament to John's managerial skill that BP is blessed with having such an impressive managerial top bench to choose from and John and I are delighted to be able to announce that Tony Hayward will be succeeding him from August 1, 2007. Tony has an excellent track record and extensive knowledge of the sector and will be able to draw on John's wealth of knowledge over the next six months."

During Lord Browne's tenure as the chief executive of BP he has presided over a fivefold increase in the company's market capitalisation to £104.6 billion and profits to $22.3 billion; while the share price has gone up around 250 per cent to 532 pence and earnings per share have gone up over 600 per cent.

Lord Browne said: "It has been a privilege to have had the opportunity to turn BP

**In this section**

> BP Reinforces its Commitment to China

> BP Commissions Atlantis Platform, Begins Oil and Gas Production

> BP Brings Cashima on Stream off Trinidad

> BP Solar to Build one of the Largest Module Assembly Factories in Europe in Puertollano

> BP Enters Canadian Oil Sands with Husky Energy

> More

**Related links**

> Biography of Tony Hayward

> The board

> How we run the business

**Related downloads**

> Download a print quality photograph of Lord Browne (jpg, 1384KB)

into an international company at the forefront of the energy industry. We clearly have important issues still to deal with which I am determined to address. I am pleased that Peter and I have been able to work together to develop a successor in Tony in whom I have every confidence."

▶ Download a print quality photograph of Tony Hayward (jpg, 1870KB)

**Note to Editors:** Biographies of Lord Browne and Tony Hayward are below.

### Dr A.B. Hayward

Tony Hayward was appointed to the main board of BP in 2003, becoming chief executive officer of BP's exploration and production segment responsible for the group's assets and operational activities relating to the discovery and production of hydrocarbons.

He joined BP in 1982 and, following a series of technical and commercial roles in BP Exploration in London, Aberdeen, France, China and Glasgow, in 1992 he moved to Colombia as exploration manager. In 1995 he became president of the BP group in Venezuela.

In 1997 Dr Hayward returned to London as a director of BP Exploration and following the merger of BP and Amoco, in 1999 he became a group vice president and a member of the upstream executive committee. He was appointed group treasurer in 2000 where his responsibilities included global treasury operations, corporate finance and mergers and acquisitions. He was appointed an executive vice president in 2002 becoming chief operating officer for exploration and production later that year.

He is a non-executive and senior independent director of Corus Group, was appointed Companion of the Chartered Management Institute in September 2005 and was a member of Citibank's Advisory Board between 2000 and 2003.

Dr Hayward was born in 1957. He is married with two children. He is a keen sportsman and enjoys sailing, triathlons and watching football, rugby and cricket.

### The Lord Browne of Madingley

Lord Browne is Group Chief Executive of BP p.l.c.

Born in 1948, he joined BP in 1966 as a university apprentice. He holds a degree in Physics from Cambridge University and an MS in Business from Stanford University, California. He has also been awarded Honorary Doctorates from Heriot Watt University (D.Eng) and Robert Gordon University (D.Tech), Dundee University (LLD), Warwick University (D.Sc), Hull University (D.Sc), Cranfield University (D. Sc), Sheffield Hallam University (Hon. Duniv), University of Buckingham (D.Sc), Leuven University, Belgium (D.Sc), Thunderbird (LLD), University of Notre Dame (LLD), Colorado School of Mines (D.Eng), D Mendeleyev University of Chemical Technology of Russia, Arizona State University (DHLitt). He is an Honorary Fellow of St John's College, Cambridge and a Senior Member of St Antony's College, Oxford. He is a Fellow and President of the Royal Academy of Engineering, a Fellow of the Royal Society, a Fellow of the Institute of Mining and Metallurgy, a Fellow of the Institute of Physics, a Fellow of the Institute of Petroleum, a Fellow of the American Academy of Arts & Sciences, a Companion of the Institute of Management, an Honorary Fellow of the Institute of Chemical Engineers, an Honorary Fellow of the Geological Society, an Honorary Fellow of the Institution of Mechanical Engineers and an Honorary Fellow of the Royal Society of Chemistry.

Between 1969 and 1983, he held a variety of exploration and production posts in Anchorage, New York, San Francisco, London and Canada.

In 1984 he became Group Treasurer and Chief Executive of BP Finance International.

In April 1986, he took up the position of Executive Vice President and Chief Financial Officer of The Standard Oil Company in Cleveland, Ohio. In 1987, following the BP/Standard merger, in addition to his position as Executive Vice President and Chief Financial Officer of BP America, he was appointed Chief Executive Officer of Standard Oil Production Company.

In 1989, he became Managing Director and Chief Executive Officer of BP Exploration based in London. In September 1991, he joined the Board of The British Petroleum Company p.l.c. as a Managing Director. He was appointed Group Chief Executive on June 10, 1995. Following the merger of BP and Amoco, he became Group Chief Executive of BP Amoco on December 31, 1998.

He is a non-executive director of Goldman Sachs. He was a director of Intel Corporation from 1997 – 2006, a Trustee of The British Museum from 1995-2005, a member of the Supervisory Board of DaimlerChrysler AG from 1998 – 2001 and a non-executive director of SmithKline Beecham from 1996-1999.

He is Chairman of the International Advisory Board of the School of Economics and Management, Tsinghua University, Chairman of the Cambridge Judge Business School and Emeritus Chairman of the Advisory Board of the Stanford Graduate School of Business. He is a Trustee of the Cambridge University Foundation, and a member of the Guild of Cambridge Benefactors. He is a member (and former Chairman) of the British American Business Inc. He is a member of the board of Catalyst; he is an honorary Trustee of the Chicago Symphony Orchestra, an honorary counsellor of the Conference Board, Inc., a Fellow of the American Academy of Arts and Sciences, a Senior Fellow of the Foreign Policy Association, a Trustee of the Eisenhower Fellowship and a Vice President of the Prince of Wales Business Leaders Forum.

In 1999, the Royal Academy of Engineering awarded him the Prince Philip Medal for his outstanding contribution to the field of Engineering. The Stanford Business School Alumni Association presented him with the Ernest C Arbuckle Award in 2001, in recognition of excellence in the field of management leadership. Other awards include the Henry Shaw Medal of the Missouri Botanical Gardens, the Gold Medal of the Institute of Management, the Institute of Energy Melchett Medal (2001), the Society of Petroleum Engineers Public Service Award (2002), the Institution of Chemical Engineers Commemorative Medal (2003), the inaugural Channing Corporate Citizenship Award from British American Business Inc. (2004), the World Petroleum Congress Dewhurst Award (2005), the Dwight D Eisenhower Leadership Award from the Business Council for International Understanding.

He was voted Most Admired CEO by Management Today from 1999 – 2002.

He was knighted in 1998 and made a life peer in 2001.

▲back to top

© 1996-2008 BP p.l.c. | Legal Notice | Privacy Statement

Peter Sutherland | The board | BP

bp

Site Index | Contact us | Reports and publications | BP worldwide |
Home

Search:

**About BP**

**Environment and society**

**Products and services**

**Investors**

**Press**

**Careers**

▶ BP Global     ▶ About BP     ▶ Who we are     ▶ Board and executive management     ▶ The board     Peter Sutherland

Peter Sutherland

Sir Ian Prosser

Tony Hayward

Byron Grote

Iain Conn

Andy Inglis

Antony Burgmans

Cynthia Carroll

Sir William Castell

George David

Erroll B Davis Jr

Douglas Flint

Dr DeAnne Julius

Sir Tom McKillop

## Peter Sutherland



Peter Sutherland
Non-executive director

### Related links

▶ Speeches

Access an archive of key speeches by BP executives



▶ Latest news

Read the latest press releases from BP p.l.c. online



Peter Sutherland was appointed chairman of BP in May 1997, having been a non-executive director and deputy chairman since July 1995.

A barrister, Mr Sutherland is a bencher of the Middle Temple in London and an honorary bencher of the King's Inns in Dublin. He practised at the Bar from 1969 to 1981, when he was appointed Attorney General of Ireland. He was also admitted to practise before the Supreme Court of the United States of America. In January 2008, he was appointed Chairman of the London School of Economics Court and Council

In 1984, he was nominated by the Government of Ireland as a Commissioner of the European Communities. He was a Commissioner with responsibility for Competition Policy from 1985 until 1989. Subsequently, in 1992 he chaired the committee that reported to the European Commission on the functioning of the Internal Market (the Sutherland Report).

In 1989, Mr Sutherland became chairman of Allied Irish Banks plc and joined the BP board in 1990. He relinquished these appointments in 1993 when he became

director-general of the General Agreement on Tariffs and Trade (GATT). He was subsequently director-general of the World Trade Organisation until 1995.

He is non-executive chairman of Goldman Sachs International and is a non-executive director of The Royal Bank of Scotland Group. In 2007, he became a member of the advisory group to President Barroso, the President of the European Community, on energy and climate change issues.

Mr Sutherland was awarded an honorary knighthood in 2004.

▲back to top

© 1996-2008 BP p.l.c. | Legal Notice | Privacy Statement