IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                      )
JACK J. GRYNBERG, GRYNBERG                                            )
PRODUCTION CORPORATION (TX),                                          )
GRYNBERG PRODUCTION CORPORATION                                       )
(CO) and PRICASPIAN DEVELOPMENT                                       )
CORPORATION (TX),                                                     )    08 Civ. 301
                                                                      )    Judge Bates
                        Plaintiffs,                                   )
                                                                      )
            -and-                                                     )
                                                                      )
BP P.L.C., a United Kingdom corporation d/b/a                         )
BP CORP NORTH AMERICA INC., an Indiana                                )
corporation, STATOILHYDRO ASA, a Norwegian                            )
corporation, BG GROUP P.L.C., a United                                )
Kingdom corporation, BG NORTH AMERICA, a                              )
Texas corporation, JOHN BROWNE, ANTHONY                               )
HAYWARD, PETER SUTHERLAND, HELGE                                      )
LUND, EIVIND REITEN, ROBERT WILSON,                                   )
FRANK CHAPMAN, individuals,                                           )
                                                                      )
                        Defendants.                                   )
                                                                      )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

## MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS TO DISMISS OF PETER SUTHERLAND, LORD JOHN BROWNE, ANTHONY HEYWARD AND HELGE LUND

Plaintiffs Jack J. Grynberg (when referred to individually, "Mr. Grynberg"), Pricaspian Development Corporation, Grynberg Petroleum Corporation (CO) and Grynberg Petroleum Corporation (TX), (collectively "Plaintiffs") through counsel, respectfully submits the following memorandum of law in opposition to the Motions to Dismiss of the Individual Defendants (Peter Sutherland, Lord John Browne, Anthony Hayward and Helge Lund).

**TABLE OF CONTENTS**

INCORPORATION BY REFERENCE ................................................................................ 2

PRELIMINARY STATEMENT ........................................................................................... 2

STATEMENT OF FACTS PERTINENT TO THE .............................................................. 2

MOTIONS OF THE INDIVIDUAL DEFENDANTS ........................................................... 2

OKIOC AND THE CRIMINAL INDICTMENT OF JAMES GIFFEN ............................. 3

ARGUMENT ............................................................................................................................ 6

    I.    HELGE LUND's MOTION TO DISMISS IS NOT RIPE ..................................... 6

    II.    IN DETERMINING PERSONAL JURISDICTION, THE GOVERNING TEST IS CONTACTS WITH THE UNITED STATES, NOT CONTACT WITH THE DISTRICT OF COLUMBIA ..................................................................................... 7

    III.    THE BP INDIVIDUAL DEFENDANTS CAN BE HELD RESPONSIBLE FOR THE FCPA VIOLATIONS OF THEIR COMPANIES ........................................... 8

    IV.    THE BP INDIVIDUAL DEFENDANTS ARE SUBJECT TO JURISDICTION UNDER A THEORY OF CONSPIRACY JURISDICTION ....................................... 11

    V.    JURISDICTION OVER THE BP INDIVIDUAL DEFENDANTS COMPORTS WITH DUE PROCESS ............................................................................................. 12

    VI.    ALTERNATIVELY, IF THE COURT CONCLUDES THAT THE VERIFIED COMPLAINT FAILED TO SHOW SPECIFIC JURISDICTION OVER BROWNE, HEYWARD AND SUTHERLAND, JURISDICTIONAL DISCOVERY SHOULD BE ALLOWED TO SHOW THESE INDIVIDUALS ARE AMENABLE TO GENERAL JURISDICTION ............................................................................................................ 13

    VII.    ALTERNATIVELY, THE COURT SHOULD GRANT LEAVE TO AMEND ...................................................................................................................... 13

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

** Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987) .......................... 12

BEC Corporation v. Dept. of Environmental Protection, 256 Conn. 602, 775 A.2d 928 (Conn. 2001) ................................................................................................ 10

** Dept. of Ecology v. Lundgren, 94 Wn. App. 236, 243, 245, 971 P.2d 948 (1999) ..... 10

Dooley v. United Technologies Corp., 786 F.Supp. 65, 71 (D.D.C. 1992) ......................... 8

** Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C.Cir.1991) ................................................................................................ 11, 13

Omni Video Games, Inc. v. Wing Co., 754 F. Supp. 261, 263 (D. R.I. 1991) ......... 7, 8, 12

SEC v. Monty Fu, No. 1:07CV01735 (D.D.C. Sept. 27, 2007) .................................... 9, 11

Sit-Set, A.G. v. Universal Jet Exch., Inc., 747 F.2d 921, 929 (4th Cir. 1984) ................. 10

United States v. Pollution Sen. of Oswego, Inc., 763 F.2d 133, 134-35 (2nd Cr. 1985).. 10

**Statutes**

15 U.S.C. §§ 78dd-1(a) ................................................................................................. 8, 9

18 U.S.C. § 1965 .............................................................................................................. 8

18 U.S.C. § 1965(d) ......................................................................................................... 7

**Other Authorities**

Securities Exchange Act of 1934 § 13(b)(5), 15 U.S.C. § 78m (2000) .............................. 9

## INCORPORATION BY REFERENCE

The Combined Opposition Brief to the Motions to Dismiss of BP and Statoil Hyrdo ("Combined Brief"), as well as papers supporting the opposition, are expressly incorporated herein by reference. This brief focuses primarily on the questions of nationwide service of process, conspiracy jurisdiction, and imputation of knowledge and responsibility to the Individual Defendants for the bribery scheme that is alleged in the Verified Complaint. The allegations concerning the bribery scheme are summarized below but discussed in far greater detail in the Combined Brief. And the portions of the Combined Brief pertaining to standards on a motion to dismiss, arbitrability, settlement and release, jurisdiction, RICO standing, RICO injury, causation, and common law claims are fully incorporated herein.

## PRELIMINARY STATEMENT

The Individual Defendants have little to say other than "no jurisdiction" for the massive criminal bribery scheme involving the OKIOC consortium, James Giffen, BP and Statoil. The jurisdictional arguments do not save these Defendants, because (1) RICO calls for nationwide service of process, (2) the Foreign Corrupt Practices Act ("FCPA"), consistent with principles of the common law, expressly contemplates liability against individual officers who are culpable in the violations of their company, and (3) conspiracy jurisdiction is a viable theory in this Circuit, and makes these Defendants every bit as amenable to jurisdiction as their co-conspirators, including the companies who's illegal conduct they have participated in shaping, and James Giffen himself.

## STATEMENT OF FACTS PERTINENT TO THE
## MOTIONS OF THE INDIVIDUAL DEFENDANTS

The Individual Defendants all served at relevant times as extremely high-level corporate officers at BP or StatoilHydro. Defendant Sutherland has served as the Chairman of BP, BP Exploration (Caspian Sea) Ltd. ("BP Exploration"), and BP

2

Exploration Operating Company Ltd. ("BPX"), and is also the current Chairman of Goldman Sachs International in London and New York.  Verified Cpt. at ¶ 9.  At all relevant times until May of 2007, Defendant Browne was CEO of BP, BP Exploration and BPX.  Id. at ¶ 10.  Beginning in May of 2007, Defendant Hayward became CEO of BP, BP Exploration and BPX.  Id. at ¶ 11.  Hayward served as a director of BPX in 1997, a group Vice President and a member of the upstream executive committee in 1999, and Treasurer of BP in 2000.  Abrams Decl. Exh. G.  Defendant Lund is the President and CEO of StatoilHydro.  Id. at ¶ 12.

While the Combined Brief sets forth the available facts underlying the bribery scheme, a brief summary is in order here.  BP and StatoilHydro were part of a massive conspiracy to use James Giffen as a middleman in furtherance of a scheme to bribe Kazakh government officials so that OKIOC consortium members, including BP and Statoil, could explore the giant oil reserves in the portion of offshore Kazakhstan in the Caspian Sea, known as "Kashagan."  Plaintiffs' provision of confidential information led directly to these Defendants' involvement in OKIOC, but OKIOC could not commercialize any of its petroleum findings until it had obtained Kazakh government approval to commercialize the find.  Combined Brief at 6.  Kashagan has been characterized as "probably the world's fifth largest oil field."  Id.

**OKIOC AND THE CRIMINAL INDICTMENT OF JAMES GIFFEN**

In the 1997-98 timeframe, the consortium of oil companies comprising OKIOC negotiated to acquire from the Kazakh government the rights to participate in OKIOC to explore for oil in certain offshore blocks in the Kazakh sector of the Caspian Sea.  Giffen Indictment at ¶ 47.  Giffen and his company, Mercator Corporation ("Mercator") offered its service to the Kazakh government "to assist in the negotiations" between the oil company consortium and the Government of the Republic of Kazakhstan.  Id. at ¶ 4. Mercator fronted as a legitimate consulting company.

3

On or about November 18, 1997, the oil companies and Kazakhstan entered into a "Production Sharing Agreement" governing their respective participation in OKIOC's exploration. Id. at ¶ 48. Under the agreement, the oil companies agreed to pay the Kazakh government a $175 million "signature bonus" due shortly after the signing of the agreement. Id. The payment of the "signature bonus" was a pre-condition to the Production Sharing Agreement becoming effective.

The Giffen indictment makes reference to an individual named "KO-I" who is described as a "very senior official of the Kazakh Government." Giffen Indictment at ¶ 5. KO-I specified that the $175 million the OKIOC companies were to pay as a "signature bonus" be divided amongst three (3) bank accounts: $100 million to an account at Credit Suisse in Switzerland, $52 million to an account at Pictet & Cie, and $23 million to an account at Credit Agricole Indosuez ("CAI"). Id. at ¶¶ 5, 48.

In April of 1998, "the oil companies participating in the (OKIOC) consortium…caused a total of approximately $23 million to be wire transferred to the CAI escrow account." Giffen Indictment at ¶ 50. These payments were made by the oil companies themselves, not by Giffen or Mercator, and not by OKIOC. As explained in further detail in the Giffen indictment, the vast majority of this money went ultimately not to the Kazakh government but to Kazakh government officials and Giffen himself. Id. at ¶ 51.

The Giffen Indictment suggests that Giffen was hired by Kazakhstan to facilitate the bribery of certain Kazakh government officials, but it is silent as to the relative culpability of any of the oil companies or consortiums mentioned in the Indictment. As BP notes in its moving brief, the payment by OKIOC members was characterized as an "entrance fee" for any oil company wishing to participate in the OKIOC consortium. BP MOL at 30. And nothing in the Giffen Indictment suggests that BP and Statoil knew

4

what Giffen was doing. Accordingly, the Giffen indictment standing alone does not implicate BP, Statoil, or any of their individual executives.

The Verified Complaint and the Combined Brief, however, spell out several reasons to implicate BP, StatoilHydro, and its most senior leadership in the bribery scheme. Without re-hashing the details, a summary of these reasons follows:

- Plaintiffs have uncovered a payment of $500,000 by BP to James Giffen in 2000. Combined Brief at 8; Exh. 1;
- On October 11, 2006, StatoilHydro entered into a Deferred Prosecution Agreement with the United States Department of Justice, paying a penalty of $10,5 million for violations of the Foreign Corrupt Practices Act based on improper payments to Iranian government officials. Much like the bribery scheme involving Giffen, StatoilHrdro's admitted participation in the Iranian bribery scheme involved the use of a middleman who claimed to be a consultant, in a bid to get a contract to help develop one of the world's largest oil fields. The Iranian bribery scheme slightly post-dated the Giffen scheme, leading to a reasonable inference that the two schemes reflect a common pattern and/or *modus operandi* of doing business at Statoil. Combined Brief at 10;
- The former BP executive who led BP's successful bid for an enormous oil Concession in the offshore Caspian Sea in Azerbaijan has stated publicly that massive line item expenditures on BP's books which were made to appear as legitimate payments to the official Azerbaijani Oil Company were in fact a cover for bribes to top Azerbaijani government officials. Verified Cpt., Exh. 2. This conduct dovetails with the criminal history of BP's former CEO, Lord John Browne, who was found guilty of criminal perjury by a High Court in the United Kingdom in the Spring of 2007. Id. at ¶ 43.
- In May of 2007, the DOJ, cooperating with Swiss authorities, has agreed that some $84 million previously held in Swiss bank accounts owned by several top Kazakhstan government officials connected with the licensing and operations of Kashagan, and blocked by the DOJ, should be released. Verified Cpt. at ¶ 42. The money will reportedly be donated by the authorities for the benefit of needy children in Kazakhstan. These monies were earmarked by the DOJ as having been paid on behalf of Western oil and gas companies in securing corrupt

5

contracts in Kazakhstan, including at least OKIOC's contractual rights. This money will reportedly be donated by the authorities for the benefit of needy children in Kazakhstan. Given the BPX/Statoil 1/7th collective interest in OKIOC, and the 2/1 split between BP and Statoil respectively, the DOJ's seizure indicates that BP bore its proportionate share of up to $8 million and Statoil $4 million of those illegal and criminal payments called expenses. Id.

- Chevron correctly viewed the $40 million "entrance fee" as an illegal bribery and accordingly refused to participate in the OKIOC consortium. Verified Complaint at ¶ 48.

- Defendants BP and Statoil have classified approximately $40 million in unspecified expenses as "production sharing fees," despite the fact that was no production in Kashagan at relevant times, and standard international production sharing contracts pay production sharing fees only from actual petroleum production and not before any oil and gas production begins. Verified Complaint at ¶ 50. The fact that there has been no such production, juxtaposed with the above facts, leads to a reasonable inference that the roughly $40 million classified as "production sharing fees" are actually illegal bribe payments.

Based upon these facts and others as set forth in the Combined Brief, the Verified Complaint sets forth proper RICO and common law causes of action against BP and Statoil. Combined Brief at 26-41. Personal jurisdiction over StatoilHydro is established, based on StatoilHydro's issuance of American Depository Receipts on the New York Stock Exchange, and RICO's nationwide service of process provision. Id. at 24-26. And BP has not asserted any jurisdictional defense.

## ARGUMENT

### I.  HELGE LUND's MOTION TO DISMISS IS NOT RIPE

Unlike the other Individual Defendants, Helge Lund has neither been served nor agreed to accept service. Mr. Lund's counsel has advised that they are not authorized to accept service. And notwithstanding a prior failed service attempt, Plaintiffs have repeatedly assured Mr. Lund's counsel that Plaintiffs are not claiming that proper service has been effectuated. Mr. Lund is believed to be a Norwegian resident, and service

6

efforts under the procedures promulgated by the Hague Convention treaty for effecting foreign service in Norway are ongoing. But again, Mr. Lund has not been served as of yet.

Mr. Lund is well within his rights to tell his attorneys to refuse service. He also has other defensive options -- he can move to dismiss for failure to serve if sufficient time elapses, he can accept service and raise any jurisdictional objection he wants, he can accept service and defend himself on the merits, or he can do nothing. What we do not believe he can do is ask this Court for an advisory jurisdictional opinion while he refuses to accept service and Plaintiffs go through the time-consuming process of trying to serve him abroad. Counsel has uncovered no cases where a defendant who all agree has not been served can test out a legal argument while refusing to accept service. Indeed, even StatoilHydro now appears to recognize that Mr. Lund's motion is moot. StatoilHydro Brief at 26, N. 15. Accordingly, the remainder of this brief will focus on the BP Individual Defendants.

II.   **IN DETERMINING PERSONAL JURISDICTION, THE GOVERNING TEST IS CONTACTS WITH THE UNITED STATES, NOT CONTACT WITH THE DISTRICT OF COLUMBIA**

The BP Individual Defendants lament the lack of allegations tying the BP Individual Defendants to the District of Columbia. BP Brief at 3-4. This is the wrong standard in a Federal RICO case. RICO provides for nationwide service of process. 18 U.S.C. § 1965(d). It is the defendant's national contacts which are relevant to a due process analysis in a federal question case when the defendant has been served under the nationwide service of process provision of the RICO Act. For example, in <u>Omni Video Games, Inc. v. Wing Co.</u>, 754 F. Supp. 261, 263 (D. R.I. 1991), the Rhode Island district court was faced with the question of personal jurisdiction over a District of Columbia corporation with its principal place of business in Massachusetts. Based on the

nationwide service provision of 18 U.S.C. § 1965, the court found that it had jurisdiction over the corporation because:

> [w]here Congress has authorized nationwide service of process, the personal jurisdiction power of this Court is "coextensive with the boundaries of the United States, [and] due process requires only that a defendant in a federal suit have minimum contacts with the United States."

Omni Video Games, 754 F. Supp. at 263 (citing Federal Trade Comm'n v. Jim Walter Corp., 651 F.2d 251, 256 (5th Cir. 1981). Thus, the relevant analysis focuses on whether defendants have minimum contacts with the United States and not whether the Fourteenth Amendment due process concerns have been satisfied. See also Dooley v. United Technologies Corp., 786 F.Supp. 65, 71 (D.D.C. 1992) (under RICO's nationwide service provision, plaintiffs' prima facie burden is met by showing that a defendant has minimum contacts with the United States).

### III. THE BP INDIVIDUAL DEFENDANTS CAN BE HELD RESPONSIBLE FOR THE FCPA VIOLATIONS OF THEIR COMPANIES

The plain language of the FCPA forbids issuers of registered securities and other "domestic concerns" (as well as their agents) from influencing foreign officials by offering, promising, or giving "anything of value." See 15 U.S.C. §§ 78dd-1(a). The FCPA also specifies that not only issuers of registered securities[1] are subject to the FCPA, but also "any officer, director, employee, or agent of such issuer…." Id. See also 78dd-2(a).

Accordingly, senior management of companies have repeatedly been subject to both prosecution and civil enforcement under the FCPA. And these enforcement actions are not necessarily dependent upon an allegation that the senior management directly bribed anybody. For example, the SEC brought a civil action in this District against Monty

---

[1] BP and StatoilHydro are both issuers of registered securities in the United States, and subject to the FCPA statute, as discussed at Point III of the Combined Brief.

8

Fu, the former CEO and Chairman of Syncor International Corporation ("Syncor"). Abrams Decl. Exh. H SEC v. Monty Fu, No. 1:07CV01735 (D.D.C. Sept. 27, 2007). The SEC alleged that Syncor funneled bribes to doctors employed by private and public hospitals in Taiwan. The SEC charged Mr. Fu not only with actual knowledge of the bribes but also failing to implement the proper internal controls that would have prevented the bribes. As described by the SEC "[Mr.] Fu had the authority to maintain compliance with the existing internal controls, and to implement additional internal controls designed to comply with the books and records and internal controls provisions (of the FCPA), yet failed to do so." Id. at 2. In its Complaint the SEC characterizes this behavior as a direct violation of the rule prohibiting a person from "knowingly circumvent[ing] or knowingly fail[ing] to implement a system of internal accounting controls or knowingly falsify[ing] any book, record, or account." Securities Exchange Act of 1934 § 13(b)(5), 15 U.S.C. § 78m (2000). The SEC maintained that this behavior constituted "aiding and abetting Syncor's books and records [violations] and internal controls violations" of federal law. Abrams Decl. Exh. H, SEC v. Monty Fu, No. 1:07CV01735 (D.D.C. Sept. 27, 2007).[2] This prosecution is consistent with the SEC's position in other cases, and their general approach to FCPA enforcement against not only companies, but the high-level executives who let bribery happen, either through misfeasance or through nonfeasance. See also Abrams Decl. Exh. I, SEC v. Phillip, 07 Civ. 1836 (D. Ore. 2007).

      The SEC's position is a sensible one. Corporations do not bribe foreign officials. People bribe foreign officials. And prosecution of the highest levels of management for their own culpability in tandem with corporate prosecutions will be a far more effective deterrent than merely prosecuting companies. A critical component of FCPA enforcement is therefore holding senior officials responsible in appropriate cases, even if it cannot be

---

[2] On September 27, 2007, the SEC filed a settled civil injunctive action, confirming entry of a final judgment against Mr. Fu and ordering him to pay a civil penalty of $75,000. Mr. Fu neither admitted nor denied the allegations in the Complaint. See SEC v. Fu, 07 Civ. 1735 (EGS) (D.D.C.), Docket Entry # 6.

proven that these officials personally bribed anyone. This truism is no less apt in a case brought under Civil RICO by a private attorney general.

This approach to holding certain high-level individuals responsible for corporate crimes and torts is especially appropriate in RICO cases where the underlying misconduct violated the FCPA. In bribery cases it is all too easy to hide behind lower-level corporate employees or middlemen like Giffen. Moreover, holding corporate officers accountable for corporate misconduct where these officers are responsible for the conduct at issue is also consistent with the general approach courts have taken to establishing civil liability for corporate officers responsible for corporate torts. If a corporation is found to have violated a federal statute, its officers will not be personally liable solely because of their status as officers. However, if the officer either directly participated in, or authorized the statutory violation he may be personally liable even if he was acting in a corporate capacity. *See* United States v. Pollution Sen. of Oswego, Inc.*,* 763 F.2d 133, 134-35 (2nd Cr. 1985); BEC Corporation v. Dept. of Environmental Protection*,* 256 Conn. 602, 775 A.2d 928 (Conn. 2001) (discussing ""an emerging body of federal case law holding individual corporate officers liable for violations of federal environmental laws when those officers either participated in these violations, [or] controlled or supervised the corporate activities that resulted in the violations.''); Cf. Sit-Set, A.G. v. Universal Jet Exch., Inc.*,* 747 F.2d 921, 929 (4th Cir. 1984). Moreover, while corporate titles do not necessarily imply culpability, Courts have not hesitated to look to a companies' senior leadership – particularly its Chief Executive or Chairman – and impute knowledge of corporate misfeasance that can be fairly presumed from the officer's status. See Dept. of Ecology v. Lundgren*,* 94 Wn. App. 236, 243, 245, 971 P.2d 948 (1999) ("As an officer who controlled the corporate conduct, [the defendant] can be deemed an active participant in that conduct.").

Here, the Individual BP Defendants have all served in key leadership positions at relevant times. Verified Complaint at ¶¶ 10-12. While BP was bribing Giffen in the 1998-

10

2000 timeframe, Sutherland was BP's Chairman (a post he continues to hold), Browne was BP's CEO (a post he held until resigning in May of 2007), and Heyward was a director of the Operating subsidiary that was active in Kazakhstan, who later was promoted to replace Browne as BP's CEO. These are high level officials who can be expected to have knowledge about the massive corporate bribery scheme which enabled BP to obtain a $1/7^{th}$ interest in Kashagan (with $1/3^{rd}$ of that interest earmarked for Statoil), the fifth largest oil field in the world. Abrams Decl. Exh. A. Both during and after the bribery schemes at issue, these Defendants were in a position to implement the controls required by the FCPA that could ensure that the present bribery ceased and that future such schemes did not occur.

Even if knowledge of the bribery scheme cannot be imputed to these men, certainly each of them at relevant times "had the authority to maintain compliance with the existing internal controls, and to implement additional internal controls designed to comply with the books and records and internal controls provisions (of the FCPA), yet failed to do so." SEC v. Monty Fu, No. 1:07CV01735, at *2 (D.D.C. Sept. 27, 2007).

### IV. THE BP INDIVIDUAL DEFENDANTS ARE SUBJECT TO JURISDICTION UNDER A THEORY OF CONSPIRACY JURISDICTION

As explained in greater detail in the Combined Brief, this case arises out of a criminal conspiracy perpetrated by the Defendants and other wrongdoers as part of a conspiracy to bribe foreign government officials. The conspiracy has strong ties to the United States, as evidenced by the fact that one of Defendants' co-conspirators, James Giffen, is a New York resident expected to stand trial later this year on charges of violating the Foreign Corrupt Practice Act in the Southern District of New York.

A co-conspirator's amenability to jurisdiction subjects all conspirators to jurisdiction under a theory of conspiracy jurisdiction. Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C.Cir.1991). Here, given RICO's nationwide

11

service provision and Giffen's New York residence, no more is needed to establish jurisdiction over these Defendants. BP's and StatoilHydro's trading of ADR's is also sufficient (though not necessary) to confer jurisdiction on these Individual Defendants.

## V. JURISDICTION OVER THE BP INDIVIDUAL DEFENDANTS COMPORTS WITH DUE PROCESS

As discussed at Point II, the operative question is minimum contacts with the United States. Accordingly the issue of Due Process arises out of the Fifth Amendment, not the Fourteenth Amendment. Omni Video Games, 754 F. Supp. at 263.

The BP Individual Defendants cite Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987), but employing the Asahi test shows that the assertion of jurisdiction here does not run afoul of Due Process. To wit:

- The exercise of jurisdiction over these individual defendants in the United States will not impose an undue burden on them, as they are extremely wealthy oil executives who have retained excellent counsel to represent them. In the case of Heyward and Sutherland, they work for a company (BP) that is active all over the United States, including in the District of Columbia which is the home of BP's "Government Affairs Team." Abrams Decl. Exhibit J. And in the case of Sutherland and Browne, they have additional contacts with this country, as detailed in Point V, *infra*.

- The interests of this Court is resolving the present dispute are substantial – the case alleges a criminal conspiracy to commit FCPA and RICO violations involving an Amercian resident (Giffen) and two companies who trade their stock on the New York Stock Exchange.

- There is no suggestion of a more efficient means to resolve this controversy than litigation in a United States District Court.

- the United States have an overriding interest in furthering the substantive social policy of stopping both American citizens and foreign defendants from (1) collaborating on American soil to bribe foreign officials, as evidenced by the FCPA, and (2) exposing American citizens and companies to unlawful interference with our economic rights.

12

VI. **ALTERNATIVELY, IF THE COURT CONCLUDES THAT THE VERIFIED COMPLAINT FAILED TO SHOW SPECIFIC JURISDICTION OVER BROWNE, HEYWARD AND SUTHERLAND, JURISDICTIONAL DISCOVERY SHOULD BE ALLOWED TO SHOW THESE INDIVIDUALS ARE AMENABLE TO GENERAL JURISDICTION**

Browne and Sutherland each have (or very recently had) well-documented and well-publicized relationships with the United States.

Putting aside their relationship with BP, a company that is extremely active in the United States, each of these men have additional contacts with the United States. From 1999 to 2007, Browne made $500,000 a year as a director of Goldman Sachs. Abrams Decl. Exh. K. A Goldman Sachs SEC form which expired in January of this year listed his address at "85 Broad Street, New York, New York 10004." Abrams Decl. Exh. L. Browne has also served as a board member of several American companies, including Catalyst, British American Business, Inc., and Apax Partners Worldwide, LLP. Abrams Decl. Exhs. K and M. Sutherland remains a non-executive Chairman of Goldman Sachs. Abrams Decl. Exh. N. And Heyward is a non-executive director of Corus Group, which has its Corus International Americas office in Illinois. Abrams Decl. Exhs. G and M.

These significant (and lucrative) contacts standing alone may well show contacts with the United States adequate for general jurisdiction. At a minimum, they satisfy the relatively lax standard necessary for the Court to order jurisdictional discovery. "As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction." Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425 (D.C.Cir.1991).

VII. **ALTERNATIVELY, THE COURT SHOULD GRANT LEAVE TO AMEND**

Defendants' Motion to Dismiss argues that Plaintiffs have not stated sufficient jurisdictional facts. Plaintiffs disagree. However, should this Court find the Complaint

13

wanting, Plaintiffs request leave to file an amended complaint to make additional jurisdictional allegations. For example, the allegations pertaining to Browne, Heyward and Sutherland may be amended with facts suggesting general jurisdiction would be appropriate, and allegations pertaining to all of the BP Individual Defendants concerning their respective roles at BP could be more particularized, assuming *arguendo* such allegations are necessary at this stage.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motion to dismiss filed by Helge Lund be denied as not ripe or moot, that the motions to dismiss of the BP Individual Defendants be denied, and that in the alternative plaintiffs should be granted leave to conduct jurisdictional discovery as to at least Defendants Browne, Heyward and Sutherland.

Dated: June 26, 2008

LAW OFFICE OF DANIEL L. ABRAMS, PLLC

By:_____
    Daniel L. Abrams (DA 7258)
    2 Penn Plaza, Suite 1910
    New York, New York 10121
    (212) 292-5663

    Kelly Pride Hebron
    Pride Law Office
    1400 Merchantile Lane, Suite 208
    Largo, MD 20774
    (301) 583-4633