UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JACK J. GRYNBERG, GRYNBERG PRODUCTION CORPORATION (TX), GRYNBERG PRODUCTION CORPORATION (CO), and PRICASPIAN DEVELOPMENT CORPORATION (TX),<br><br>      Plaintiffs,<br><br>      v.<br><br>BP P.L.C., STATOILHYDRO ASA, BG GROUP P.L.C., BG NORTH AMERICA, JOHN BROWNE, ANTHONY HAYWARD, PETER SUTHERLAND, HELGE LUND, EIVIND REITEN, ROBERT WILSON, and FRANK CHAPMAN, individuals,<br><br>      Defendants. | Civil Action No. 1:08-CV-00301 - (JDB) |

## MEMORANDUM OPINION

Plaintiffs Jack J. Grynberg, Grynberg Production Corporation (TX), Grynberg Production Corporation (CO), and Pricaspian Development Corporation (TX) (collectively, "plaintiffs" or "Grynberg") sued several oil companies and their executives alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various state laws. See Complaint ("Compl.") at ¶¶ 57-86.  Before the Court are three motions filed by the various defendants to dismiss the complaint.  BP P.L.C. ("BP") filed a motion to compel arbitration and dismiss the complaint for failure to state a claim.  BP executives John Browne, Anthony Hayward, and Peter Sutherland (collectively, "Individual BP Defendants") filed a motion to dismiss for lack of personal jurisdiction.  Statoilhydro ASA ("Statoil") filed a motion to compel

arbitration and dismiss the complaint for failure to state a claim and for lack of personal jurisdiction. The Court concludes that the initial question of the arbitrability of Grynberg's claims is one for the arbitrator, and therefore the complaint will be dismissed against BP, Individual BP Defendants, and Statoil without prejudice. The Court does not reach the defendants' Rule 12(b)(2) and 12(b)(6) motions.

BACKGROUND

The dispute in this case stems from business dealings in Kazakhstan between plaintiffs and the defendant oil companies. See Compl. at ¶ 22. In the late 1980s and early 1990s, Grynberg obtained information about large oil and gas reserves in Kazakhstan. Grynberg arranged meetings between the Kazakh government and several oil companies, including a wholly-owned subsidiary of BP -- BP Exploration Operating Company Ltd. ("BPX") -- and British Gas Group ("BG"), to develop those reserves. See id. at ¶¶ 32-36. In 1993, BPX and Statoil formed a separate joint venture. Id. at ¶ 38. Soon thereafter, BPX allegedly "cut [its] own deal with the Kazakhstan Government to squeeze the Grynberg Plaintiffs out of Kazakhstan. . . ." Id. at ¶ 23. Litigation then ensued.

The parties agreed to settle their initial dispute. In January 1999, Grynberg executed virtually identical Settlement Agreements and Mutual Release Agreements (collectively, "the Agreements") with BPX and Statoil. The Agreements require BPX and Statoil to account for the profits they earn in Kazakhstan and to pay plaintiffs a portion of net profits. Id. at ¶ 23. The Agreements also release all parties from all claims related to Statoil's and BPX's activities in Kazakhstan. See Statoil's Memorandum of Law in Support of its Motion to Dismiss ("Statoil Mot.") at 6-7; BP's Memorandum of Law in Support of its Motion to Dismiss ("BP Mot.") at 5-9.

Most germane to the current dispute, the Agreements provide that any disputes "arising out of, in relation to or in any way connected with" the Agreements shall be "referred to and settled by" arbitration.  See Statoil Mot. at 6-8; BP Mot. at 9-10.  The Agreements incorporate the Commercial Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), see Settlement Agreement at § 10.04, and provide that New York law governs, see id. at § 10.02.

BPX and Statoil sold their interests in the Kazakh oil and gas reserves in June 2001.  Compl. at ¶ 40.  The sale closed in 2002 and plaintiffs quickly initiated the currently-pending arbitration.  Plaintiffs alleged that BPX and Statoil had concealed their planned sale of their Kazakh interests at the time the parties entered into the Agreements.  Statoil Mot. at 9.  Plaintiffs also alleged that BPX and Statoil sold their interests at too low a price and that BPX and Statoil had not paid plaintiffs the full amount due under the Agreements.  Id.  The arbitration has not gone smoothly.  Over the past six years, plaintiffs have asked a court to intervene in the arbitration three times, all unsuccessfully.

Plaintiffs now seek judicial intervention for a fourth time.  The central allegation in the current complaint is that "[d]efendants have engaged in criminal bribery schemes, and in attempting to cover up those bribes, have lied to the Plaintiffs, withheld evidence, with trickery have attempted to force Plaintiffs, without their knowledge, consent or approval, to pay a portion of those illegal bribes out of the profits that the corporate Plaintiffs should have shared in, thereby harming Plaintiffs' hard-earned and well-justified reputation as a crusader against bribery and other corruption within the petroleum industry."  Compl. at ¶ 24.  This allegation forms the basis of plaintiffs' RICO and common law claims.  See id. at ¶¶ 57-86.

STANDARD

When considering a motion to compel arbitration, "the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions" pursuant to Federal Rule of Civil Procedure 56(c).  Brown v. Dorsey & Whitney, LLP, 267 F.Supp.2d 61, 67 (D.D.C. 2003) (internal quotation marks omitted); see also Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 & n.9 (3d Cir. 1980).  Thus, the motion should be granted when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant bears the burden of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may support its motion by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Fed. R. Civ. P. 56(c)).

To determine whether a genuine issue of material fact exists, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Par-Knit Mills, Inc., 636 F.2d at 54.  But the non-movant must establish more than a mere "scintilla of evidence" in support of its position.  Anderson, 477 U.S. at 252.  Indeed, the movant may point to the absence of evidence proffered by the non-movant to succeed on a motion to compel arbitration.  Cf. Celotex, 477 U.S. at 322.  "If the [non-movant's] evidence is merely colorable, or is not significantly probative," a motion to compel arbitration may be granted.  See Anderson, 477 U.S. at 249-50 (citations omitted).

ANALYSIS

The Court's analysis begins and ends with the threshold question whether the arbitrator or the Court determines arbitrability. Plaintiffs do not seriously contest the <u>existence</u> or <u>validity</u> of the arbitration agreement.[1] Rather, plaintiffs argue that their current claim is beyond the <u>scope</u> of the arbitration agreement, that they never intended the arbitrator to determine arbitrability, and that the arbitrator has already decided that these claims are not arbitrable. The Court is not persuaded by any of plaintiffs' arguments.

Plaintiffs first argue that the current allegations fall outside the scope of the arbitration clause. <u>See</u> Plaintiffs' Opposition ("Pl. Opp.") at 17-18. Plaintiffs allege that criminal acts -- bribery in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1 <u>et seq.</u> -- form the predicate acts necessary for their RICO claim, 18 U.S.C. § 1961. Plaintiffs rely on <u>Washburn v. Societe Commerciale de Reassurance</u>, 831 F.2d 149 (7th Cir. 1987), for the proposition that claims "focus[ing] on the agreements' role in a larger criminal scheme are beyond the scope of arbitration." Pl. Opp. at 18. In <u>Washburn</u>, the court recognized that RICO claims can be arbitrable. <u>Id.</u> at 149 (citing <u>Shearson/American Exp., Inc. v. McMahon</u>, 482 U.S. 220 (1987)). But the court held that a narrow arbitration clause referring "questions of interpretation and performance" of a contract to arbitration did not require arbitration of a plaintiff's civil RICO claim. <u>Id.</u> at 152.

---

[1] In one paragraph of their Opposition, plaintiffs argue that the Agreements are void because they were induced by bribery. Pl. Opp. at 17-18. But this argument does not square with plaintiffs' other allegations. Plaintiffs never allege that the Agreements themselves were induced by bribery. Indeed, any alleged bribery did not involve plaintiffs; it involved the defendants and the Kazakh government. Moreover, as discussed <u>infra</u>, plaintiffs' claims are, at bottom, based on money they are owed under the Agreements. If the Agreements are void, plaintiffs' claims would not exist.

Plaintiffs' allegations do not fall outside the scope of the arbitration clause. Federal and state statutes establish a general policy in favor of arbitration. See Shearson, 482 U.S. at 226-27; Cooper v. Bruckner, 21 A.D.3d 758, 758-59 (N.Y. App. Div. 2005). Washburn does not help plaintiffs overcome this policy because the arbitration clause in that case was far narrower than the one in the current case. See Washburn, 831 F.2d at 152. The parties here agreed to refer any "dispute or difference arising out of, in relation to or in any way connected with [the Agreements] (whether contractual, tortious, equitable, statutory or otherwise)" to arbitration. Settlement Agreement at § 10.04. Nor is the Court persuaded by plaintiffs' characterization of their claim. Plaintiffs style their claim as a criminal FCPA action, but ignore the fact that the FCPA does not provide private plaintiffs with a cause of action. See Citicorp. Intern. Trading Co., Inc. v. Western Oil & Refining Co., Inc., 771 F. Supp. 600, 606-07 (S.D.N.Y. 1991). Rather, this is a RICO action and RICO actions are arbitrable. See Shearson, 482 U.S. at 238-39. Indeed, the thrust of plaintiffs' complaint is that the bribes the defendant oil companies allegedly paid to Kazakh officials deprived plaintiffs of profits they are entitled to under the Agreements. See Compl. at ¶ 24. That claim, stripped of its FCPA veneer, plainly falls within the broad reach of the arbitration clause.

Next, plaintiffs argue that the Court, not the arbitrator himself, should make the threshold arbitrability determination. Courts presume that parties to an arbitration agreement intend that courts, not arbitrators, decide the gateway issue of arbitrability. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002). Because arbitration is a matter of contract, however, the arbitrability question itself may be submitted to an arbitrator. See AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986); First Options of Chicago, Inc.

v. Kaplan, 514 U.S. 938, 943-44 (1995).  "Clear and unmistakable evidence" that the parties intended an arbitrator to determine arbitrability is required.  See First Options, 514 U.S. at 944.  Courts apply principles of ordinary state-law contract formation to determine whether "clear and unmistakable evidence" exists.  See id.  Absent clear and unmistakable evidence, the issue is most properly one for the court, rather than the arbitrator, to consider.  Id.; see also Howsam, 537 U.S. at 83.

BP and Statoil point to the arbitration agreement's incorporation of the AAA Rules as evidence of the parties' intent to submit questions of arbitrability to the arbitrator.  See Settlement Agreement at § 10.04 (providing for "arbitration pursuant to the Commercial Arbitration Rules ('AAA Rules') of the American Arbitration Association ('AAA') as presently in force.").  Rule R-8(a) of the AAA Rules provides that the "Arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  See 1999 AAA Commercial Rules at Rule R-8.  The defendants argue that incorporation of the AAA Rules by reference constitutes "clear and unmistakable evidence" that the parties intended to submit the arbitrability determination to the arbitrator himself.  Ample case law supports the defendants' argument.  See, e.g., Contec Corp. v. Remote Solution, Co., Ltd., 398 F.3d 205, 208-09 (2d Cir. 2005) (holding that under New York law,[2] when "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such

---

[2] The parties do not dispute that New York law governs the Agreements.  See Settlement Agreement at § 10.02.  In any event, New York law "follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is 'a clear and unmistakable agreement to arbitrate arbitrability.'"  See Contec Corp., 398 F.3d at 208 n.1 (quoting Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir.2003)).

issues to an arbitrator."); <u>Avue Technologies Corp. v. DCI Group, LLC</u>, Civ.A.No.06-327 (JDB), 2006 WL 1147662 at *6-7 (D.D.C. Apr. 28, 2006) (holding that under D.C. and federal law, incorporation of AAA Rules by reference constitutes clear and unmistakable evidence that the parties intended an arbitrator to determine arbitrability).

Plaintiffs argue that incorporation of the AAA Rules does not constitute "clear and unmistakable evidence" in this case because the parties agreed to the AAA Rules in 1996 whereas Rule R-8(a) did not come into effect until January 1, 1999. Even though they signed the Agreements on January 18, 1999, the argument goes, the parties intended to incorporate the 1996 Rules, not the 1999 Rules. The Court is not persuaded. Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." <u>W.W.W. Associates, Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162 (1990). The lengthy and comprehensive Agreements at issue in this case are the products of years of negotiation between sophisticated parties. The arbitration clause itself could not be clearer: it provides for application of the AAA Rules "as presently in force." Settlement Agreement at § 10.04. This demonstrates that the parties contemplated that the AAA Rules would change over time. Moreover, Rule 1 of the <u>1996</u> AAA Rules provides that "[t]hese rules and any amendment of them shall apply in the form obtained at the time the demand for arbitration . . . is received by the AAA." <u>See</u> 1996 AAA Commercial Rules at Rule 1. Plaintiffs sought arbitration in 2002. Thus, even if plaintiffs intended to incorporate the 1996 AAA Rules rather than the 1999 Rules, Rule R-8(a) would nonetheless apply. Therefore, the Court holds that the arbitration agreement incorporated Rule

R-8(a), and that incorporation of Rule R-8(a) constitutes clear and unmistakable evidence that the parties intended to submit the threshold question of arbitrability to the arbitrator himself.

Finally, plaintiffs argue that the Court should decide whether their claims are arbitrable because the arbitrator, Mr. Stephen Hochman, has already decided that he cannot. Defendants disagree, and argue that Mr. Hochman has decided that he can decide arbitrability, but that he is awaiting this Court's ruling before he makes that decision. Each side points to emails authored by Mr. Hochman to support its position, see Pl. Opp. at 19-20 (quoting from an August 7, 2007 email); Statoil Rep. at 8-9 (arguing that plaintiffs take the August 7 email out of context and instead pointing to an April 24, 2007 email), but at this stage the Court draws all inferences in favor of the non-movant. See Anderson, 477 U.S. at 255. The parties' dispute does not constitute a genuine issue of material fact, however, because plaintiffs acknowledge that Mr. Hochman "claims he will consider the issue of arbitrability if the Court refers the matter to him." Pl. Opp. at 20. Plaintiffs characterize Mr. Hochman's willingness to consider the issue of arbitrability as an "unfortunate but not surprising" "change of heart" given six years of "unnecessary delay, bias in favor of the defendants, and use of false confidentiality concerns and judicial reluctance to interfere with an 'ongoing' arbitration." Id. But plaintiffs do not flesh out these loaded assertions with any facts suggesting bias on the part of Mr. Hochman or dalliance on the part of the defendants. Indeed, both parties agreed to the confidentiality provisions and they specifically named Mr. Hochman as the designated arbitrator in the Agreements. See Settlement Agreement at § 10.04. And the delay appears to be at least partially attributable to plaintiffs, not defendants: this is the fourth time plaintiffs have sought judicial relief, see Transcript of August 19, 2008 Hearing ("Tr.") at 25:22-26:6, and plaintiffs have filed "approximately 100

communications" to the arbitrator or the auditor over the past two and a half years, see Tr. at 29:4-29:22.  Because plaintiffs have not pointed to any facts suggesting arbitrator bias or purposeful delay by the defendants, and because plaintiffs acknowledge that Mr. Hochman has stated that he can decide arbitrability, the Court holds that Mr. Hochman, not the Court, should decide arbitrability.

CONCLUSION

For the foregoing reasons, the Court holds that the arbitrator is the proper entity to decide whether plaintiffs' claims are arbitrable.  Accordingly, BP's and Statoil's motions to compel arbitration will be granted and plaintiffs' complaint will be dismissed against BP, Individual BP Defendants, and Statoil without prejudice.  A separate Order has been issued on this date.

**SO ORDERED.**

                                                                /s/
                                                        JOHN D. BATES
                                                   United States District Judge

Dated:   November 12, 2008