## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**JACK J. GRYNBERG, et al.,**

    **Plaintiffs,**

    **v.**

**BP P.L.C., et al.,**

    **Defendants.**

---

**Civil Action No. 08-301 (JDB)**

## <u>MEMORANDUM OPINION</u>

In 1990, Grynberg Production Company and BP Petroleum Development Ltd. entered a joint venture to explore and develop oil and natural gas reserves in the Northeastern Caspian Sea off the shore of Kazakhstan. For most of the intervening twenty-five years, they have been locked in contentious litigation, both here and abroad. That litigation spilled into this Court in 2008 when Jack Grynberg and several companies that he controls (collectively "Grynberg") sued several oil companies and their executives, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and state law.

Enforcing an arbitration agreement previously executed by the parties, the Court ultimately dismissed Grynberg's complaint. <u>See</u> <u>Grynberg v. BP P.L.C.</u>, 585 F. Supp. 2d 50 (D.D.C. 2008). Grynberg subsequently added his RICO claims to an ongoing arbitration between the parties, where the arbitrator then decided them. Now, eight years after this Court's decision and six years after the decision of the arbitrator, Grynberg has moved under Federal Rule of Civil Procedure 60 to vacate this Court's dismissal of his RICO claims, citing bias by the arbitrator and bad faith by the defendants. For the reasons below, Grynberg is not entitled to that relief. His Rule 60 motion will therefore be denied.

1

# BACKGROUND[1]

## A. The Underlying Transaction

In 1990, a BP subsidiary and one of Grynberg's companies entered a joint venture to explore and develop oil and natural gas reserves in the Northeastern Caspian Sea off the shore of Kazakhstan. Grynberg contributed original and confidential information about the target reserves to the joint venture; in return, he received an interest in the net profits that BP derived from the reserves' development. Separately, BP entered a sub-venture with Statoil, which became privy to Grynberg's original information, subject to confidentiality obligations. Then things went south. In 1993, BP and Statoil joined a consortium of international oil companies hoping to obtain concessions from the Kazakh government to develop reserves, including those covered by the Grynberg-BP joint venture. Grynberg calls this consortium the "Giffen Consortium." Its namesake, James Giffen, was charged in 2003 with violations of the Foreign Corrupt Practices Act arising out of the alleged bribery of Kazakh officials. Ultimately the consortium secured its oil and gas concessions.

Grynberg sued, alleging that BP and Statoil had misappropriated his original, confidential information for their own benefit. The litigation resolved in 1999 with two substantially identical settlement agreements—one with BP and another with Statoil. Under the agreements, Grynberg was entitled to an interest in the net sale proceeds derived from development of the covered reserves. More important for present purposes, the agreements also contained a broad arbitration clause requiring that any "dispute or difference arising out of, in relation to or in any way connected with" the settlement "shall be finally and exclusively referred to and settled by arbitration." See, e.g., BP 1999 Settlement Agreement [ECF No. 114-5] § 10.04(a). Stephen Hochman, who had

---

[1] The background on the underlying transaction and the beginning of the arbitration is drawn primarily from the allegations in Grynberg's declaration. See Grynberg Decl. [ECF No. 114-2].

assisted the parties in their settlement negotiations, was specified in the agreements as the sole arbitrator. In the event Hochman became "unable or unwilling to serve" in that role, arbitration would be completed by a three-arbitrator panel. See id. § 10.05(b).

## B. The Arbitration Commences

Before long, a dispute arose under the settlement agreements. In 2001, BP and Statoil announced that they would sell their interests in the covered reserves to Total, another international oil company. Those sales became the subject of a number of disputes before the arbitrator. First, Grynberg alleged that BP and Statoil had concealed their intention to sell their interests in the covered reserves in order to fraudulently induce him into the settlement agreements. Second, he alleged that BP and Statoil had used a number of side deals to artificially depress the proceeds of the sale—and to thereby artificially reduce Grynberg's take. Thus began, in 2002, what Grynberg calls the "13 year arbitration from hell." Grynberg Decl. [ECF No. 114-2] at 4. By mid-2007, the fraudulent inducement claim and side deal claims had been resolved against Grynberg. See 2010 Final Award [ECF No. 114-7] at 7–18. But the arbitration was very contentious. Grynberg plainly thought the arbitrator was not giving his evidence and arguments a fair hearing. During this phase of the arbitration, Grynberg sought outside judicial relief three times, filed approximately 100 communications to the arbitrator and auditor, accused the arbitrator of bias, and demanded that the arbitrator disqualify himself from deciding some remaining claims, which the arbitrator refused to do. See Grynberg, 585 F. Supp. 2d at 56.

## C. The RICO Claims

Grynberg filed suit in this Court in 2008 alleging violations of RICO and state law (collectively "RICO claims"). His core allegation was that defendants, through their participation in the "Giffen Consortium," had bribed Kazakh officials in exchange for oil and gas concessions.

Those bribes, Grynberg contends, were then misrepresented by the companies as legitimate production costs—thereby depriving Grynberg of profits to which he was entitled under the settlement agreements and implicating him in a scheme of foreign bribery. See Compl. [ECF No. 1] ¶ 24. Enforcing the parties' arbitration agreement, this Court dismissed Grynberg's RICO claims, holding that their arbitrability was a question for the arbitrator. See Grynberg, 585 F. Supp. 2d at 51. No appeal was taken. Grynberg then added his RICO claims to the still pending arbitration.

The arbitrator divided Grynberg's new allegations into the "audit claims" and the "DC Based RICO" claims. The "audit claims" centered on whether $28 million of "signature bonuses"—characterized by Grynberg as bribes and by the defendants as legitimate business expenses—could be properly counted as costs in a calculation of BP's net sale proceeds under the settlement agreements.[2] See 2010 Final Award at 18–19. The "DC Based RICO" claims were essentially the same as those brought in this Court. See id. at 21–22. As the arbitration progressed, Grynberg remained unimpressed with the arbitrator's handling of his case. In a flurry of correspondence, Grynberg and various attorneys demanded discovery on the RICO and audit claims. See, e.g., Dec. 8, 2008, Letter from Grynberg to Hochman [ECF No. 141-4] at 3 ("I want to depose the Chief Financial Officer of BP, item by item . . . Also, I want to depose everyone who was associated with producing that fraudulent document of expenditures by BP."). Grynberg also made clear his feelings about the arbitrator, the defendants, and their lawyers. See id. ("Is that arbitration or is that a whitewash? . . . It's a Kangaroo Court that you have run for the last six (6) years."); id. (defendant corporations are run by "criminal[s]"); id. at 2–3 (counsel are "liars not lawyers" and made "fraudulent presentation[s]")

---

[2] The "audit claims" dealt only with BP. At this point, the audit of Statoil was still ongoing.

### D.  A "Final" Decision

Grynberg did not get his discovery.  In 2010, the arbitrator issued a final award resolving all thirteen claims before him.  Among them were the audit and RICO claims, which the arbitrator resolved without determining whether the "signature bonuses" were in fact bribes.  As to the audit claims, the arbitrator concluded that it was irrelevant whether the "signature bonuses" were bribes or legitimate business expenses; either way, they could be properly deducted as "costs" in any calculation of the "net proceeds" derived from BP's development of the covered reserves.  See 2010 Final Award at 18–19.  The arbitrator also deemed the nature of the "signature bonuses" irrelevant to the resolution of the RICO claims.  Even if the "signature bonuses" were bribes, the arbitrator reasoned, Grynberg could not establish that payment of the bribes caused him an injury—without the "signature bonuses," the consortium may not have obtained its concession; and without the concession, Grynberg would not have received any payments for development of the covered reserves.  See id. at 21–22.  Adding insult to injury, upon defendants' motion, the arbitrator also assessed $3 million of sanctions against Grynberg for his conduct during the arbitration.[3]  See id. at 25–28 (citing litigation against defense counsel among Grynberg's sanctionable conduct).

From here, the litigation split off into two different fora: the state courts of New York and the federal courts in Texas.  First, to New York.  Defendants moved the New York Supreme Court to confirm the arbitrator's award.  Jack Grynberg cross-moved to vacate the sanctions award; one of his corporations cross-moved to vacate the arbitrator's decision as to the audit claims.  No one moved to vacate the arbitrator's RICO decision.  The court vacated the arbitrator's award of sanctions, reasoning that the arbitrator had lacked the authority to impose them.  It confirmed the

---

[3] The arbitrator denied a motion for sanctions that had been filed by Grynberg. See 2010 Final Award at 28–29.

arbitration award in all other respects.  See Dec. 8, 2010, Supreme Court Opinion [ECF No. 114-8].  On appeal, the Appellate Division  affirmed as to the sanctions  but reversed as to the audit claims.  According to the Appellate Division,  the arbitrator erred when he concluded that it was irrelevant whether the "signature bonuses"  were bribes; rather, treating a bribe  like a legitimate cost in a calculation of "net proceeds"  would violate public policy.  Thus, the Appellate Division remanded the case to the arbitrator to "determine the nature" of the "signature bonuses."  See Feb. 21, 2012, Appellate Division Opinion [ECF No. 141-14].  BP sought leave to appeal, but its motion was denied.  See June 28, 2012, Court of Appeals Order [ECF No. 144-32].  Appellate Division order in hand, Grynberg sought to disqualify  the arbitrator for bias.  See Mar. 6, 2012, Letter from Ronald  C. Minkoff  to Hochman [ECF No. 141-15].   When Hochman refused to step down, Grynberg sought judicial  intervention  from the New York courts.  By May 2013, two such attempts had proven unsuccessful.  See May 16, 2013, Appellate Division  Opinion [ECF No. 144-12].

Meanwhile, parallel proceedings took place in Texas.  While the parties litigated the arbitrator's final award and alleged bias up and down the New York state courts, Grynberg filed a new suit in the United States District Court for the Southern District of Texas, alleging RICO violations  like those he had alleged in this Court and those resolved by the arbitrator.  That suit was dismissed on grounds of res judicata.  See Grynberg v. BP P.L.C., 855 F. Supp. 2d 625, 648–53 (S.D. Tex. 2012).  According to the Texas district court, the arbitrator had rendered a final decision on the merits of the RICO claims by concluding  Grynberg had not been injured by the underlying criminal activity.  See id. at 651–62.  The Fifth Circuit affirmed.  See Grynberg v. BP, P.L.C., 527 F. App'x 278, 282–83 (5th Cir. 2013) (per curiam).

### E.  To the New York Court of Appeals?

By September 2013, things were falling into place.  The arbitrator's award had been confirmed in most respects.  Hochman would remain as the arbitrator.  And he had only one BP claim—the audit claim, on remand from the Appellate Division—along with claims arising out of the Statoil audit left pending before him.  But as it turns out, the relative calm would not last.  On September 11, 2013, the arbitrator held a meeting with the parties.  The parties wanted to discuss scheduling.  The arbitrator, however, wanted to discuss why the Appellate Division's decision was wrong—as to both the sanctions issue and the audit claims.  Both errors, in the arbitrator's view, stemmed from the New York courts' mistaken belief that New York arbitration law, rather than the Federal Arbitration Act, applied to the proceedings.  See Sept. 11, 2013, Arbitration Meeting Tr. [ECF No. 141-17] at 28:24–29:18  (discussing the Supreme Court decision on sanctions); id. at 67:11–69:13  (discussing the Appellate Division  decision on the audit claims).  Thus, the arbitrator reasoned, when the Appellate Division had vacated part of his award on grounds of "public policy"—a vacatur ground available under New York arbitration law but not under the FAA—it made a legal error.  As support for his position, the arbitrator distributed a copy of a New York Law Journal article.  See id. 61:22–63:16.

The arbitrator proceeded to map out what he saw as next steps.  He considered himself duty bound to act as an "ideal judge" and "do what's right under the law"—hence, rather than comply with the Appellate Division's remand order, which he thought had impermissibly elevated state over federal law, the arbitrator signaled his intention to reissue his prior findings on the audit claims.  See id. 73:16–74:21.  Based on an erroneous view of finality and appellate procedure, he hoped that by issuing a prompt final decision on remand, he could make the issues ripe for immediate review by the New York Court of Appeals.  See, e.g., id. at 47:23–49:07.  Counsel for

all parties attempted to correct the arbitrator's understanding and explain that any appeal of his decision on remand would have to work through the Supreme Court and Appellate Division before reaching the Court of Appeals. See, e.g., id. at 49:08–51:12. Despite extensive conversation, however, the meeting closed without consensus on the appellate procedure issues. And before it did, the arbitrator asked counsel for defendants whether they were considering seeking sanctions against Grynberg—this time, for his attempts to remove the arbitrator for bias and his decision to file RICO claims in Texas during the ongoing arbitration. See id. 141:21–148:23. The arbitrator said his question was motivated by a desire to "identify issues and indicate which issues are going to be relevant." Id. at 148:18–23. Counsel for one of Grynberg's companies' immediately expressed his dismay that the arbitrator was "raising" arguments for one of the parties to the arbitration. Id. 148:24–149:02.

In late November 2013, the arbitrator issued a 20-page final award after remand. See 2013 Final Award [ECF No. 114-10]. That award presented the arbitrator's views on the various topics discussed at the September 2013 meeting: the arbitrator's duty to follow the law, Grynberg's prior attempts to remove the arbitrator for bias, the purported legal errors in the Appellate Division's decision, the ability of the Court of Appeals to hear an appeal from the new award, the authority of an arbitrator to impose sanctions, and the propriety of imposing them against Grynberg in this case. As to the audit claims, the arbitrator was as good as his word: he effectively reissued his 2010 decision, without determining whether the "signature bonuses" were, in fact, bribes. See id. at 17–19. By doing so, he understood he was "refus[ing] to comply" with the Appellate Division's remand order. Id. at 19. But he was also "urging the Court of Appeals to correct the [Appellate Division's] Decision so as to resolve a purely legal issue that has broad State-wide implications." Id. at 17. He viewed the fact that his decision might accrue to defendants' benefit as purely

coincidental.  See id. at 7 ("[M]y sole motive was to fulfill my ethical duties as an arbitrator to the arbitration process as well as to the New York courts.").

**F. The Arbitrator Is Removed**

Needless to say, Grynberg did not see things that way.  Thus began another attempt to disqualify the arbitrator—and this time, Grynberg succeeded.  He moved in the Supreme Court to vacate the arbitrator's 2013 award and to remand the audit claims to a three-arbitrator panel pursuant to the arbitration agreement.  The Supreme Court granted those motions.  See Apr. 2, 2014, Supreme Court Opinion [ECF No. 114-11].  The court found that Hochman had exceeded his authority as arbitrator when he "explicitly failed to follow the unambiguous directive of the [Appellate Division]."  Id. at 5.  It also concluded that the arbitrator "would not be able to fairly make a determination with respect to the issue remanded to him" because doing so "would violate what he perceives to be his ethical obligations as an arbitrator."  Id. at 7.  Finally, in the court's view, the arbitrator had "moved beyond the normal role of an arbitrator in the arbitration process by rendering an award which is in effect a brief to the Court of Appeals requesting that they uphold his original award."  Id. at 7.  For all these reasons, the arbitrator needed to be removed.  The same court later consolidated the ongoing Statoil arbitration with the BP arbitration, and removed the arbitrator from all disputes between the parties in order to eliminate any "appearance of bias."  See July 17, 2014, Supreme Court Opinion [ECF No. 141-10] at 8.  Defendants appealed, and the Appellate Division affirmed.  See Apr. 16, 2015, Appellate Division Opinion [ECF No. 114-15].  Although defendants sought leave to appeal to the Court of Appeals, that motion was denied.  See Sept. 1, 2015, Court of Appeals Order [ECF No. 114-32].

Meanwhile, outside the courtroom, the arbitrator Hochman was keeping up a steady correspondence with the parties.  The main focus was the arbitrator's desire to guide the case to

the Court of Appeals as soon as possible.   On the day that he issued his 2013 award, the arbitrator expressed his "hope . . . that at least one of the parties will be willing to preserve the right of all parties to act in the best interest of all parties by filing a notice to the Court of Appeals requesting leave to appeal the [Appellate Division] Decision." Nov. 27, 2013, Email from Hochman to Counsel [ECF No. 141-20].   BP ultimately filed such a motion.   Unsurprisingly, it was denied. Months later, the arbitrator was advised of the Supreme Court's decision removing him from the BP arbitration.   (The arbitrator had himself submitted a brief in that litigation.)   Relying on the Supreme Court decision, Grynberg asked the arbitrator to withdraw from the ongoing Statoil arbitration as well.   See Apr. 17, 2014, Email from Minkoff to Hochman [ECF No. 141-22]. Hochman refused and, in a long email to the parties, explained that this newest opinion also incorrectly applied New York law to a case that should be governed by the FAA.   See Apr. 21, 2014, Email from Hochman to Counsel [ECF No. 141-23].   Days later, the arbitrator followed up, unsolicited, with a longer memo articulating his view of an arbitrator's duty, defending his impartiality, and reiterating his desire to get the case to the Court of Appeals as soon as possible. See Apr. 25, 2014, Mem. to the Parties [ECF No. 114-13].   That supplemental memo also raised the possibility that all the litigation between the parties could be transferred to a new judge, expert in arbitration and complex commercial litigation, who could be trusted to properly sort out the legal issues.   See id. at 2–3. Four days later, the arbitrator sent the parties another email—this time focusing on the res judicata impact of the Texas RICO litigation—which he retracted the following day.   See Apr. 29 & 30, 2014, Emails from Hochman to the Parties [ECF Nos. 141-25 & 141-26]. In mid-July 2014, when the arbitrator was removed from the Statoil arbitration, his participation in this case came to an end.

### G. Grynberg's Rule 60 Motion

And so, at the time that Grynberg filed his Rule 60 motion in this Court on December 29, 2015, here is where things stood:  Grynberg's RICO claims, filed here in 2008, were decided by the arbitrator in 2010.  His attempt to relitigate those claims in Texas federal court has been barred by principles of preclusion.  The broad arbitration agreement between the parties remains in effect, although the arbitrator specified in that agreement has now been removed.  In his absence, the agreement requires the parties to select a three-arbitrator panel to decide the remaining "signature bonus" related claims.  That effort was well underway when Grynberg filed his motion, which seeks to vacate this Court's 2008 decision dismissing his claims, rescind the arbitration agreement, and revive the previously dismissed RICO claims.  As a basis for this extraordinary relief, Grynberg cites the arbitrator's bias—which he argues was present from the beginning of the arbitration but now finally revealed—and defendants' bad faith during the arbitration process.  It is to those arguments that the Court now turns.

### LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) allows a court, upon "motion and just terms," to relieve a party from a final judgment, order, or proceeding for specified reasons.  "Regardless of the particular reason for providing such relief, however, under Rule 60(b) the trial judge must strike a delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of <u>all</u> the facts."  <u>Twelve John Does v. District of Columbia</u>, 841 F.2d 1133, 1138 (D.C. Cir. 1988) (internal quotation marks and alterations omitted).  District courts are vested with a large measure of discretion in striking that balance.  <u>Id.</u>

## DISCUSSION

### A.  Rule 60(b)(5)

Grynberg first seeks relief under Rule 60(b)(5), which allows the Court to relieve Grynberg from its 2008 order if "applying it prospectively is no longer equitable." "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." Horne v. Flores, 557 U.S. 433, 447 (2009) (internal quotation marks omitted).  Grynberg believes the arbitrator's bias—concealed at the time of this Court's decision but now in the open—constitutes a changed circumstance sufficient to justify relief under Rule 60(b)(5).

But there is a fundamental problem with Grynberg's argument.  Under Rule 60(b)(5), an order may be modified "only to the extent that it has 'prospective application.'"  Twelve John Does, 841 F.2d at 1138.  For an order to have "prospective application," it must be "executory or involve[] the supervision of changing conduct or conditions."  Id. at 1139 (internal quotation marks omitted).  The Court's 2008 dismissal order involved no such thing.  This Court was not obligated to supervise the parties' ensuing arbitration.  Once Grynberg's complaint was dismissed, the Court properly put Caspian Sea oil and gas development out of its mind.  The order was an unconditional dismissal of Grynberg's suit, and "it is difficult to see how an unconditional dismissal could ever have prospective application within the meaning of Rule 60(b)(5)."  Id.

Of course, the order did require something of Grynberg: to the extent he wanted resolution of his RICO claims, he would have to arbitrate them.  "That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application' for the

purposes of Rule 60(b)(5)." Id. at 1138.  In other words, the 2008 order does not have "prospective application" merely because it influenced, or even caused, some future events.  Other cases from this district provide ample illustration of that principle.  See, e.g., Keepseagle v. Vilsack, 118 F. Supp. 3d 98, 123–25 (D.D.C. 2015) (cy pres provision in a settlement agreement did not apply prospectively even though it required class counsel to perform administrative responsibilities in the future); Conservation Force v. Salazar, 915 F. Supp. 2d 1, 4–5 (D.D.C. 2013) (order remanding case to agency did not have prospective application even though the agency was required to reconsider a permit application in the future).  Because this Court's 2008 order does not (and never did) apply prospectively, Grynberg is not entitled to relief under Rule 60(b)(5).[4]

## B. Rule 60(b)(6)

Alternatively, Grynberg invokes Rule 60(b)(6), which permits a district court to relieve a party from a final judgment for "any other reason that justifies relief."  But, as the D.C. Circuit has cautioned, Rule 60(b)(6) is to be "only sparingly used." Twelve John Does, 841 F.2d at 1140 (internal quotation marks omitted).  "This catchall provision has been interpreted to apply when a party demonstrates 'extraordinary circumstances.'" Marino v. DEA, 685 F.3d 1076, 1079 (D.C. Cir. 2012) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 393 (1993)). "[P]laintiffs must clear a very high bar to obtain relief under Rule 60(b)(6)." Kramer v. Gates, 481 F.3d 788, 792 (D.C. Cir. 2007).  At the very least, "a more compelling showing of inequity or hardship is necessary to warrant relief under subsection (6) than under subsection (5)." Salazar ex. rel. Salazar v. District of Columbia, 633 F.3d 1110, 1120 (D.C. Cir. 2011).  In an attempt to make such a compelling showing of inequity, Grynberg points to the arbitrator's alleged bias and the defendant's alleged bad faith in exploiting that bias throughout the arbitration.

---

[4] Even if the 2008 order did apply prospectively, for the reasons contained in the remainder of this Memorandum Opinion, the Court would not grant Grynberg relief under Rule 60(b)(5).

Unfortunately for Grynberg, his motion struggles against several currents in the D.C. Circuit's Rule 60(b)(6) jurisprudence. First, "a party who has not pursued an appeal may obtain relief under Rule 60(b)(6) only if there are circumstances so extraordinary as to . . . essentially [make] the decision not to appeal an involuntary one." Twelve John Does, 841 F.2d at 1141 (internal quotation marks and alteration omitted). Grynberg has forgone several opportunities to challenge this Court's 2008 decision and the arbitrator's 2010 RICO award. Most obviously, he failed to appeal this Court's 2008 decision dismissing his RICO claims. In 2010, when the arbitrator also dismissed Grynberg's RICO claims, Grynberg again sat on his hands, declining to challenge that portion of the arbitrator's award in New York state court. See Dec. 8, 2010, Supreme Court Opinion. The arbitrator's RICO award was confirmed by the New York courts, and from then then until now, Grynberg has not (to this Court's knowledge) attempted to disturb it.

Although Grynberg tries, he cannot adequately explain these omissions. He protests that he did not realize he needed to challenge the arbitrator's decision on the RICO claims, because he thought the arbitrator had refused to decide their merits. See Pls.' Reply [ECF No. 141] at 2. But this makes little sense. The arbitrator plainly "dismissed" Grynberg's "DC Based RICO claim." 2010 Final Award at 22. If Grynberg wanted to keep those claims alive, the need to appeal should have been apparent. His only previous attempt to revive them was his effort to relitigate them in a Texas federal court, which ended with a dismissal on grounds of res judicata. See Grynberg v. BP P.L.C., 855 F. Supp. 2d 625, 653 (S.D. Tex. 2012), aff'd, 527 F. App'x 278, 283 (5th Cir. 2013) (per curiam). Perhaps Grynberg now regrets these litigation decisions, but he has not pointed to circumstances "so extraordinary" as to make them essentially "involuntary." Twelve John Does, 841 F.2d at 1141. And Rule 60(b)(6) "may not be employed simply to rescue a litigant

14

from strategic choices that later turn out to be improvident," Salazar, 633 F.3d at 1120, or as "an opportunity for unsuccessful litigants to take a mulligan," Kramer, 481 F.3d at 792. Grynberg's failure to pursue various avenues of appeal thus constitutes one reason to deny his Rule 60(b)(6) motion.

A party seeking relief under Rule 60(b)(6) must also show that he "has a meritorious claim or defense to the motion upon which the district court dismissed the complaint." Marino, 685 F.3d at 1080 (internal quotation marks omitted). Although this is not a high bar, id., Grynberg does not clear it. The Court's 2008 order granted defendants' motion to dismiss. The arbitration agreement that served as the foundation for the Court's decision remains in effect—and the RICO claims remain within its ambit. Assuming the Court agreed to vacate the 2008 order, on what grounds could it then deny a renewed motion to dismiss? Grynberg offers a couple—although neither provides steady footing. The first ground he provides is the alleged bias of the arbitrator. But the arbitrator has now been removed. Any revived claims sent back to the arbitration would be heard by a three arbitrator panel, selected pursuant to the settlement agreement. The arbitrator's past conduct therefore says little about the propriety of future arbitration. Grynberg also argues that the Court may simply set aside the arbitration provision itself. See Pls.' Rule 60 Mot. [ECF No. 114-1] at 33–39. But he has not cited any authority convincing the Court it can use Rule 60(b) to set aside a final judgment and an arbitration clause in one fell swoop. The arbitration clause remains in place, and as long as it does, Grynberg does not have a potentially meritorious defense to the motion upon which the Court dismissed his complaint. See Marino, 685 F.3d at 1080. That provides an independent reason to deny Grynberg's Rule 60 motion.

Relatedly, Grynberg has cited no cases where Rule 60 has been used to vacate a court order compelling arbitration. Perhaps that is unsurprising because his requested relief is in some tension

15

with the "liberal federal policy favoring arbitration agreements." <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 25 (1991) (internal quotation marks omitted). Under the Federal Arbitration Act, "judicial review of arbitral awards is extremely limited." <u>Kanuth v. Prescott, Ball & Turben, Inc.</u>, 949 F.2d 1175, 1178 (D.C. Cir. 1991). In the event his Rule 60 motion is granted, Grynberg seeks to amend his complaint to add claims akin to the audit claims still pending in the arbitration. <u>See</u> Pls.' Mem. in Supp. of Mot. to Amend [ECF No. 126-1] at 2 (discussion of proposed Count VII). In its entirety, then, Grynberg's motions seeks under Rule 60 what is generally limited under the FAA: a federal forum to litigate (or, in the case of the RICO claims, relitigate) claims that the parties have agreed to arbitrate. The Court thus hesitates to grant him that relief.

Finally, one more obstacle stands in Grynberg's path to Rule 60 relief: <u>res judicata</u>. Even if the Court were willing to vacate the 2008 order <u>and</u> Grynberg was able to escape the reach of the arbitration clause, Grynberg's RICO claims are likely still precluded. Two federal courts—a district court in Texas and the Court of Appeals for the Fifth Circuit—have already concluded that the arbitrator's dismissal of Grynberg's RICO claims is entitled to preclusive effect. Grynberg now argues primarily that preclusion based on the arbitration award would be "inequitable," but he barely disputes that the formal requirements for <u>res judicata</u> are satisfied.[5] <u>See</u> Pls.' Reply at 19–23. As long as the 2010 award remains in effect, Grynberg faces long odds in attempting to relitigate his RICO claims.

Grynberg has one response to all these arguments: the arbitrator's "extraordinary" bias and defendants' bad faith in exploiting it. In his view, the arbitrator's removal demonstrates that he

---

[5] Grynberg <u>does</u> argue that the arbitrator's 2010 award did not dismiss his RICO claims on the merits and that, therefore, the arbitral award lacks preclusive effect. This argument has already been squarely rejected in the Texas litigation. <u>See</u> <u>Grynberg v. BP P.L.C.</u>, 527 F. App'x 278, 282 (5th Cir. 2013) (per curiam); <u>Grynberg v. BP P.L.C.</u>, 855 F. Supp. 2d 625, 651–52 (S.D. Tex. 2012). This Court agrees with that analysis.

had been biased against Grynberg all along—including in 2008, when this Court dismissed the RICO claims, and in 2010, when the arbitrator dismissed them. Defendants knew it, and wielded the arbitrator's bias to thwart Grynberg whenever possible. These recent revelations, Grynberg contends, now justify forgiving his failure to challenge the dismissal of his RICO claims, rescinding the arbitration agreement, denying preclusive effect to both the arbitration award and the Texas decision, and, ultimately, vacating this Court's 2008 dismissing his claims. As discussed above, there are already a number of reasons to deny Grynberg's Rule 60 motion. For the sake of argument, however, the Court will assume that Grynberg could prevail if he could prove his allegations of bias. In the Court's view, however, he has failed to do so.

First, Grynberg has failed to show that defendants and their counsel acted in bad faith during the arbitration. Grynberg's motion is full of allegations about defendants' evil deeds. See, e.g., Pls.' Rule 60 Mot. at 25 ("wielding [the arbitrator's] bias," defendants "stonewalled" and "obstructed" discovery); id. at 26 (defendants "unreasonabl[y]" opposed removal of the arbitrator in order to "procure[] unnecessary delay"); id. ("[d]efendants . . . have taken advantage of [the arbitrator's] bias to frustrate the very purpose of arbitration" and to "delay any resolution of the case" until after Grynberg's death); id. at 30 (defendants sought to "twist [the arbitrator's] bias to their advantage"). Once the colorful language is stripped away, however, there is little left to these allegations. They essentially boil down to the following: defendants resisted discovery into certain claims, and opposed each step in Grynberg's final attempt to remove the arbitrator. Grynberg has not convincingly shown that these positions were adopted for nefarious purposes. Even assuming that some positions crossed the line from zealous into somewhat misguided advocacy, Grynberg still would not be entitled to a finding of bad faith. Cf. District of Columbia v. Straus, 705 F. Supp. 2d 14, 17 (D.D.C. 2010). Defendants' litigation conduct, moreover, cannot be evaluated in total

isolation from Grynberg's—which has been, to put it mildly, less than exemplary. The record assembled in connection with this motion paints a picture of a highly contentious arbitration. Viewed in that context, none of defendants' litigation behavior makes a "compelling showing of inequity" sufficient to justify relief under Rule 60(b)(6). Salazar, 633 F.3d at 1120.

That leaves Grynberg only the alleged bias of the arbitrator as a basis for Rule 60 relief. But this Court is not convinced that the arbitrator's 2010 award, the decision that dismissed the claim Grynberg now seeks to revive, was infected by an anti-Grynberg bias. Grynberg has spent the better part of a decade arguing that the arbitrator was biased against him. And for the better part of a decade, state and federal courts have concluded otherwise. In 2008, looking back over the first phase of the arbitration, this Court concluded there were no facts suggesting bias by the arbitrator. Grynberg, 585 F. Supp. 2d at 56. Other judicial decisions examined the period between this Court's order in November 2008 and the resumption of arbitration in September 2013, during which the arbitrator's 2010 award was issued. In August 2012, the New York Supreme Court concluded that Grynberg had "failed to establish bias on the part of the arbitrator." Aug. 17, 2012, Supreme Court Opinion [ECF No. 144-10] at 4. Grynberg subsequently sought to renew his motion, but was rebuffed again by the same Supreme Court judge. See Dec. 1, 2012, Supreme Court Opinion [ECF No. 144-11]. In May 2013, a panel of the Appellate Division similarly found Grynberg's bias argument to be "without merit." May 16, 2013, Appellate Division Opinion. Courts have also been asked to assess the arbitrator's decision to dismiss Grynberg's RICO claims. Without opposition from Grynberg, the New York Supreme Court confirmed the decision. Dec. 8, 2010, Supreme Court Opinion at 12. A federal district court and court of appeals subsequently concluded that the decision was entitled to preclusive effect. See Grynberg, 855 F. Supp. 2d at

653, aff'd, 527 F. App'x at 283.  In short, the period in which the 2010 award was issued has been closely scrutinized, by multiple courts, for arbitral bias.  No court found any.

Grynberg now argues that all those decisions have been undermined by the arbitrator's subsequent refusal to comply with the Appellate Division's mandate, his correspondence with the parties, and his decision to "assum[e] the role of [d]efendants' counsel" by raising arguments on their behalf and filing briefs before the New York courts.  See, e.g., Pls.' Rule 60 Mot. at 23–24. These transgressions, Grynberg contends, culminated in the arbitrator's subsequent removal for "misconduct and blatant bias," thus conclusively demonstrating that he was biased all along, that the 2010 award is infected by that bias, and that each of the decisions discussed above is in error. See, e.g., Pls.' Reply at 23–24.

But Grynberg misreads the record.  Fairly construed, neither of the New York courts that required the arbitrator's removal concluded that he was actually biased—either in 2014 or in the years before.  The Supreme Court opinions removing the arbitrator from the BP and Statoil arbitrations focused primarily on his professed disagreement with the Appellate Division and his notion of an arbitrator's duty.  In its first decision, after a lengthy discussion of these topics, the Supreme Court concluded that the arbitrator would be unable to "fairly make a determination" on the audit claims because "to do so would violate what he perceives to be his ethical obligations as an arbitrator."  Apr. 2, 2014, Supreme Court Opinion at 7.  In a second opinion, which covered much of the same terrain, the same judge removed the arbitrator from the Statoil arbitration in order to eliminate the "appearance of bias."  July 17, 2014, Supreme Court Opinion at 8 (emphasis added).  The Appellate Division affirmed, citing only the "arbitrator's explicit failure to follow the clear directive of this Court."  Apr. 16, 2015, Appellate Division Opinion at 2.  None of these

courts focused on the arbitrator's relationship with Grynberg, and none concluded that the arbitrator had been out to get him.

In that respect, their views are consistent with this Court's assessment of the arbitrator's conduct. The Court will not endorse the arbitrator's take on arbitral duty, his decision to defy the mandate of an appellate court, or his purposeful attempts to steer the case to the New York Court of Appeals. But it does not need to. To resolve Grynberg's motion, the Court need only determine whether the arbitrator's conduct was motivated by bias. And the Court is not persuaded that it was. The arbitrator explained, time and again, the motivation for his actions. See, e.g., 2013 Final Award at 7 ("My reason for referring the parties to the [New York Law Journal] Article was to increase the likelihood that the Court of Appeals would, at the appropriate time, correct what I believe was an erroneous [Appellate Division] Decision . . . . [M]y sole motive was to fulfill my ethical duties as an arbitrator to the arbitration process as well as to the New York courts."); id. at 14 (expressing the arbitrator's view that "it is important that the international community know that they can rely on the New York courts to follow the FAA's pro arbitration policy when they review arbitral awards"); Nov. 27, 2013, Email from Hochman to Counsel ("My only interest is that the Court of Appeals correct the errors of the [Appellate Division] sooner rather than later."); Apr. 25, 2014, Mem. to the Parties at 1 ("I am writing this memorandum in the hope that it will convince whichever court or courts hear the appeal of the [Supreme Court decision] that vacated the [2013 Final Award], and the motions of the [defendants] to confirm the [2013 Final Award], to decide the [audit claims] and Sanctions issues correctly in accordance with the applicable law."). The Court does not consider these professions of purpose to be elaborate window-dressing for bias against Grynberg. Quite simply, it seems that the arbitrator decided the case, was reversed on what he considered to be a faulty premise, and was driven to distraction trying to make it "right."

The arbitrator's most inflammatory comments, regarding the imposition of sanctions against Grynberg, must be viewed in this context.  At least part of the arbitrator's interest in sanctions after remand was due to his belief that the Appellate Division had improperly curtailed his ability to impose sanctions and his desire to push the issue to the Court of Appeals.  See, e.g., 2013 Final Award at 20 ("The Court of Appeals should correct the erroneous vacatur of the Sanctions Award because it also presents a purely legal question that is unsettled and has broad State-wide implications."); Dec. 9, 2013, Email from Hochman to Parties [ECF No. 141-21] at 3 ("It is in the interest of all parties as well as the public interest that the Court of Appeals finally determine the issue of whether arbitrators have the same authority as judges to award sanctions in appropriate cases sooner rather than later.").  Of course, the arbitrator's interest in sanctions was not purely academic.  He plainly thought that Grynberg's attempts to remove him for bias and his decision to file RICO claims in Texas following the 2010 award could warrant sanctions—and he made those observations to the parties sua sponte.  Sept. 11, 2013, Arbitration Meeting Tr. at 141:21–157:13.  The Court cannot pretend to be untroubled by this aspect of the arbitrator's conduct.  But ultimately, viewed in light of the entire record, these 2013 comments regarding Grynberg's conduct in 2011 and 2012 do not convince the Court that the arbitrator was biased in 2010, when he dismissed the RICO claims that Grynberg now seeks to revive.

## CONCLUSION

Grynberg's Rule 60 motion—filed at the end of 2015—asks for extraordinary relief: to revive RICO claims dismissed by this Court in 2008 and decided by an arbitrator in 2010.  He seeks this relief notwithstanding his decision not to appeal this Court's 2008 order dismissing his claims, his failure to challenge or seek to vacate the arbitrator's 2010 award, serious issues of preclusion, the continued existence of an arbitration agreement between the parties, and the federal

policy in favor of arbitration. In an attempt to overcome these significant hurdles to Rule 60 relief, Grynberg alleges that the arbitrator who decided his RICO claims was biased at the time of decision—and that therefore he is entitled to revive those claims in this Court and add some others still pending in the ongoing arbitration. But ultimately the hurdles are too high and Grynberg's evidence too equivocal. Like those courts to have examined the question before, this Court is not convinced that the arbitrator was biased against Grynberg in 2010 when he decided the RICO claims. For all the foregoing reasons, the Court concludes that Grynberg has failed to establish extraordinary circumstances warranting the requested Rule 60 relief. Grynberg's Rule 60 motion must therefore be denied. Because this case will remain closed, Grynberg's motion to amend his complaint will be denied as moot.

A separate Order has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: <u>September 8, 2016</u>